IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| JESSIE DOTSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| V. | ) | No. |
| | ) | |
| ZAC POUNDS, Warden, Riverbend, | ) | **CAPITAL CASE** |
| Maximum Security Institute, | ) | |
| | ) | |
| Respondent. | ) | |

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

TABLE OF CONTENTS

I.    Introduction ......................................................................................... 1

II.   Jurisdiction/Venue .............................................................................. 10

III.  Parties ................................................................................................. 10

IV.   Obstacles to Investigation and Fact Development ............................ 10

  1.  AEDPA's non-jurisdictional one-year statute of limitations and predecessor
      counsel's erroneous legal advice deprived Mr. Dotson of sufficient time to
      investigate and prepare this petition. ............................................... 12

  2.  The Memphis Police Department's original files are unaccounted for ........ 13

  3.  The Tennessee Attorney General conspired with Mr. Dotson's prosecutor Ray
      Lepone to remove the SCDAG file from the office of the Shelby County District
      Attorney General and subsequently denied access to the file to Petitioner ... 19

  4.  Tennessee Attorney General's Unconstitutional DA Intervention Bill Has
      Halted All State Court Litigation in Capital Cases ....................................... 23

V.    Habeas Rule 2 and Pleading Requirements ........................................ 29

VI.   Procedural Background ....................................................................... 30

VII.  Procedural Defenses .......................................................................... 39

  1.  Actual innocence excuses any procedural default. ......................... 39

  2.  Post-conviction procedures rendered the process ineffective to protect the
      rights of Mr. Dotson. ........................................................................ 40

  3.  The existence of multiple *Brady* claims serves as cause and prejudice to excuse
      procedural default. ........................................................................... 41

  4.  Extreme mismanagement and gross negligence by the Office of the Post-
      Conviction Defender (OPCD) constitutes cause to excuse the procedural
      default of post-conviction claims. .................................................... 41

  5.  AEDPA is unconstitutional. ............................................................. 43

  6.  Ineffective assistance of post-conviction counsel serves as cause for the default
      of Mr. Dotson's ineffective assistance of trial counsel claims. ........................ 43

VIII. Constitutional Claims for Relief ....................................................... 44

i

1. Police violated Mr. Dotson's constitutional rights throughout the duration of his interrogation, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. ................................................................................. 49

   a.   C.J. Dotson's memory was contaminated by improper law enforcement questioning ................................................................................. 49

   b.   Psychological pressure and threats caused Jessie Dotson to falsely confess. ................................................................................. 53

2.   Mr. Dotson's statement was obtained in violation of *Miranda v. Arizona*... 58

3.   The State of Tennessee destroyed evidence in bad faith. ........................... 61

4.   The prosecution suppressed exculpatory evidence in violation of *Brady v. Maryland*. ................................................................................. 78

5.   The prosecution suppressed evidence of favorable treatment and deals made with State witnesses. ................................................................... 78

6.   The prosecution failed to disclose lies, threats, promises, and other coercive interrogation methods police used to interrogate Jessie, which coerced him into making a false confession. ................................................... 79

7.   The prosecution failed to disclose that Mr. Dotson's false confession was obtained in violation of Miranda. .................................................... 82

8.   Sgt. Caroline Mason engaged in misconduct by suggesting Jessie as a suspect to C.J. and tampering with C.J.'s memory. .......................................... 83

9.   The prosecution failed to disclose C.J.'s records, including an evaluation that showed significant neurocognitive impairments. ................................... 84

10.  The prosecutor deliberately elicited testimony from Lt. Armstrong that Mr. Dotson invoked his right to counsel in violation of Mr. Dotson's due process rights................................................................................. 85

11.  Prosecutorial misconduct in closing arguments violated Mr. Dotson's due process rights. ................................................................................. 86

12.  The State intentionally schemed to induce Mr. Dotson to become frustrated and erupt on the witness stand in an effort to prey on racial prejudices of the jury................................................................................. 90

13.  The cumulative effect of the prosecutorial misconduct render Mr. Dotson's conviction and death sentence unconstitutional............................................. 92

14.   The involvement of *The First 48* denied Mr. Dotson his right to due process. ................................................................................................... 92

15.   The admission of Mr. Dotson's custodial statements violated his Fifth Amendment rights. .......................................................................... 98

16.   Mr. Dotson's due process rights were violated when law enforcement witnesses and the prosecution were permitted to comment on his invocation of the right to counsel. ..................................................................................... 99

17.   The trial court erred in failing to grant a mistrial sua sponte when Mullins testified Jessie had invoked his right to counsel. .......................................... 101

18.   The admission of testimony regarding petitioner's history of imprisonment violated his right to a fair trial. ...................................................... 102

19.   Mr. Dotson was denied due process when the Chief Justice of the Tennessee Supreme Court denied him funding for experts necessary to develop his post-conviction claims. .......................................................................... 106

20.   Counsel provided ineffective assistance of counsel in violation of Mr. Dotson's rights. ................................................................................................ 110

20.1   Counsel failed to investigate, discover, and present that Mr. Dotson's alleged confessions were coerced and involuntary and failed to file a motion to suppress those alleged confessions pre-trial. ...................... 112

20.2   Counsel failed to obtain *The First 48* footage. ..................................... 115

20.3   Counsel failed to subpoena *The First 48* crew members. .................... 116

20.4   Counsel failed to challenge the state's destruction of the unedited video recording of Mr. Dotson's interview with police and his interactions with his mother. .............................................................................. 117

20.5   Counsel failed to challenge *The First 48*'s invocation of media shield law. ................................................................................................... 119

20.6   Counsel failed to move to strike the state's death notice on the basis that Mr. Dotson was ineligible for the death penalty because of being intellectually disabled and suffering from co-morbid neurocognitive disorders, brain damage, and psychiatric illness. ................................. 120

20.7   Counsel rendered ineffective assistance by failing to develop a meaningful relationship with Jessie and his family. ............................. 121

20.8   Counsel failed to object to the trial court's use of stun cuffs. ............... 122

20.9   Counsel failed to challenge Juror Stephen Ray who admitted on voir dire that he would not be able to consider mitigation. ................................... 124

20.10      Counsel failed to exhaust peremptory challenges. ........................... 126

20.11      Counsel failed to object to death qualification of the jury, which led to the exclusion of qualified Black jurors. ............................................... 127

20.12      Counsel failed to voir dire on race and implicit bias. ....................... 130

20.13   Counsel were constitutionally ineffective in failing to investigate and present available and powerful mitigating evidence. ........................... 131

20.14   Counsel were ineffective in the use of experts. .................................. 141

20.15      Counsel were constitutionally ineffective in failing to investigate, prepare, and present his intellectual disability claim under *Atkins v. Virginia*, 536 U.S. 304 (2002). ............................................................... 150

20.16      Counsel failed to prepare Jessie to testify. .......................................... 151

20.17      Counsel failed to fully investigate, develop, or present evidence that Mr. Dotson was not competent to stand trial or to testify. ........................ 152

20.18   Counsel failed to adequately cross-examine Priscilla Shaw. ............... 153

20.19      Counsel failed to adequately cross-examine Erica Smith. ................ 154

20.20      Counsel failed to challenge C.J. Dotson's competency to testify, to prepare for his cross-examination, and to effectively cross-examine him. ..................................................................................................... 157

20.21      Counsel failed to object and move to strike inflammatory, irrelevant testimony about Sgt. Davidson's emotional distress while investigating the crime. ............................................................................................ 158

20.22      Counsel failed to effectively investigate alternate suspects identified by C.J. Dotson and to effectively cross-examine Willie Boyd Hill. .......... 159

20.23      Counsel failed to challenge Sergeant Mullins as an expert on bloodstain pattern analysis and general crime scene investigation. ................... 160

20.24      Counsel failed to object to and move to exclude Dr. Funte's testimony regarding autopsies she did not perform and about which she had no personal knowledge. ............................................................................ 161

20.25    Counsel failed to object to inadmissible testimony and stipulated to evidence that was otherwise inadmissible. ......................................... 162

20.26    Counsel failed to object or move for a mistrial after Sgt. Mullins testified that Mr. Dotson invoked his right to counsel or to raise the issue in the motion for new trial............................................................................. 162

20.27 Counsel failed to object to introduction of inflammatory photographs and stipulated to admissibility of prejudicial photographs. .......................... 163

20.28    Counsel made an improper, prejudicial admission in opening statement of sentencing hearing. ........................................................................... 163

20.29    Counsel failed to file a motion in limine to prevent prosecutorial misconduct in argument, despite the pattern and practice of the Shelby County District Attorney's Office to commit such. ............................. 164

20.30    Counsel failed to object to prosecutorial misconduct in closing argument. ................................................................................................ 165

20.31    Counsel failed to object to the anti-sympathy instruction given by the trial court following the penalty proof................................................. 166

20.32 Counsel failed to object to jury instructions that prohibited the consideration of lesser included offenses. ................................................. 166

20.33    Counsel failed to challenge reference to moral certainty in reasonable doubt instructions. ............................................................................. 171

20.34 Counsel failed to object to *Dyle* instruction regarding eye-witness identification. .......................................................................................... 172

20.35 Counsel failed to request missing evidence instruction regarding *The First 48* footage. .......................................................................................... 173

20.36    Counsel failed to raise on appeal claims of prosecutorial misconduct for eliciting the inflammatory, irrelevant testimony of Sgt. Davidson's emotional distress while investigating the crime. .............................. 175

20.37 Counsel failed to raise on appeal the jury instruction claims, above, on appeal. ................................................................................................ 176

20.38    Counsel failed to raise on appeal claims of prosecutorial misconduct for the improper and incendiary comments made during closing. .......... 177

20.39 The cumulative effect of ineffective assistance of counsel violated Mr. Dotson's constitutional rights. ................................................................ 177

21. Trial Counsel McAfee had a conflict of interest involving his representation of a high-ranking Gangster Disciple that impeded avenues of investigation and substantially impaired McAfee's performance. ............................................... 178

22. Mr. Dotson is intellectually disabled and therefore ineligible for the death penalty under *Atkins v. Virginia*. ..................................................................... 180

23. The Shelby County Jail gave Mr. Dotson psychotropic medication at the time of his trial in violation of his constitutional rights. ....................................... 187

24. Mr. Dotson suffers from co-morbid neurocognitive disorders, brain damage, and psychiatric illness, which make him ineligible for the death penalty... 187

25. In violation of his procedural and substantive due process rights, Mr. Dotson was not competent to stand trial or to testify. ................................................. 189

26. Mr. Dotson's capital sentence is unconstitutional because of racial disparity in the imposition of the death penalty. ............................................................. 190

27. The jury that presided over Mr. Dotson's trial engaged in misconduct that violated his right to trial by an impartial and unbiased jury, his right to due process and his right to individualized sentencing. ...................................... 194

28. Mr. Dotson's constitutional rights were violated by the trial court's failure to sua sponte excuse automatic death penalty juror Stephen Ray. .................. 196

29. The trial court violated Mr. Dotson's due process rights by ordering him to be placed in stun cuffs during trial without conducting a hearing or making findings that they were necessary. ................................................................. 197

30. The trial court's denigration of defense counsel in the presence of the jury violated Mr. Dotson's right to a fair trial. .................................................... 200

31. Mr. Dotson's Sixth Amendment right to confront witnesses against him was violated when the state offered testimony of a pathologist who did not perform the autopsies. ................................................................................................ 201

32. The trial court violated Mr. Dotson's due process rights in denying his motion to prohibit the display of photographs of the victims after their death........ 204

33. The trial court's denial of Mr. Dotson's motion to provide DNA analysis for all person who made contact with the crime scene compromised his efforts to present a defense. ........................................................................................... 205

34. The trial court erred in denying Mr. Dotson's motion for the production of statements of individuals not called as witnesses for the state. ................... 206

35.    The evidence was insufficient for each count of the indictment................. 208

36.    The jury instructions improperly defined reasonable doubt, reducing the burden of proof on the state in violation of the due process clause guaranteed by the Fourteenth Amendment. .................................................................... 209

37.    The anti-sympathy jury instruction violated Mr. Dotson's Eighth and Fourteenth Amendment rights......................................................................... 212

38.    The state utilized duplicative aggravating circumstances that failed to narrow the class of defendants eligible for the death penalty in violation of Mr. Dotson's due process and Eighth Amendment rights.................................... 216

39.    The trial court violated Mr. Dotson's constitutional rights by denying his motion for disclosure of information regarding the proportionality review of the imposition of the death penalty...................................................................... 218

40.    Mr. Dotson's rights to due process and to be free from cruel and unusual punishment were violated by the introduction of victim impact evidence at sentencing....................................................................................................... 219

41.    Mr. Dotson's three, forty-year consecutive sentences for the three counts of attempted first degree murder are unreasonable and violate due process of law. ....................................................................................................................... 221

42.    Mr. Dotson's death sentence is unconstitutional because he is innocent. . 221

43.    The Tennessee death penalty statutory scheme is unconstitutional. ........ 222

44.    Mr. Dotson's capital sentence is disproportionate in violation of the Eighth Amendment guarantee of freedom from cruel and unusual punishment. ... 224

45.    Tennessee's methods of execution are unconstitutional. ........................... 225

46.    Mr. Dotson's death sentence violates international law............................. 226

47.    Mr. Dotson's death sentence violates his fundamental right to life........... 228

48.    Mr. Dotson's death sentence is unconstitutional under *Hurst v. Florida*.. 228

49.    The cumulative effect of the errors recited herein render Mr. Dotson's conviction and death sentence unconstitutional........................................... 230

50.    AEDPA unconstitutionally suspends the writ of habeas corpus and abridges Mr. Dotson's Fourteenth Amendment rights under the Privileges and Immunities Clause of the Fourteenth Amendment....................................... 231

a. Judicially created restrictions on the availability of the writ have created a de facto suspension of the writ. ........................................................................... 231

b. AEDPA violates the Fourteenth Amendment's Privileges and Immunities Clause. ....................................................................................................... 236

IX.    Conclusion ................................................................................................... 239

**CERTIFICATE OF SERVICE** ........................................................................ 240

Petitioner Jessie Dotson, pursuant to all rights available under Article I § 9 and Article III of the United States Constitution; the Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. § 2201, and 28 U.S.C. § 2241 et. seq., including 28 U.S.C. §§ 2241 & 2254, respectfully moves this Court for a writ of *habeas corpus* declaring unconstitutional his six first-degree murder convictions and the resulting capital sentences, and his three attempted first-degree murder convictions and the resulting consecutive 40-year sentences.

## I.    Introduction

Jessie Dotson's wrongful conviction and capital sentence is the result of improper police tactics, prosecutorial misconduct, suppressed exculpatory evidence, false testimony, a false confession, and constitutionally ineffective assistance of counsel. The state's theory is that Jessie Dotson (a man who lives with neurocognitive deficits) killed his armed brother (a known Gangster Disciple) in a drunken argument, then killed three other adults (two of whom were armed),[1] then brutally stabbed and beat five children, two of whom tragically died.[2] And after doing all of that, he allegedly somehow staged the crime scene to make it look like the murders were the result of gang retaliation. All without getting a speck of blood on him. All

---

[1] Hollis Seals (a/k/a "E") had obtained his gun immediately upon being released from jail on March 1, 2008. Marissa Williams, the mother of 4 of the children and Cecil's sometime girlfriend, had a .9mm handgun. Cecil carried a .45 caliber handgun, a sawed-off shotgun, and an AK-47.

[2] Cecil Dotson, Jr. ("C.J."), Cedrick Dotson, and Ceniyah Dotson survived. Cecil Dotson, II ("Man Man") and Cemario Dotson died.

without leaving any of his own DNA. All without getting any of the victims' DNA on himself. All without getting so much as a scratch on his body. And all by himself. This makes no sense. As former Assistant District Attorney General Ray Lepone said, "... everybody, the one constant comment they would make is there is no way one individual did this—it's impossible." *After The First 48: Lester Street* (A&E television broadcast Aug. 11, 2011) (Season 2, Episode 3), available at https://www.aetv.com/shows/after-the-first-48/season-2/episode-3 (*After the First 48*). Lepone also admitted, "We knew that his DNA was not in there. And with a crime scene this bloody, that's going to trouble some jurors." *Id.*

This was the worst mass murder case in Memphis history. The pressure to solve the case was enormous—all the more so because a reality television cameraman with the Arts and Entertainment (A&E) Channel was embedded with the Memphis Police Department at the time. Emotions were running high. Time was running out. The TV show that was taping the entire investigation is called *The First 48*. The premise is that if a crime is not solved within 48 hours, it may never be solved. Memphis, and the world, was watching. "You don't want to let the citizens of Memphis down. They trusted us and they believed us when we said we found the person responsible for this." Lt. Toney Armstrong, *After The First 48*, Season 2, Episode 3.

In this case, we intend to prove that Mr. Dotson is innocent. We intend to prove that the Lester Street Murders, as they have come to be known because of the reality TV show, were committed as a result of gang violence and retaliation.

Cecil Dotson, the brother of Jessie Dotson, was a Gangster Disciple who had crossed multiple members of his own gang. Cecil's gang nickname was G1, and he was over the Binghampton neighborhood drug trade for the Gangster Disciples[3] in 2008. At the time, Mexican drug cartels were working with Memphis gangs, including the Gangster Disciples and Memphis Mob, to sell drugs in Memphis and throughout the United States. The Mexican cartels also had ties to brutal gangs such as the Sureños-13, Norteños, and MS-13. This unholy alliance reached a tipping point when Craig Petties was arrested in Mexico in January 2008.

In the years preceding his capture, Petties ran the Memphis Gangster Disciples drug distribution network while exiled in Mexico. His connections with the drug cartel included Edgar "La Barbie" Valdez Villareal and Joaquin "El Chapo" Guzman Loera.[4] Without Petties's physical presence in Memphis, the Memphis Gangster Disciples structure was in disarray. Members were robbing other members. Drugs and money went missing. The cartels were increasingly distressed about this lack of discipline and wanted to send a message.

---

[3] Memphis Gang structure divides the city up by neighborhood. Each neighborhood leader reports to a higher up who then reports to the Chief of Security who reports to the Governor. In 2008, the highest-ranking Gangster Disciples were Craig Petties, Clinton Lewis (a/k/a "Goldie"), Martin Lewis, Markel Vester (a/k/a "Cado" or "Kado"), Timothy Williams (a/k/a "Doc Holiday"), Rico Harris/Mickens (a/k/a "Big Brim). The Memphis Governor, Eric Brown (a/k/a "Big Easy") was killed the week before by Vice Lord Vernon Motley.

[4] A confidential informant interviewed in preparation for this filing stated that El Chapo's motto was "no child left behind."

It is well known that gangs such as MS-13, Sureños-13, and Norteños keep discipline through the threat of extreme brutality. These gangs are known for torturing those who cross them—including severing limbs and beheadings. Cecil Dotson had crossed the gang in multiple ways. As a result, a blackout—an order to kill an entire family—was ordered, and this tragedy was the result.

All the evidence pointed to the murders being a gang blackout. It is believed that the murders took place in the early morning hours of March 2, 2008. The police discovered the bodies at approximately 6:00 p.m. on March 3, 2008.  On March 3, 2008, Cecil Dotson's daughter told the police her father had stolen weapons from Doc Holiday a short time before the murders. (Doc Holiday (Timothy Williams) is a high-ranking Gangster Disciple known to be the "Governor" of Orange Mound, another Memphis neighborhood. He is also a successful rapper.) Another source told the police that Cecil Dotson, after being intoxicated, confided that he had ripped off a big-time drug dealer. Another source told the police Cecil had stolen $50,000 worth of drugs from Doc Holiday. Another witness said Cecil had been written up by the gang for having called the police on another gang member. The punishment was a DV, which stands for death violation. Lt. Armstrong stated, "After hearing that, your mind [is] going OK this is really, really getting out of control." *After The First 48: Lester Street*

On March 7, 2008—5 days after the murders—Memphis Police Chief Larry Godwin informed Lt. Armstrong that he was calling in other agencies since the Memphis Police Department had not yet made any arrests. The FBI was brought in to consult on the case and told the state that the case seemed consistent with the

work of a Mexican cartel. The defense was never given that information. Lt. Armstrong has admitted, "We felt that it might have been gang-related because of the way that the bodies were placed inside of the house. Cecil's pants were pulled down, which is a sign of disrespect from some gangs." *Id.*

Faced with losing local control of their investigation, and embarrassment on national TV, Sgt. Caroline Mason took it upon herself to try to get the oldest surviving victim, Cecil "C.J." Dotson Jr., to name the suspect. Sgt. Mason was not trained in proper techniques for questioning children. Qualified experts had already been brought in, and C.J. had named "Cassandra," "Roderick," and a man in a bloody mask as the assailants. He also said the "other baby mama" was there. As will be described in detail, the other baby mama is Erica Smith, whose actions leading up to and after the discovery of the bodies are inherently suspect.

C.J., who suffered a traumatic brain injury and had a pre-existing neurological disorder, was on a mixture of mind-altering medications when Sgt. Mason went to question him on March 7, 2008. Records reveal he was prescribed fentanyl, morphine (IV), propofol (IV), and hydrocodone. Nevertheless, Sgt. Mason got C.J. to say that the person who did this was "Junior," and to repeat the allegation on tape. Four days later, Linda Steele, a national expert in forensic interviewing of children, attempted a forensic interview of C.J. and concluded he was not yet ready to provide reliable information. Her report was never provided to defense counsel and, in fact, has yet to ever be turned over. C.J.'s treating psychologist opined that C.J.'s memory was not reliable, but the defense was not provided this information.

Based solely on this one, unreliable statement from a severely injured and heavily medicated child, the police decided to abandon all efforts to investigate the involvement of gangs in this crime. Instead, the entire focus turned to Jessie Dotson, whose nickname is "Junior." Jessie was immediately detained. His ankle was handcuffed to the chair in the large interrogation room in the homicide division of the Memphis Police Department. Over the course of seven hours, a sleep-deprived and psychologically manipulated Jessie Dotson repeatedly told the detectives he is innocent. Dotson was also deprived of food during the interrogation. He invoked his right to silence but was ignored.

In the words of Lt. Armstrong, "We are going to go hard at Jessie tonight." *The First 48: Lester Street* (A&E television broadcast July 15, 2008) (Season 7, Episode 6), available at https://www.aetv.com/shows/the-first-48/season-7/episode-6. And they did. Over the course of the evening, Lt. Armstrong threatened to arrest Jessie's mother, Priscilla Shaw, and sister, Nicole Dotson. He threatened to kill Jessie. He threatened to put Jessie in general population with the Gangster Disciples in the jail at 201 Poplar and let them kill him. He lied to Jessie and told him that they had Jessie's footprints in blood at the scene. He made promises to Jessie but told him he had to hurry, or else Lt. Armstrong couldn't help him. And then, he repeatedly played the tape of C.J. saying that Jessie did it. Jessie broke. He confessed. His barebones confession is not consistent with the crime scene evidence and does not contain any information that was not already known to the family or fed to Jessie through the

interrogation. Dr. Richard Leo, the foremost expert in false confessions, will tell this court in later filings that Jessie's confession is a classic example of a false confession.

Jessie's entire interrogation was taped. It was taped by *The First 48* field producer Isaac Mathes. *The First 48*'s lawyers claim that all raw footage of the confession has been destroyed. But they have never said so under oath, and in the follow-up episode, aired after the trial, never-before seen footage was included. *The First 48* claims journalistic privilege as an excuse for destroying this evidence.[5] But once *The First 48* signed the contract with the Memphis Police Department and was granted access that no news outlet is permitted—and that is prohibited by Tennessee law—they became an agent of the state. Their destruction of this tape, if it is indeed destroyed, was state action and it deprived Mr. Dotson of critical proof that his confession was coerced.

Further, during the course of the investigation for this petition, we learned that the Memphis Police Department independently taped Mr. Dotson's interrogation, though it continues to deny having done so. *The First 48* field producer, Mr. Mathes, explains in a declaration that film footage of Mr. Dotson's interrogation by Lt. Armstrong, where the vantage point is directly at Mr. Dotson, is footage he filmed of the video *that the Memphis Police Department made* of Mr. Dotson's interrogation. Meaning the Memphis Police Department also filmed the interrogation. Mr. Dotson was entitled to this tape at trial and is entitled to this tape

---

[5] As discussed below, *The First 48* does not qualify as a news organization that is protected by journalistic shield laws.

now. The suppression of the tape materially harmed Mr. Dotson at trial, as his attorneys were left with Mr. Dotson's word versus that of Lt. Armstrong,[6] who had been promoted to Deputy Director because of his work on this case.

After he broke down and told Lt. Armstrong what he wanted to hear, Jessie invoked his right to counsel. During the overnight interrogation, Jessie repeatedly asked to speak with his mother. After invoking his right to counsel, the police brought Jessie's mother to the station. They told her Jessie had confessed. They told her that the victims' blood was on Jessie's shoes (it was not). Then, they sent her in to get more information from Jessie. All the while the cameras for *The First 48* were running. Jessie told his mother the police were trying to pin the case on him. She became visibly upset and began to speak loudly. Afraid the police would arrest his mother, as they threatened to do before, Jessie repeated his false confession to her.

The trial of Jessie Dotson lasted for two weeks. Sgt. Anthony "Tony" Mullins, who processed the crime scene, was on the stand for three days. At no time did he reveal the crime scene was videotaped by law enforcement. A recent discovery shows a photograph of a crime scene officer with a video camera in his hand at the crime scene. This video has never been disclosed. *The First 48*'s Isaac Mathes also video-taped the crime scene and that tape similarly has never been disclosed. Crime scene

---

[6] Armstrong was later promoted to Director. He left the position upon the election of Mayor Strickland and is now head of security for St. Jude's Hospital. For purposes of this petition, we will refer to law enforcement officers using the titles they held at the time of the investigation.

video is crucial—particularly where the defense is that the crime was committed by gang members, while the state maintains a single person is responsible.

During his three days of testimony, Sgt. Mullins testified about the large quantities of blood at the scene, the blood spatter that was everywhere, the number of shell casings and bullets recovered. Not a single item from the crime scene could be linked to Jessie Dotson, save fingerprints on a beer can–which is unsurprising since it was his brother's house. No DNA, no hair, no fiber, no trace evidence, no footprints, no eyewitness, no confidential informant, nothing whatsoever. At trial, 468 exhibits were introduced, and not even one points to Jessie Dotson as the perpetrator. Unaccounted for to this day are a backpack, bandana, photographs of Cecil Dotson and high-ranking Gangster Disciples, and live 9mm and .380 ammunition. All of this evidence was discovered on March 7, 2008, by a gang expert from the Organized Crime Unit who was brought in to identify evidence of gang activity at the crime scene. Inexplicably, there are no evidence receipts for any of this evidence, which was flagged as evidence of gang activity.

This introduction is the tip of the iceberg. To this day, hairs found in the fingers of Marissa Williams—as if pulled from the head of her assailant, remain untested. Jessie Dotson is excluded as a contributor to the hairs. Hairs found in the blood on the thigh of Shindri Roberson, come from an unknown origin. DNA from fingernail scrapings have not been matched, though Jessie Dotson is excluded as the contributor.

Further substantial constitutional errors exist, including that Mr. Dotson is ineligible for the death penalty due to an intellectual disability and that trial counsel's penalty phase defense was constitutionally ineffective. Multiple instances of *Brady* violations and ineffective counsel occurred. Nothing is more unjust than the incarceration of a man who is actually innocent. Such is the case here.

## II.    Jurisdiction/Venue

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in Tennessee's Western District. 28 U.S.C. § 2241(d).

## III.    Parties

Petitioner Jessie Dotson is an inmate of the Tennessee Department of Corrections (TDOC). Mr. Dotson's TDOC number is 00241710. The TDOC currently houses Mr. Dotson in Unit 2, Riverbend Maximum Security Institution (RMSI), 7475 Cockrill Bend Industrial Road, Nashville, Tennessee, 37209.

Respondent, Zac Pounds, is the RMSI Warden and an agent of the state. Warden Pound's address is Riverbend Maximum Security Institution, 7475 Cockrill Bend Industrial Road, Nashville, Tennessee, 37209.

## IV.   Obstacles to Investigation and Fact Development

Undersigned counsel and Mr. Dotson have faced numerous obstacles in the investigation and preparation of this petition. These obstacles include the fact that undersigned counsel had less than six months to investigate and prepare this petition; predecessor counsel failed to inform Mr. Dotson of the federal statute of limitations and the impact on their failure to file a post-conviction petition in time to stop the federal clock; undersigned counsel has been denied access to critical files and

interviews of law enforcement witnesses; and the State Attorney General's Office conspired with the trial prosecutor, Ray Lepone, who was in the process of negotiating a job with the State Attorney General, to remove the original Shelby County District Attorney General's (SCDAG) file from the local district attorney general's office to the State Attorney General's Office against the long standing policy of the SCDAG and without the knowledge or consent of Shelby County District Attorney General Steven Mulroy. Thereafter, the Tennessee State Attorney General refused counsel's request to view the file. Additionally, the Tennessee State Attorney General proposed, drafted, lobbied for, and shepherded a bill to intervene in capital post-conviction cases, stripping authority from local DAs in the criminal courts in death penalty cases. This bill has been ruled unconstitutional and the state AG has appealed the decision. The impact has been to halt all post-direct appeal state capital cases in the State of Tennessee until the issue can be finally resolved on appeal. Thus, there is no active mechanism for Mr. Dotson to seek the assistance of the Shelby County Criminal Court to develop or exhaust claims or seek access to files because the issue of who represents the state in such proceedings is in flux. His intellectual disability claim also remains stayed, pending the resolution of that litigation. These obstacles will be discussed more in detail below.

1.    **AEDPA's non-jurisdictional one-year statute of limitations and predecessor counsel's erroneous legal advice deprived Mr. Dotson of sufficient time to investigate and prepare this petition.**

Federal habeas petitioners have one year in which to file their Petition for Writ of Habeas Corpus. 28 U.S.C. § 2244(d)(1).[7] "The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C.A. § 2244(d)(2). Undersigned counsel were appointed to represent Mr. Dotson on August 3, 2023. Because of the inordinate amount of time used by predecessor counsel to properly file a petition for post-conviction relief, undersigned counsel were left with less than six months on the federal statute of limitations clock in which to file this Petition. Predecessor counsel did not explain to Mr. Dotson the consequences of using up so much of his federal statute of limitations on the front end of state filing. This is particularly significant because Tennessee law allows multiple, liberal amendments to post-conviction petitions, including up to the day of evidentiary hearings—such that predecessor counsel could have filed, stopped the clock, then amended the petition once further investigation necessitated such. A pro se post-conviction petition suffices to stop the statute of limitations. Moreover, it appears that predecessor counsel was under the impression that the currently pending petition to determine that he is ineligible to be executed on the basis of his intellectual disability pursuant to state statute in Shelby

---

[7] The statute of limitations is not jurisdictional and allows for equitable tolling.

County Criminal Court is grounds to toll the federal statute of limitations. There is no case law to support that contention. This petition is timely filed. However, Mr. Dotson has been deprived of six months of his federal statute of limitations due to predecessor counsel's deficient performance.

The statute and rules permit habeas petitions to be amended. Petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C.A. § 2242. Counsel will diligently seek a scheduling order for discovery and amendment.

### 2. The Memphis Police Department's original files are unaccounted for.

On November 28, 2023, undersigned counsel Ms. Kelley Henry and investigator Ben Leonard met in-person with Ruth Murray, who is the records custodian for Central Records at the Memphis Police Department. It is customary practice to request Memphis Police Department files through Ms. Murray and Central Records. Central Records is responsible for maintaining the original Memphis Police Department files. Ms. Murray instructed Ms. Henry and Mr. Leonard that the request in this case should go to Sgt. Brownlee who is the Public Information Officer and Legal Liaison for the Memphis Police Department. Ms. Henry and Mr. Leonard went directly to the 11th floor of 170 N. Main Street and made contact with Sgt. Brownlee. Sgt. Brownlee instructed Henry and Leonard to put the request in an email and he would "take care of it." Ms. Henry immediately sent an email stating:

> Sgt. Brownlee,
>
> This email is to request copies of all records maintained by the Memphis Police Department relating to the investigation of the

13

homicides and assaults which occurred at 722 Lester Street, Memphis, TN. The call out to the scene was on 3/3/2008, but it is believed that the homicides/assaults occurred on 3/2/2008. The victim's names are Cecil Dotson, Sr., Marissa Williams, Hollis Seals, Shindri Roberson, Cecil Dotson, Jr., Cecil Dotson II, Cemario Dotson, Cedrick Dotson, Ceniyah Dotson, Jessie Dotson was convicted for these crimes in 2010. I have been appointed to represent Mr. Dotson by the United States District Court for the Western District of Tennessee to investigate and prepare a Petition for Writ of Habeas Corpus which has a due date of January 22, 20024. This request is in aid of my appointment to represent Mr. Dotson. I have copied my lead investigator, Ben Leonard, and chief paralegal, Satyra Deaver, who are assisting me with this case.

Should you have any questions, I can be reached at the numbers below (cell is best). Thank you for your kind attention to this matter.

Sgt. Brownlee forwarded Henry's email to Sgt. Mullins, Lt. Brian Beasley, Lt. William Acred, Lt. Marcus Frierson, and Ms. Murray with instructions to, "see the forwarded email and assist Central Records so they can have access."

On December 15, 2023, Ms. Henry followed up with a request to Sgt. Brownlee to ascertain the status of the outstanding request. Sgt. Brownlee emailed the same distribution group this time saying, "Please provide an update on this one." On January 3, 2024, Ms. Henry sent a letter to Memphis Police Chief, Cerelyn "C.J." Davis. The letter stated:

Dear Chief Davis:

I am writing to seek your assistance in my investigation on behalf of my client, Jessie Dotson. The United States District Court for the Western District of Tennessee appointed me to represent Mr. Dotson in his federal habeas corpus proceedings. Our statute of

limitations deadline is January 22, 2024.[8] In furtherance of our court-ordered obligation to investigate Mr. Dotson's case my investigator and I met with Sgt. Louis Brownlee in person at his office on November 28, 2023, to seek guidance on obtaining necessary information for our investigation. Sgt. Brownlee asked that we put our request in an email. We sent the email within an hour of our in-person meeting and Sgt. Brownlee immediately forwarded the email to Lt. Anthony Mullins, Lt. Brian Beasley, Lt. William Acred, and Lt. Marcus Frierson directing them to assist Ms. Murray in Central Records to provide access to the records we were seeking. The specific request was as follows:

> This email is to request copies of all records maintained by the Memphis Police Department relating to the investigation of the homicides and assaults which occurred at 722 Lester Street, Memphis, TN. The call out to the scene was on 3/3/2008, but it is believed that the homicides/assaults occurred on 3/2/2008. The victim's names are Cecil Dotson, Sr., Marissa Williams, Hollis Seals, Shindri Roberson, Cecil Dotson, Jr., Cecil Dotson II, Cemario Dotson, Cedrick Dotson, Ceniyah Dotson, Jessie Dotson was convicted for these crimes in 2010. I have been appointed to represent Mr. Dotson by the United States District Court for the Western District of Tennessee to investigate and prepare a Petition for Writ of Habeas Corpus which has a due date of January 22, 20024. This request is in aid of my appointment to represent Mr. Dotson. I have copied my lead investigator, Ben Leonard, and chief paralegal, Satyra Deaver, who are assisting me with this case.

After receiving no response to our request, we followed up with Sgt. Brownlee on December 15, 2023. Sgt. Brownlee immediately forwarded my email to the same individuals, stating "All, please provide an update on this one." To date, we have received no

---

[8] This date is a typographical error. The deadline for filing is January 26, 2024.

further communication from anyone at MPD responsive to our request.

I request that you intervene to ensure that we receive the requested information in a timely manner. Any information withheld from us now, but discovered after the statute of limitations deadline, will present serious consequences for my client.

In addition to the request for records above, we request that you make the following MPD employees available for interview: Lt. Anthony Mullins, Lt. Caroline Mason, Sgt. Rick Davison, Sgt. Connie Justice, Sgt. Vivian Murray, Sgt. Bill Ashton, Sgt. Debo Carson, Sgt. Larry Carson, Sgt. Connie Justice, Officer Alex McCollum, Sgt. W.D. Merritt, Sgt. Vivian Murray, Sgt. David Parks, Sgt. Bart Ragland. I do apologize if I have misstated any individuals ranks.

As we have less than three weeks to file our petition, I ask for your reply no later than close of business on January 10, 2024.

Should you have any questions or concerns, I can be reached at kelley_henry@fd.org or 615-337-0469.

Thank you in advance for your prompt attention to this extremely important matter.

Within an hour of emailing this letter, Senior Legal Counsel with the Memphis Police Department Jimmy Thomas telephoned Ms. Henry. Mr. Thomas told her that she had been dealing with the wrong people and that he would look into getting a response. A meeting with Mr. Thomas was scheduled for January 4, 2024. The in-person meeting took place at Mr. Thomas' office in Memphis. Mr. Thomas assured Henry and Leonard that he would do everything he could to gather the records, but that interviews of police department personnel were not likely because, "You know their attitude is they will talk to you on the stand." Ms. Henry said, "That's fine. I

16

just need it in writing so that I can request depositions from the Court." A follow-up meeting was scheduled for the following Thursday, January 11, 2024, where Mr. Thomas stated that he would gather all that he could. Various phone calls and text messages ensued. Mr. Thomas called Ms. Henry on January 11, 2024, and stated that Assistant Shelby County District Attorney General Paul Hagerman stated that we [Dotson's federal team] already had the file because we had the DA file. Henry told Mr. Thomas that was not the case and followed up with an email to DA Mulroy and ADA Hagerman stating:

> Steve and Paul:
>
> I spoke with Jimmy Thomas at MPD this morning regarding our outstanding request for records in the Dotson case. Mr. Thomas stated that Mr. Hagerman told him that my office has already obtained a copy of the SCDAG file through a TPRA request. This is inaccurate. Perhaps you were mistakenly thinking about the recent disclosure of the jury tampering investigation? As Steve knows, Ray Lepone gave the original SCDAG file to Nick Spangler at the AG's office. I had previously raised concerns about any SCDAG file leaving the SCDAG custody with Steve, who in front of Ray and a number of other witnesses assured us that the originals would remain in the custody of the SCDAG. This has been the policy of the SCDAG for the 24 years I have practiced here. So it unusual for the file to leave the office. As I understand it, Steve requested the file be returned to your office but that request was denied.
>
> Mr. Thomas seemed to be under the impression that Mr. Hagerman was warranting that my office has received everything we need from MPD from your office. He also claims that the entire MPD file was given to the SCDAG. This would also be a departure from the practice in Memphis and Shelby County. Whatever the case may be, I can assure you we do NOT have the entire MPD file. Important supplements are missing, as well as Safe Streets

17

Task Force reports. The TN AG has refused to make the file available for review.

Mr. Thomas indicated that he will continue to search for the electronic files which may exist. But, I wanted to correct any possible misbelief about what my office has received through TPRA. Our statute of limitations runs on Jan. 22 and our request to the MPD has been outstanding for some time. We would appreciate your cooperation in assisting us in getting these records in a timely manner.

Mr. Hagerman responded:

Was [not] aware of any of that. [I] was told that the file had been subject of a public records request which is traditionally how attorneys get the file for collateral reviews. [I] do not know what you have received or not received (other than the flash drive [I] gave you).[9] [So] if [I] gave anyone the wrong impression etc., that is on me.

On January 12, 2024, Ms. Henry followed up with Mr. Thomas who said that the electronic files still in existence on the server were due to be on his desk that afternoon, and he would need to redact them. He stated he would let Ms. Henry know when they were ready. On Tuesday, January 16, 2024, Ms. Henry contacted Mr. Thomas to check on the records. Mr. Thomas stated that the records were ready and asked if they could be picked up. Ms. Henry asked if the Memphis Police Department had the ability to scan and upload the records to a Dropbox folder since Memphis and Nashville had experienced record snowfall and Henry and Leonard were in Nashville.

---

[9] Mr. Hagerman did disclose audio recordings with jurors who had been interviewed after an online allegation of jury tampering in the Dotson case surfaced. In reliance on the recordings provided by Hagerman, a jury tampering claim is not raised in this petition. Should new evidence come to light, Mr. Dotson reserves the right to amend this petition to add such a claim.

Mr. Thomas stated they could not. Henry and Leonard then traveled to Memphis that same day and retrieved 153 pages of printed supplements. Mr. Thomas explained that the printed supplements were all the Memphis Police Department had to produce. Mr. Thomas stated Lt. Mullins represented to him the original file was given to the Shelby County District Attorney General's Office. Based on counsel's experience and training, this is a departure from the business practice of the Memphis Police Department to maintain the originals in Central Records. Important supplements, Safe Streets Task Force Reports, videotapes, audiotapes, and statements remain missing and unaccounted for.

3.   **The Tennessee Attorney General conspired with Mr. Dotson's prosecutor Ray Lepone to remove the SCDAG file from the office of the Shelby County District Attorney General and subsequently denied access to the file to Petitioner.**

The longstanding policy of the SCDAG office is that the original of its file shall not leave the office. This policy has been in place through multiple administrations. The policy makes sense because it protects the chain of custody and integrity of the file when claims are raised under *Brady v. Maryland* and its progeny. Former Deputy District Attorney General Ray Lepone is aware of this policy. Mr. Lepone was the lead prosecutor in the trial of Mr. Dotson's case. He publicly decried the election loss of his former boss, Amy Weirich, in a social media post on the night of the election. Julia Baker and Alicia Davidson, *Steve Mulroy Defeats Amy Weirich in District Attorney Race*, The Daily Memphian, August 5, 2022 (Lepone compares the loss to watching the train coming down the track toward a loved one. "The last post as your

19

Deputy DA. I hope you turnaround and see the train and vote before the end of the day tomorrow.").

The SCDAG, and Weirich in particular, have been the subject of multiple court rulings finding prosecutorial misconduct and intentional suppression of exculpatory evidence. This track record of misconduct led to Weirich's overwhelming defeat.

As it happens, it was not Lepone's last day in the office. Newly elected DA Mulroy kept Lepone on in the position of second-in-command. In that position, Lepone was present at a meeting in March 2023, where undersigned counsel, Ms. Henry, specifically requested DA Mulroy to resist any attempt to remove original files from the DA's office. Also present were Assistant Shelby County District Attorneys General Lorna McClusky and Gerald Skahan, Assistant Federal Public Defenders Richard Tennent and Amy Harwell, and Federal Public Defender Investigator Ben Leonard. The subject of the meeting was two upcoming court dates in capital cases. Mulroy informed undersigned counsel that due to proposed legislation that would strip him of power in these cases, discussed in section IV.4 below, he could not move forward until the legislation was resolved. Of particular concern to Ms. Henry was language in the proposed bill about cooperation between the local DA and the state AG, including access to files. Ms. Henry raised the issue and asked DA Mulroy to please maintain chain of custody on all Shelby County death penalty cases and keep the files in the office to maintain file integrity. DA Mulroy assured Ms. Henry that he would continue to enforce the longstanding policy of keeping originals in the office.

On July 13, 2023, Ms. Henry informed Jessica Indingaro, Special Assistant to DA Mulroy, that she anticipated being appointed to represent Mr. Dotson, whose appeal had been recently denied by the Tennessee Supreme Court. On July 15, 2023, Ms. Henry learned that the SCDAG's office was planning to hand over its original files to the state AG. Ms. Henry immediately called DA Mulroy to remind him of the March conversation and the importance of the integrity of the files. Mr. Mulroy responded that he believed that his office was only providing copies and he would check with Mr. Lepone to confirm. The morning of July 17, 2023, Nick Spangler with the Tennessee State Attorney General's Office took custody of the original SCDAG file in the Dotson case and other Shelby County Capital cases. Ms. Henry verbally complained to Ms. Indingaro who said the decision had been made "at the Ray level." Ms. Henry complained to Steve Mulroy that same morning. Mr. Mulroy informed Ms. Henry in a text message, "I didn't realize we were sending out originals. I told Ray that as of this morning, the law is unconstitutional. No more original files to leave our office. AG can of course get copies upon request." It is Ms. Henry's understanding that AG Mulroy requested the originals of the SCDAG's files be returned and that request has not been honored.

Two weeks later, on August 3, 2023, Ray Lepone announced that he would be leaving the SCDAG to take a job with the state AG. It is reasonable to assume that he was in the process of applying for his new position when he handed over the original of Mr. Dotson's file to the TN AG without consulting AG Mulroy.

A request on Mr. Dotson's behalf to view the file made to the Tennessee Attorney General's office was denied.

The Memphis Police Department maintains that its original file is contained within the SCDAG file, which is now in the possession of the state AG. In 24 years of practice in capital cases arising out of Shelby County prosecutions, this is the very first time in undersigned counsel Ms. Henry's experience that the Memphis Police Department has claimed to have turned over all of their files to the SCDAG.[10] Now those files are with the state AG's office and remain hidden from Mr. Dotson.

Critical evidence in this case remains missing. Further, there is a good faith basis to believe that state witnesses such as Willie Boyd Hill (a potential suspect) and Erica Smith (another suspect) were given deals in exchange for their testimony. The state's actions have impeded Mr. Dotson's ability to investigate and prepare his petition for writ of habeas corpus. Counsel for Mr. Dotson will seek leave of court to issue subpoenas to continue their investigation. As of January 26, 2024, this pleading is filed based on what has been gleaned from investigation, including interviews of

---

[10] MPD Legal Counsel Jimmy Thomas did provide counsel with a 153-page printout of electronic files. Critical police reports remain missing.

three Gangster Disciples with knowledge of the events, but who wish to remain anonymous for fear of retaliation.[11]

### 4. Tennessee Attorney General's Unconstitutional DA Intervention Bill Has Halted All State Court Litigation in Capital Cases

The Tennessee Attorney General drafted, lobbied for, and shepherded a bill designed to strip lawful jurisdiction away from local district attorneys general and did so using the clandestine caption bill process of the state legislature. Public records show the following chain of events.

On November 29, 2022, an urgent email was sent from the executive assistant of Tennessee Attorney General Jonathan Skrmetti's Chief of Staff Brandon Smith, stating that a meeting regarding the intervention bill needs to happen ASAP. The email references the necessary attendees as Brandon Smith and Lacey Mace, Executive Counsel at the TN AG's office. The email is to Leslie Price, Senior Deputy of the Criminal Justice Section of the TN AG's office. Ms. Price copies Zach Hinkle, Associate Solicitor General, who at the time was handling cases with pending execution date requests.

---

[11] Members of the Gangster Disciples also threatened physical harm to the trial team resulting in a security detail being provided to some members of the team. We are awaiting answers to public records requests regarding the extent and source of the threats. TPRA requests have been sent to the Memphis Police Department, Shelby County Sheriff's Department, and the Shelby County District Attorney General's Office. The Memphis Police Department has responded that they have no records responsive to the request.

On January 30, 2023, a caption bill that claimed to address the backlog of untested rape kits was filed in the Tennessee House of Representatives. House Bill 1002. This caption bill was always intended to be used as a stealth vehicle for what the TN AG calls "our intervention bill." On February 2, 2023, the companion caption bill was filed on the state Senate side by newly elected state Sen. Brent Taylor, a vocal opponent of Steve Mulroy. Senate Bill 1500.

On March 2, 2023, TN AG Chief of Staff Brandon Smith has a telephone call about the bill with Erin Merrick, Chief Legal Counsel to Governor Bill Lee.

On March 10, 2023, which is a Friday, Deputy Chief of Staff Kaki Carrigan emails Leslie Price to let her know that a meeting to discuss the bill has been set for Monday, March 13, 2023. Present will be Speaker Cameron Sexton, Leader William Lamberth, Chairman Bud Hulsey, and Chairman Clay Doggett. Brandon Smith will also attend. Leslie Price asks for Zach Hinkle and Ron Coleman to attend as well. Per the meeting invitation which is sent at 10:52 AM on March 10, attendees at the "Meeting at Speaker Sexton's Office re Intervention bill" will include Deputy Chief of Staff and Senior Counsel Clark Hildabrand, Chief of Staff Brandon Smith, Deputy Chief of Staff Kaki Carrigan, TN AG Spokeswoman Leigh Ann Apple Jones,[12] TN AG Assistant Director of Legislative Affairs Matthew Cook, Leslie Price, Zach Hinkle, and Ron Coleman.

---

[12] Jones is now a lobbyist.

| | |
|---|---|
| **From:** | Brandon J. Smith on behalf of Melissa Smith |
| **To:** | Clark Hildabrand; Melissa Smith; Brandon J. Smith; Kaki Carrigan; Leigh Ann Apple Jones; Matthew Cook; Leslie Price; Zachary T. Hinkle; Ronald L. Coleman |
| **Subject:** | FW: Meeting with Speaker Sexton"s Office re Intervention bill |

-----Original Appointment-----
From: Melissa Smith <Melissa.Smith@ag.tn.gov>
Sent: Friday, March 10, 2023 10:52 AM
To: Melissa Smith; Brandon J. Smith; Kaki Carrigan; Leigh Ann Apple Jones; Matthew Cook; Leslie Price; Zachary T. Hinkle; Ronald L. Coleman
Subject: Meeting with Speaker Sexton's Office re Intervention bill
When: Monday, March 13, 2023 2:00 PM-2:30 PM (UTC-06:00) Central Time (US & Canada).
Where: CHB 600

On March 13, 2023, the TN AG delegation meets to strategize before the meeting with Sexton. At 2:00 on March 13, 2023, the meeting between the AG delegation and House leadership takes place. Late in the evening on March 13, 2023, the rape kit captioned bill is amended to include the language written by the TN AG to strip jurisdiction from local DAs in capital cases post-direct appeal. Nothing in the bill addresses the shameful backlog of rape kit testing.

On March 15, 2023, the TN AG Jonathan Skrmetti texts his Chief of Staff, Brandon Smith asking:



On March 29, 2023, Brandon Smith texts Erin Merrick saying that he wants to talk about a bill coming her way. "The capital case intervention bill should be headed your way, if it is not already there." Also on March 29, 2023, Assistant Director of Legislative Affairs Matthew Cook provides an update on the status of the intervention bill.

From: Matthew Cook <Matthew.Cook@ag.tn.gov>
Sent: Wednesday, March 29, 2023 2:03 PM
To: Brandon J. Smith <Brandon.Smith@ag.tn.gov>
Cc: Kaki Carrigan <Kaki.Carrigan@ag.tn.gov>
Subject: Intervention Bill - SB1500/HB1002

### SB1500 Taylor/HB1002 Lamberth – Intervention Bill

SENATE:
- Passed out of Judiciary committee quickly. Vote 6 Y – 1 N.
- Amendment 006336. DA amendment.
- Has not been calendared on the floor yet. My guess is next week: Monday or potentially Thursday.

HOUSE:
- Passed out of Sub and Full committees quickly.
  - Sub: Rep. Hardaway (Memphis) only Rep. to ask questions.
  - Full: No discussion.
- Amendment 005770. Not the DA change.
- Calendared on the floor for Thursday. Item #9.
  - Lamberth said he is going to substitute House bill with Senate bill.
    - This means Lamberth might roll the bill to wait on the Senate to pass first and substitute on the House side.
    - Or, he will pass the bill. The Senate will reject the House bill. Pass their version. And Lamberth would then have to accept the Senate version at that point.
      - Obviously, this version is more involved.


MC

**Matthew Cook**
Assistant Director of Legislative Affairs
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
O: 615-687-7099
Matthew.cook@ag.tn.gov

On March 30, 2023, TN AG Jonathan Skrmetti thanks Brandon Smith in reference to the intervention bill passing the House chamber for "making that happen so quickly and smoothly."

On April 10, 2023, Matthew Cook notes the intervention bill is on the Senate Calendar and he will "give Senator Taylor a call soon for a refresher[.]"

The bill passed the state Senate Chamber on April 10, 2023. The Senate's version cleared the House Chamber on April 17, 2023, and was transmitted to the Governor on April 18th. On May 1st, the bill was signed into law and immediately challenged. Nearly every death penalty defendant in the state of Tennessee who had a case pending in the criminal courts challenged the law as unconstitutional. As of July 17, 2023, the law was declared unconstitutional. *McKay v. State*, Shelby Cnty. Crim. Ct Case Nos. B87597 and B87598 (Jul. 17, 2023). The State of Tennessee appealed that decision, essentially grinding all capital cases to a halt. The *McKay* case is currently pending in the Tennessee Court of Criminal Appeals, and most capital cases pending in state court have been stayed pending resolution of that case.

This unconstitutional bill, written and lobbied for by the TN AG, has served as an impediment to Mr. Dotson, as he cannot access the state criminal courts for purposes of seeking access to sealed records, exhausting new claims, to request subpoenas for records, or to seek access to the original file being held in secret in the TN AG's office.

Mr. Dotson's Petition to Determine Ineligibility To Be Executed Pursuant To Tenn. Code Ann. § 39-13-203, Tennessee's intellectual disability statute, remains stayed pending the outcome in the *McKay* Case.[13]

Mr. Dotson maintains that the above-described actions constitute external impediments to his ability to investigate and present his claims in support of habeas

---

[13] The appeal in McKay's case raises similar, but not identical challenges to the AG's authority to appear in Mr. Dotson's intellectual disability case.

relief within the one-year statute of limitations, as the appeal in the *McKay* case will not be final prior to the January 26, 2024, deadline for Mr. Dotson. Mr. Dotson should receive equitable tolling and be permitted to amend his petition with new evidence or claims that may come to light after he is permitted to engage in discovery.

## V.    Habeas Rule 2 and Pleading Requirements

As noted in Section IV, this petition was prepared under extremely difficult circumstances. Every effort has been made to fully comply with Rule 2 of the Rules Governing § 2254 Cases in the United States District Courts. This petition adheres to the advice of Professors Hertz and Liebman:

> Although the Habeas Rules do not require that every item of relevant evidence or every relevant legal authority be catalogued in the pleading, **especially given that many of the relevant facts may not surface until fact-development proceedings (for example, discovery and a hearing) are made available**, the rules do require that the petitioner include in the statement of each claim enough supporting facts to distinguish it from claims of its generic type, and to justify a decision for petitioner **once the alleged facts are proven**.

Randy Hertz & James S. Liebman, 1 *Federal Habeas Corpus Practice and Procedure*, 7th ed., § 11.6 (2023) (footnotes omitted) (emphasis added). Professors Hertz and Liebman also counsel that facts in a habeas petition should be pled in summary form. Lengthy legal argument is not necessary to plead a claim. Petitioner need only plead a colorable claim (an extremely low bar) to satisfy Rule 2. Each fact pled in this verified petition is pled on information and belief based on investigation, review of the record, and counsel's own experience in litigating cases. Counsel intends to seek vigorous discovery in light of the many obstacles to fact development discussed in Section IV.

29

Mr. Dotson is indigent and incarcerated on death row. As detailed below, he lives with neurocognitive deficits. Counsel have been appointed to assist him in the preparation of this petition, but Mr. Dotson wishes to make it clear that he waives no constitutional claims. Every effort has been made to uncover and plead facts which establish his entitlement to relief. Should the court find any defect in pleading, it is respectfully requested that counsel be permitted to cure the defect.

## VI.   Procedural Background

In the Criminal Court for Tennessee's 30th Judicial District, Shelby County, a jury convicted Jessie Dotson of six counts of premeditated first-degree murder and sentenced him to death, and three counts of attempted first-degree murder, for which he was sentenced to three consecutive 40-year sentences.

On direct appeal, the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court affirmed Mr. Dotson's conviction and death sentence. *State v. Dotson*, No. W2011-00815-CCA-R3DD, 2013 WL 4728679 (Tenn. Crim. App. June 25, 2013), *aff'd*, 450 S.W.3d 1 (Tenn. 2014).

Mr. Dotson's appointed counsel raised the following issues on direct appeal to the Tennessee Court of Criminal Appeals:

I.    The Defendant's Constitutional Right to Confront Witnesses Was Violated by Hearsay Testimony of Statements Made By Cecil Dotson, Jr. In Interviews with Law Enforcement Officers, In Violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution

II.   The Defendant's Right to Due Process of Law Was Violated by Testimony that He Invoked His Fifth Amendment Right to Counsel

III.  The Admission of the Defendant's Custodial Statements Violated His Constitutional Rights Guaranteed by the Fourth, Fifth and Fourteenth

Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution

    A.     Mr. Dotson's Custodial Statements Were Made In Violation of the Fourth Amendment Protection Against Unreasonable Seizures

    B.     The Admission of Mr. Dotson's Custodial Statements to Lt. Armstrong After He Asserted His Right to Remain Silent Violated His Constitutional Rights Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution

    C.     The Admission of Mr. Dotson's Custodial Statements to Priscilla Shaw After He Asserted His Right to Counsel Violated His Constitutional Rights Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution

IV.    The Admission of Testimony Regarding the Defendant's History of Imprisonment Violated His Right to a Fair Trial

V.    The Court's Denigration of Defense Counsel in the Presence of the Jury Violated the Defendant's Right to a Fair Trial

VI.    The Defendant's Sixth Amendment Right to Confront Witnesses Was Violated by the Testimony of A Pathologist Who Did Not Perform the Autopsies

VII.    The Court Erred in Denying the Defendant's Motion to Prohibit Display of Photographs of Victims After Death

VIII.    The Court's Denial of the Defendant's Second Amended Motion to Provide DNA Analysis for All Persons Who Made Contact with The Crime Scene Compromised His Efforts to Present a Defense, Violating the Right to Due Process of Law

IX.    The Court Erred in Denying the Defendant's Motion for Production of Statements of Individuals Not to be Called as Witnesses for the State

X.    The Evidence Was Insufficient For Conviction of Each Count in the Indictment

XI.    The Jury Instructions Improperly Defined "Reasonable Doubt," Reducing the Burden of Proof on the State In Violation of Due Process of Law Guaranteed by the Fourteenth Amendment to the United States

Constitution and Article I, Sections 8 and 9 of the Tennessee
Constitution.

XII.    The Court Erred in Denying the Defendant's Request for a Jury
Instruction Regarding Facilitation of First-Degree Murder

XIII.   The Court Erred in Denying the Defendant's Motion to Strike
Aggravating Circumstances Which Were Duplicative

XIV.    The Court erred in Denying the Defendant's Motion For a Probable
Cause Finding that Alleged Aggravating Factors Existed

XV.     The Court erred in Denying the Motion for Disclosure of Information
Regarding the Proportionality Review of the Imposition of the Death
Penalty

XVI.    The Court Erred in Admitting Victim Impact Evidence at Sentencing

XVII.   The Court Erred in Denying the Defendant's Motion to Argue Last in
the Sentencing Hearing

XVIII.  The Court Erred in Allowing the Death Verdicts to Stand

XIX.    The Three Forty-year Sentences, Consecutive to Each Other Violate Due
Process of Law.

XX.     Prosecutorial Misconduct So Infected the Trial that Mr. Dotson was
Denied the Constitutional Right to a Fair Trial

XXI.    Cumulative Error Requires Reversal

Mr. Dotson's appointed counsel raised the following issues on direct appeal to

the Tennessee Supreme Court:

I.      The Admission of the Defendant's Custodial Statements Violated His
Constitutional Rights Guaranteed by the Fourth, Fifth and Fourteenth
Amendments to the United States Constitution and Article I, Sections 7
and 9 of the Tennessee Constitution

        A.      Mr. Dotson's Custodial Statements Were Obtained In Violation of
        the Fourth Amendment to the United States Constitution and
        Article I, § 7 of the Tennessee Constitution

        B.      The Admission of Mr. Dotson's Custodial Statements to Lt.
        Armstrong Violated His Constitutional Rights Under the Fifth

and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution

C.   The Admission of Mr. Dotson's Custodial Statements to Priscilla Shaw After He Asserted His Right to Counsel Violated His Constitutional Rights Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution

II.   The Defendant's Right to Due Process of Law Was Violated by Testimony that He Invoked His Fifth Amendment Right to Counsel and to Silence Guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution

III.   The Admission of Hearsay Testimony Regarding Statements Made by Cecil Dotson, Jr. To Third Parties Violated Both the Tennessee Rules of Evidence and the Constitutional Right to Confront Witnesses Guaranteed by the Sixth Amendment to the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution.

A.   The Introduction of C.J.'s Statement Implicating Mr. Dotson Violated the Defendant's Constitutional Right to Confront Witnesses

B.   Law Enforcement Officers' Recitation of C.J.'s Out-of-Court Statements Which implicated Mr. Dotson Violated the Tennessee Rules of Evidence

IV.   The Admission of Testimony Regarding the Defendant's History of Imprisonment Violated His Right to a Fair Trial

V.   The Court's Denigration of Defense Counsel in the Presence of the Jury Violated the Defendant's Right to a Fair Trial

VI.   The Defendant's Sixth Amendment Right to Confront Witnesses Guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution, Was Violated by the Admission of Autopsy Reports and Testimony of A Pathologist Who Did Not Perform such Autopsies

VII.   The Court Erred in Denying the Defendant's Motion to Prohibit Display of Photographs of Victims After Death

VIII.   The Court's Denial of the Defendant's Second Amended Motion to Provide DNA Analysis for All Persons Who Made Contact with the

Crime Scene Compromised His Efforts to Present a Defense, Violating the Right to Due Process of Law

IX. The Court Erred in Denying the Defendant's Motion for Production of Statements of Individuals Not to be Called as Witnesses for the State

X. The Evidence Was Insufficient For Conviction of Each Count in the Indictment

XI. The Jury Instructions Improperly Defined "Reasonable Doubt," Reducing the Burden of Proof on the State In Violation of Due Process of Law Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution.

XII. The Court Erred in Denying the Defendant's Request for a Jury Instruction Regarding Facilitation of First-Degree Murder and Attempted First-Degree Murder

XIII. The Court Erred in Denying the Defendant's Motion to Strike Aggravating Circumstances Which Were Duplicative

XIV. The Court erred in Denying the Defendant's Motion For a Probable Cause Finding that Alleged Aggravating Factors Existed

XV. The Court erred in Denying the Motion for Disclosure of Information Regarding the Proportionality Review of the Imposition of the Death Penalty

XVI. The Court Erred in Admitting Victim Impact Evidence at Sentencing

XVII. The Court Erred in Denying the Defendant's Motion to Argue Last in the Sentencing Hearing

XVIII. The Court Erred in Allowing the Death Verdicts to Stand

XIX. The Three Forty-year Sentences, Consecutive to Each Other Violate Due Process of Law

XX. Prosecutorial Misconduct So Infected the Trial that Mr. Dotson was Denied the Constitutional Right to a Fair Trial

XXI. Cumulative Error Requires Reversal

On state post-conviction review, the trial court denied Mr. Dotson relief, and

the Tennessee Court of Criminal Appeals affirmed the trial court. *Dotson v. State*,

No. W201901059CCAR3PD, 2022 WL 860414 (Tenn. Crim. App. Mar. 23, 2022). The Tennessee Supreme Court granted Mr. Dotson's application for permission to appeal his claim that he was unconstitutionally denied due process and appellate review of the denial of his request for expert funds and that he was deprived of a full and fair post-conviction hearing as a result of the denial of expert funds the post-conviction trial court had deemed necessary. The Court affirmed the judgments of the post-conviction court and the Court of Criminal Appeals on these separate grounds. *Dotson v. State*, 673 S.W.3d 204 (Tenn. 2023).

Mr. Dotson's appointed counsel raised the following issues in state post-conviction:

## First Amended Petition for PC Relief – filed 5/30/17

### I. Claims Related to Failure to Investigate

Claim 1: Ineffective Assistance of Trial Counsel-Failure to Investigate Mitigation

Claim 2: Ineffective Assistance of Trial Counsel-Failure to Obtain or to Properly Utilize Expert Assistance in Regard to the Guilt-Innocence and Penalty Phase Investigation

### II. Claims Related to Pre-Trial Preparation and Motions Practice

Claim 3: Ineffective Assistance of Trial Counsel-Failure to Object to Imposition of Stun Cuffs

Claim 4: Mr. Dotson's Right to Due Process Was Violated by Imposition of Stun Cuffs Without a Hearing and Findings

Claim 5: Ineffective Assistance of Trial Counsel-Failure to Timely File a Motion to Suppress Mr. Dotson's Alleged Confessions

Claim 6: Ineffective Assistance of Trial Counsel-Failure to Timely Investigate and Request *The First 48* Footage

35

Claim 7: Ineffective Assistance of Trial Counsel-Failure to Challenge *The First 48*'s Production Company's Invocation of the Media Shield Law

Claim 8: Ineffective Assistance of Trial Counsel-Failure to Develop a Meaningful Relationship with Jessie Dotson

### Ill. Claims Related to Jury Selection

Claim 9: Ineffective Assistance of Trial Counsel-Failure to Rehabilitate Jurors Who Were Able to Follow the Law

Claim 10: Ineffective Assistance of Trial Counsel-Failure to Challenge Juror Substantially Impaired in Considering and Imposing Any Sentence but Death

Claim 11: Structural Error-Juror Substantially Impaired in Considering Any Sentence but Death Served, in Violation of the Sixth, Eighth, and Fourteenth Amendments and Should Have Been Dismissed Sua Sponte

Claim 12: Ineffective Assistance of Trial Counsel-Failure to Exhaust Peremptory Challenges

Claim 13: Ineffective Assistance of Trial Counsel-Failure to Object to State Always Questioning Jurors First

Claim 14: Ineffective Assistance of Trial Counsel-Failure to Object to Death Qualification of the Jury

Claim 15: Ineffective Assistance of Trial Counsel-Failure to Voir Dire on Issues of Race and Implicit Bias

### IV. Claims Related to Conduct of Trial

Claim 16: Ineffective Assistance of Trial Counsel-Failure to Effectively Challenge State Witnesses

Claim 17: Ineffective Assistance of Trial Counsel-Failure to Object to Inflammatory Questions/Answers of State Witnesses

Claim 18: Ineffective Assistance of Trial Counsel-Failure to Object to Introduction of Inflammatory Photographs

Claim 19: Ineffective Assistance of Trial Counsel-Failure to Object to Testimony That Would Otherwise Be Inadmissible/Stipulating to State's Evidence

Claim 20: Ineffective Assistance of Trial Counsel-Failure to Adequately Prepare Mr. Dotson to Testify

Claim 21: Ineffective Assistance of Trial Counsel-Failure to Present Mitigation

Claim 22: Ineffective Assistance of Trial Counsel-Improper, Prejudicial Admission in Closing Argument

Claim 23: Ineffective Assistance of Trial Counsel-Failure to File Motion in Limine and Request a Pre-trial Hearing to Prevent Prosecutorial Misconduct in Argument Given the Shelby County District Attorney's Office Pattern of Misconduct in Argument

Claim 24: Ineffective Assistance of Trial Counsel-Failure to Object to Prosecutorial Misconduct in Closing Arguments

Claim 25: Prosecutorial Misconduct-Closing Arguments

Claim 26: Ineffective Assistance of Appellate Counsel-Failure to Raise Claims of Prosecutorial Misconduct in the Sentencing Trial Closing and the Inflammatory and Irrelevant Testimony of Officer Davidson as Plain Error

## V. Claims Related to Jury Instructions

Claim 27: Ineffective Assistance of Trial Counsel-Failure to Object to Anti-Sympathy Instruction as Violative of the Eighth and Fourteenth Amendments and Article I, § 6, Tennessee Constitution

Claim 28: The Anti-Sympathy Instruction Violates the Eighth and Fourteenth Amendments and Article I, § 6, Tennessee Constitution, under the Circumstances of this Case

Claim 29: Ineffective Assistance of Trial Counsel-Failure to Object to Order of Instructions as Violative of the Eighth and Fourteenth Amendments and Article I, § 6, Tennessee Constitution

Claim 30: Ineffective Assistance of Trial Counsel-Failure to Object to Confusing Sentencing Unanimity Instructions/Failure to Request an Instruction Concerning the Consequences of Failure to Agree at Penalty as Violative of the Eighth and Fourteenth Amendments and Article I, § 6, Tennessee Constitution

Claim 31: Ineffective Assistance of Trial Counsel-Failure to Challenge Reference to Moral Certainty in Reasonable Doubt Instructions as Violative of the Eighth and Fourteenth Amendments and Article I, § 6, Tennessee Constitution

Claim 32: Ineffective Assistance of Trial Counsel-Failure to Object to Dyle Instruction

Claim 33: Ineffective Assistance of Trial Counsel-Failure to Request a Missing Evidence Instruction Regarding *The First 48* Footage

Claim 34: Ineffective Assistance of Appellate Counsel-Failure to Raise These Instruction Claims on Appeal

## VI. Claims Related to State Misconduct

Claim 35: State Misconduct-Failure to Preserve *The First 48* Raw Footage

Claim 36: State Misconduct-Withholding Cecil Dotson, Jr., Medical Records Which Contained Information Favorable to the Defense, in Violation of Brady

## VII. Claims Related to Mr. Dotson's Death Sentences and Tennessee's Death Sentencing Scheme

Claim 37: Death is Disproportionate

Claim 38: Tennessee's Death Penalty Scheme is Fraught with Multiple Structural Defects that Violated Mr. Dotson's Rights Under the Tennessee and United States Constitutions

Claim 39: Tennessee's Execution Methods of Lethal Injection and Electrocution Are Unconstitutional

Claim 40: Mr. Dotson's Death Sentences Were Imposed in Violation of International Law

Claim 41: Mr. Dotson's Death Sentences Were Imposed in Violation of Hurst v. Florida

## VIII. Cumulative Error

Claim 42: The Cumulative Effect of Ineffective Assistance of Counsel Requires that Mr. Dotson's Convictions and Death Sentences Be Vacated

Claim 43: The Cumulative Effect of Prosecutorial Misconduct Requires that Mr. Dotson's Convictions and Death Sentences Be Vacated

Claim 44: The Cumulative Effect of All Errors Requires that Mr. Dotson's Convictions and Death Sentences Be Vacated

## Supplemental Petition for PC Relief – filed 9/26/18

Claim 45: Mr. Dotson's Convictions and Death Sentences Are the Product of Premature Deliberations and a Coerced Verdict Targeting the Sole Black Male Juror

Claim 46: Mr. Dotson's Death Sentence Violates His Fundamental Right to Life Guaranteed by the United States Constitution and the Constitution of Tennessee

## VII.  Procedural Defenses

Procedural default is an affirmative defense that must be invoked by the Respondent. *Gray v. Netherland*, 518 U.S. 152, 165 (1996). To the extent that the state invokes that defense, Mr. Dotson pleads the following to excuse any procedural default.

### 1.  Actual innocence excuses any procedural default.

"In certain exceptional cases involving a compelling claim of actual innocence . . . the state procedural default rule is not a bar to a federal habeas corpus petition." *House v. Bell*, 547 U.S. 518, 522 (2006). Mr. Dotson "may obtain review of his constitutional claims only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). Mr. Dotson's claim of actual innocence brings him within this narrow class of cases. *Id.* at 315. In instances where a habeas petitioner invokes the actual innocence exception, the Court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (cleaned up). Upon meeting the *Schlup* exception, the district court is free to evaluate the merits of procedurally defaulted claims. *Id.* at 537.

Mr. Dotson further asserts that he satisfies the stringent requirements of 28 U.S.C. § 2254(e)(2)(A)(ii). Mr. Dotson pleads that any procedural bars may be excused

in light of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations."); *see also Sawyer v. Whitley*, 505 U.S. 333, 341–42 (1992).

### 2. Post-conviction procedures rendered the process ineffective to protect the rights of Mr. Dotson.

As is pleaded elsewhere in this petition, Mr. Dotson was denied the ability to develop numerous post-conviction claims for relief because he was denied expert assistance under Tennessee Supreme Court Rule 13. This reality has two consequences. First, Mr. Dotson did not culpably fail to develop these claims. As the Supreme Court recently reiterated,

> [28 U.S.C.] § 2254(e)(2) applies only when a prisoner "has failed to develop the factual basis of a claim." We interpret "fail," consistent with *Keeney*, to mean that the prisoner must be "at fault" for the undeveloped record in state court. *Williams v. Taylor*, 529 U.S. 420, 432 (2000). A prisoner is "at fault" if he "bears responsibility for the failure to develop the record." *Id.*

*Shinn v. Ramirez*, 596 U.S. 366, 382 (2022). Given that Mr. Dotson was denied the necessary resources to properly develop these claims in state court by state action, the strictures of § 2254(e)(2) are simply inapplicable.

Furthermore, these circumstances also demonstrate that the provisions of 28 U.S.C. § 2254(b)(1)(B) apply to this case. Those provisions provide that a petitioner is relieved of his obligation to exhaust state remedies where "(i) there is an absence of available state corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)–(ii).

Here, Mr. Dotson is relieved of the exhaustion requirement for claims that should have been raised in state post-conviction because the denial of expert assistance rendered the process ineffective to protect Mr. Dotson's rights.

> **3.    The existence of multiple *Brady* claims serves as cause and prejudice to excuse procedural default.**

Claims Five, Six, Seven, Eight, Nine, and Ten allege *Brady* violations related to multiple instances where the state denied Mr. Dotson his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The existence of a *Brady* violation is sufficient to establish cause and excuse the procedural default of a claim. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 289 (1999).  The Sixth Circuit has succinctly remarked that the "state's suppression of *Brady* evidence constitutes cause under the procedural-default doctrine." *Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010). In light of these well-established principles, Mr. Dotson pleads that the existence of these *Brady* violations excuses the procedural default of the specified *Brady* claims as well as any other claims whose factual development was hindered by actions of the prosecution and police.

> **4.    Extreme mismanagement and gross negligence by the Office of the Post-Conviction Defender (OPCD) constitutes cause to excuse the procedural default of post-conviction claims.**

The Supreme Court has "not identified with precision exactly what constitutes 'cause' to excuse a procedural default . . . ." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Nonetheless, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the

defense impeded counsel's efforts to comply with the state's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

By Tennessee Supreme Court rule, OPCD is the default provider of indigent state post-conviction services for the capitally convicted. *See* Tenn. Sup. Ct. R. 13(e)(4)(A). By statute, OPCD is overseen by a state oversight commission that includes members appointed by the governor, speaker of the Senate, and speaker of the House of Representatives. Tenn. Code Ann. § 40-30-203. In sum, OPCD employees are state employees, and it must be considered a public entity that is part of the instrumentalities of state government.

During the relevant time that OPCD represented Mr. Dotson—and for years prior to that—the organization was institutionally mismanaged, subject to extreme turnover, and roiled by internal disputes and employee substance abuse, all of which led OPCD counsel to provide grossly negligent representation to their clients. Mr. Dotson pleads that the institutional mismanagement by OPCD and its state overseers constitutes a form of "government interference" that constitutes cause. *Brown v. Allen*, 344 U.S. 443, 486 (1953), *superseded by statute on other grounds*, 28 U.S.C. § 2254. Because the extreme mismanagement of OPCD exceeded the mere negligence of post-conviction counsel, the holding of *Shinn v. Ramirez*, 596 U.S. 366 (2022), is inapplicable. *Shinn* held that "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record." *Shinn*, 596 U.S. at 383. In this case, however, Mr. Dotson does not claim that counsel's mere negligence contributed to the failure to properly raise claims. Rather, he pleads that the

42

institutional mismanagement of OPCD constitutes cause and that the actions of the agency exceeded mere negligence and involved government interference.

### 5. AEDPA is unconstitutional.

In Claim 50 of this petition, Mr. Dotson asserts that AEDPA is unconstitutional both because it effectively suspends the writ of habeas corpus and because Mr. Dotson possesses a right under the Privileges and Immunities Clause of the Fourteenth Amendment to pursue habeas corpus relief. AEDPA unconstitutionally infringes upon these rights. As such, Mr. Dotson pleads that the provisions of AEDPA that burden the exercise of habeas corpus rights are unconstitutional and inapplicable.

### 6. Ineffective assistance of post-conviction counsel serves as cause for the default of Mr. Dotson's ineffective assistance of trial counsel claims.

In *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 416–17 (2013), the Supreme Court held that when a substantial claim of ineffective assistance of trial counsel was defaulted as a result of the ineffective assistance of post-conviction counsel, a habeas petition may excuse the procedural default of the claim. In *Shinn v. Ramirez*, 596 U.S. 366 (2022), the Supreme Court did not overrule *Martinez/Trevino*. *See id.* at 387 (affirming *Martinez*'s "narrow exception"). Mr. Dotson invokes the *Martinez/Trevino* excuse for procedural default with respect to substantial ineffective assistance of trial counsel claims that were defaulted due to the ineffective assistance of post-conviction counsel. Further, as he will show later in these proceedings, 28 U.S.C. § 2254(e)(2) does not preclude the admissibility of evidence to support his claims.

## VIII. Constitutional Claims for Relief[14]

**Preface:** Numerous individuals in this case who would normally be considered private citizens acted as agents of the state. Whether in the context of the Fourth, Fifth, Sixth, or Fourteenth Amendment, the law is well-settled behind the principle that the state may not do through a private individual that which it could not do itself. *See, e.g.*, *United States v. Walther*, 652 F.2d 788, 793 (9th Cir. 1981) ("[T]he government cannot knowingly acquiesce in and encourage directly or indirectly a private citizen to engage in activity which it is prohibited from pursuing[.]"). A corollary to this well--settled doctrine is that in a variety of constitutional contexts, under certain circumstances, private citizens may act as agents of the state and their conduct is imputed to the state.

The caselaw regarding private citizens acting as agents of the state is perhaps most developed in the context of the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) (defining the relevant inquiry as whether the private citizen "must be regarded as having acted as an 'instrument' or agent of the state"); *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614 (1989) ("Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities."); *United States v. Highbull*, 894 F.3d 988, 992 (8th Cir.

---

[14] Unless otherwise specifically noted, each error is alleged to have affected both the guilt-innocence (conviction) and the penalty (capital sentence) phase of the verdict. Each fact pled in this petition is incorporated by reference to each claim as if fully set forth therein. Further, for each claim, Mr. Dotson incorporates all averments in this petition into each claim, as if set forth fully therein.

2018) ("Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances.").

To be deemed an agent of the state, "[t]he government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before we deem the citizen to be an instrument of the state." *Walther*, 652 F.2d at 791. "In determining whether a private citizen is an agent of the government, two critical factors are 'whether the government knew of and acquiesced in the intrusive conduct,' and 'whether the party performing the search intended to assist law enforcement officials or to further [the informant's] own ends.'" *United States v. Malbrough*, 922 F.2d 458, 462 (8th Cir. 1990) (quoting *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)).

Other relevant circumstances indicative of a citizen acting as an agent include "(1) whether the government had knowledge of and acquiesced in the intrusive conduct; (2) whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and (3) whether the citizen acted at the government's request." *Highbull*, 894 F.3d at 992; *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) (same). These cases clearly hold that "[c]onstitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by 'private' persons or entities that is prohibited to the

45

government itself." *United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973), *overruled on other grounds by*, *United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007).

In the context of the Fifth Amendment, there is broad agreement in the law that the state may not evade *Miranda* requirements by extracting a statement through the use of a private individual. In *Estelle v. Smith*, 451 U.S. 454 (1981), for example, the Supreme Court held that statements obtained by a psychiatrist without *Miranda* warnings violated the Fifth Amendment. *See id.* at 469. Similarly, in *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court held that the defendant's confession was coerced even though an informant, not law enforcement, communicated threats to the defendant. *See id.* at 286.

Even in *Illinois v. Perkins*, 496 U.S. 292 (1990), where the Supreme Court held that statements made to a government informant did not violate *Miranda*, the court focused not on who the statements were made to but rather the conditions under which the statement was made. *See id.* at 296. The decisive factor was that the statements in *Perkins* were not made in a "police-dominated atmosphere" rather than the fact that the informant elicited by a private citizen. *Id.*

On the other hand, where statements are obtained by a third party in situations resembling stationhouse interrogations, courts have held that *Miranda*'s protections extend to the actions of private, third parties. In *U.S. ex rel. Wilson v. O'Leary*, 682 F. Supp. 944 (N.D. Ill. 1988), a police officer arrested the defendant and led him to an adjacent lot and permitted a gang of private citizens to hurl questions at the defendant in an "emotionally charged encounter." *Id.* at 945–46. Ultimately,

46

the defendant made inculpatory statements to the private citizens gathered. Although the questioning was conducted by private citizens, the court nonetheless held that the defendant's *Miranda* rights were violated because the defendant was subjected to the "functional equivalent" of a custodial interrogation. *Id.* at 948; *see also Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (holding that *Miranda* protections apply when a suspect is subjected to the "functional equivalent" of stationhouse interrogation); *Battie v. Estelle*, 655 F.2d 692, 699 n.12 (5th Cir. 1981) (holding that to prevail on a *Miranda* claim the defendant must present "some connection with the state by the person questioning a defendant").

Another example is the "joint venture" doctrine. This doctrine is applicable when government officials conduct interrogations alongside foreign officials and "ensures that United States law enforcement agents cannot circumvent their obligations under *Miranda* just by outsourcing custodial interrogation to foreign agents while still 'actively participat[ing] in the questioning conducted by foreign authorities . . . .'" *United States v. Straker*, 800 F.3d 570, 615 (D.C. Cir. 2015) (quoting *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003)). Accordingly, in the context of the Fifth Amendment privilege, the law recognizes that a statement made to a private party is protected under the ambit of *Miranda* so long as the circumstances of the interrogation have the characteristics of a stationhouse interrogation and the private party has "some connection to the State." *Battie*, 655 F.2d at 699 n.12.

In the context of the Sixth Amendment, robust jurisprudence exists detailing the instances where private individuals act as agents of the state. In *Massiah v.*

47

*United States*, 377 U.S. 201 (1964) the Supreme Court held that it violated a defendant's Sixth Amendment rights to use an informant to elicit information from a defendant after the right to counsel had attached. Consistent with *Massiah*, courts have not hesitated to impute the conduct of private citizens operating on behalf of police. *Maine v. Moulton*, 474 U.S. 159, 176 (1985) ("Accordingly, the Sixth Amendment is violated when the state obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent."); *United States v. Henry*, 447 U.S. 264, 274 (1980) (affirming the exclusion of evidence obtained by an informant after the right to counsel attached); *Ayers v. Hudson*, 623 F.3d 301, 315–17 (6th Cir. 2010) (granting habeas relief for a *Massiah* violation obtained by an informant). A prisoner need not demonstrate that there was an explicit agreement between the government and the private individuals soliciting information from the accused. *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004) (holding "that an explicit agreement to compensate [the informant] is not necessary").

Courts have recognized that the destruction of evidence by an agent of the state constitutes a due process violation. *United States v. Beckstead*, 500 F.3d 1154, 1158 n.3 (10th Cir. 2007) (holding that a private cleaning service specializing in crime scene cleanup was an agent of the state when acting under police direction); *United States v. Fernandez*, 24 F.4th 1321, 1338 (10th Cir. 2022) (applying common law agency principles to determine whether a private company was an agent of the state for *Trombetta/Youngblood* purposes); *United States v. Cooper*, 983 F.2d 928, 930 (9th

48

Cir. 1993) (affirming the dismissal of an indictment when "a waste disposal company under contract to the DEA" destroyed evidence).

Accordingly, in a wide variety of contexts concerning core criminal constitutional protections, the law is consistent that the state may not avoid its constitutional responsibilities simply by enlisting a private individual to do what the state is prohibited from doing. But that is exactly what happened here in a variety of contexts.

### 1. Police violated Mr. Dotson's constitutional rights throughout the duration of his interrogation, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Mr. Dotson's false confession is the product of state misconduct and was obtained in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Mr. Dotson's incriminating statements came only after he was fatigued, hungry, threatened with physical harm, and his family was threatened with physical harm and arrest. Moreover, Mr. Dotson was induced and pressured to make inculpatory statements to protect himself and his family after a police officer improperly tampered with the memory of C.J. Dotson to obtain a false accusation that "Junior" was responsible for the murders and Mr. Dotson was lied to and told that his bloody footprints were found at the scene of the crime.

### a. C.J. Dotson's memory was contaminated by improper law enforcement questioning

C.J. Dotson, who was 9 years old, had a history of behavioral and mental disorders prior to the events of March 1-2, 2008. C.J. was a pre-existing client of the Child Advocacy Center. C.J.'s cognitive functioning was already compromised even

before he received his catastrophic head injuries. His mother and teachers complained of his aggressive behavior and frequent swearing. He was aggressive with his younger siblings and was receiving medication for his ADHD at the time of the events. C.J.'s physical examination at the hospital also revealed signs of prior child abuse, most likely at the hands of his father, Cecil Dotson, Sr. [15]

C.J. suffered severe injuries, including being stabbed in the head. He went through emergency surgery on March 3, 2008. Among other medications, he was receiving fentanyl, morphine (IV), propofol (IV), and hydrocodone when Sgt. Mason took it upon herself to get C.J. to name his assailant.

But two days earlier, C.J. had told Pat Lewis, who is a trained forensic child advocate, that Cassandra and Roderick/Roger had committed the murders. During that tape-recorded statement, amongst other statements, C.J. said the following:

- "I got you big boy. Don't ever stop playing with the gang, boy. You never know what would happen boy."

- "I found the bitch, yeah."

---

[15] On February 28, 2008, Cecil Dotson severely beat his daughter, Cierra, and two of his other children for "breaking in" to a room in the home and eating honey buns. Cierra is C.J.'s half-sister and was living at 722 Lester at the time. It was because of this beating that Cierra Dotson was not in the home on the evening of March 1-2, 2008. Instead, because her arm was injured and she suffered a panic attack, Cecil Dotson allowed Cierra to stay with her mother even though DCS had removed Cierra from her mother's home due to sexual abuse Cierra experienced at the hands of her mother's boyfriend. All of the children and the adult victim Marissa Williams had old scars on their bodies. Cecil Dotson physically, verbally, mentally, and sexually abused Marissa Williams (mother of C.J., Cedrick, Cemario, and Ceniyah) and Erica Smith (the mother of Cecil "Man Man" Dotson, II).

- (beginning unintelligible) … "knife in your ass, your skinny-ass motherfucking ass … Your skinny motherfucking … Peeww. Peewww."[16]

- "I'm still gonna kill your punk ass."

- "Well, damn, bitch. Let me see the phone, motherfucker."

- "Shut the fuck up, bitch."

Pat Lewis stopped questioning C.J. because it appeared he was becoming distressed as he was reliving the murders—in other words he seemed to be repeating what he overheard the assailants say to the victims.

Though it had been decided that for the child's welfare, he should only be questioned by trained experts, Sgt. Mason failed to follow the protocol. On March 7, 2008, after Police Chief Godwin told the homicide detectives that he was bringing in outside agencies, Sgt. Mason took it upon herself to go back to C.J. one last time.

It is important to note that Sgt. Mason was a frequent "star" of the reality TV show *The First 48*. She loved the limelight, and according to a former Shelby County District Attorney General who worked with her, even carried around photographs of herself to autograph for her "fans."

So, Sgt. Mason rushed to C.J.'s bedside and broke every rule about child-victim interviews. She emphasized to C.J. that the University of Memphis Tigers basketball team had signed basketball cards for him (and that she made that happen), that he

---

[16] Marissa Williams had a rectal tear and hemorrhage, according to the autopsy report.

51

had been given balloons and a teddy bear. The emphasis on the gifts was designed to impress on C.J. that he needed to give Sgt. Mason what she was looking for. The fact that she was not relying on what he had said previously signaled that she was not pleased with his previous answers and needed a different one. Sgt. Mason then pressured C.J.:

> *Open your mouth and talk to me.* You been talking to me the whole time I been here. *So talk to me now. Don't stop now 'cause we need to get these bad guys,* 'cause they're still out there, and I want to get them so that they won't cause you any more problems. You don't have anything to worry about. That's why I'm here. *That's why I came every day, faithfully, to see about you.* Because I want you to remember what happened and tell me who these guys are, and you won't have to deal that right now, anymore. Okay? Okay? Okay, C.J.?

No matter how well-intentioned she may have been, Sgt. Mason's questioning was completely inappropriate. And this is just the part she chose to tape. We don't know what was said before the tape-recorder was turned on.

When C.J. finally gave her an answer she wanted, that Uncle Junior was the perpetrator and acted alone, Sgt. Mason re-enforced the false memory by praising his answers.

> This is very important, C.J. You're telling me some good stuff, and you don't have to worry about anything. Everything's okay with Sgt. Mason. Okay? I'm gonna stay in touch with you, even after this ordeal. I'm gonna stay in touch with you. Maybe we can get together and hang out and go to some games, or do something. Okay?

By giving C.J. gifts and praising him for saying certain things and not praising him for others, C.J.'s memory was tampered with irreparably. C.J.'s statement that

it was his Uncle Junior is not consistent with the crime scene facts or physical evidence. Neither is his statement to Sgt. Mason that Jessie drove a black Escalade. Jessie did not drive an Escalade of any color—or any car for that matter.

There was no urgency for Sgt. Mason to question C.J. without the trained professionals present. No urgency other than other agencies were being called in and she would not be the hero of the TV show.

Four days later, Linda Steele, an expert with the National Children's Advocacy Center brought in by the state at the suggestion of the FBI, attempted to interview both C.J. and Cedrick. Steele determined that neither child was psychologically stable enough to be questioned. Her report has never been disclosed. But in an email message to ADA Ray Lepone, in preparing for trial, Ms. Steele warned "if I were to testify for you in any capacity my contact with the kids might come up as an issue; so I did document it 'just in case' immediately following the Memphis visit."[17]

As described in the *Brady* claim below, the state also failed to disclose that C.J.'s treating psychiatrist opined that his memory is not reliable.

Nevertheless, this one statement from a grieving, injured, and heavily medicated 9-year-old child, changed the course of the entire investigation.

### b. Psychological pressure and threats caused Jessie Dotson to falsely confess.

Sgt. Mason hurriedly called Lt. Armstrong to inform him that she had gotten C.J. to identify Jessie. At 6:00 PM on March 7, 2008, Lt. Armstrong ordered the TACT

---

[17] Linda Steele did not testify.

team to arrest Jessie Dotson. He was handcuffed and put in a police cruiser. He was driven down to 201 Poplar, placed in the large interrogation room, and handcuffed by his ankle to a chair. He had barely slept in four days. He had not eaten since noon.

For nearly seven hours, Jessie Dotson maintained his innocence during his overnight interrogation. Trial Tr. vol. 29, 2170, 2174-5, 2223–25. He invoked his right to silence (but was ignored). He invoked his right to counsel (but was ignored).[18] Sgts. Mason and Stark were the first to attempt to get Mr. Dotson to confess. When they were unsuccessful, Lt. Armstrong decided he would go it alone. He stated, "We are going to go hard" at Jessie. *The First 48: Lester Street*, *supra*. He did go hard.

Lt. Armstrong lied to Jessie and told him that the police had his bloody footprints at the scene. He threatened that he would kill Jessie himself. He threatened that he would "lock up" Jessie's mother and sister. He threatened that he would put Jessie "on the fourth floor" and let the Gangster Disciples kill him.[19] He pressured Jessie that "they are coming" and that Jessie needed to hurry up and tell Lt. Armstrong what he needed to hear, or else Lt. Armstrong would not be able to help.

---

[18] After he gave an incriminating oral statement, Jessie again asked for a lawyer. As a result, the police sent in his mother to continue the questioning.

[19] The jail at 201 Poplar is notorious for allowing gangs to run the jail. Ashley Frantz, *The Jail From Hell*, Salon (Jan. 23, 2001) available online at https://www.salon.com/2001/01/23/memphis_2/ (last checked Jan. 24, 2024) ("According to Judge McCalla's recent ruling finding the county in contempt, the jail holds more than 250 members of Memphis' most lethal gangs, the Gangster Disciples and the Vice Lords, who outnumber the guards and run the jail with more authority than they do.")

The *coup de grace* came with the playing of C.J.'s tape-recorded statement to Sgt. Mason. In the words of Lt. Armstrong, after he played the tape, Jessie broke. "Once I played the tape, actually his heart started beating so fast I could see it in his throat, you know, in his neck, and I wasn't going to let him off of there. Again, I was not going to give him a chance to recoup from that." *After the First 48: Lester Street*, *supra*.

Dr. Leo will explain to this Court in later filings that the tactics used by the Memphis Police Department are known to law enforcement to induce false confessions. They did so here. The tactics are particularly likely to induce false confessions from people who have neurocognitive disorders, mental disease, or who are fatigued or hungry. Jessie was all of these.

Jessie's false confession (and there are two differing accounts—one from Lt. Armstrong and one from Sgt. Davidson) is not consistent with the crime scene facts. Just some of the discrepancies include:

- According to Davidson, Jessie told Lt. Armstrong that he first shot his brother with Jessie's own gun, which is a .44 caliber. No .44 caliber bullets or shell casings are found at the scene.

- The children (and likely adults) were assaulted with boards and other hard objects. Photographs of Cecil Dotson, Sr. and Hollis Seals show head injuries consistent with gang punishment known as "pumpkin

head."[20] Jessie says nothing about boards or blunt objects in his statement.

- According to Jessie's statement, when he shot his brother, no one else at the home was restrained or injured. Hollis Seals and Marissa Williams were both armed. Marissa had her cell phone within reach. Yet the police were not called, Jessie was not shot. Jessie was not injured in anyway. It simply strains credulity to believe that Hollis Seals, whose first task upon getting out of jail that night was to get his gun for protection, would not have shot Jessie Dotson right then and there.

- Jessie's incriminating statement is that he acted alone. But the crime scene evidence makes it very clear that, in the words of Ray Lepone, everybody said, "there is no way one individual did this—it's impossible." *After the First 48: Lester Street, supra.*

- Evidence of semen was detected on the oral swab of Cecil Dotson, II ("Man Man") and saliva was detected on his penile swab. Again, Jessie Dotson is excluded from all of the DNA evidence at the scene. This patent evidence of sexual assault remains unexplained (though seems consistent with the brutality of the cartels). Jessie's statement certainly does not explain it.

---

[20] A "pumpkin head" is when a person's head is beaten so badly that it resembles a pumpkin.

- Ceniyah's fingers were severed. Jessie says nothing of this in his false confession. Again, this level of brutality is what is seen with the gangs associated with the Mexican cartels.

As he testified at trial, Mr. Dotson made a false admission of guilt in direct response to a threat by Lt. Armstrong. *Id.*, 2224–27. He also testified that he made subtle assurances to his mother that his alleged confession was the product of coercion. *Id.*, 2220–21.

"Certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Such is the case here.

There are three requirements for a finding that a confession was involuntary due to police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Michael v. Butts*, 59 F.4th 219, 227 (6th Cir. 2023) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). "A defendant is coerced when the totality of the circumstances shows that his will was 'overborne and his capacity for self-determination critically impaired[.]'" *Id.* at 227–28 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). Courts must look at the "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of

57

the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth*, 412 U.S. at 226).

Jessie's will was overborne by the coercive tactics of the Memphis Police Department. As a result, he provided a false confession which was the cornerstone of the state's case against him. Again, there is zero physical evidence tying Mr. Dotson to the murder. It is impossible to imagine how one person could accomplish all of this carnage and yet not leave a single piece of biological evidence at the scene or have any blood on his clothes or the bike that he rode away from the scene.

Without Jessie's false confession, there is no conviction in this case. C.J.'s statement is inherently unreliable. Jessie's false confession violated due process and should not have been admitted at trial. He was prejudiced as a result of the police misconduct.

Trial Counsel was constitutionally ineffective for failing to move to suppress Mr. Dotson's statement on these grounds.

Prosecutorial misconduct and the intentional suppression of exculpatory evidence excuses any perceived procedural barrier.

> ### 2.   Mr. Dotson's statement was obtained in violation of *Miranda v. Arizona*.

Mr. Dotson's statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) in at least four ways. First, Sgt. Mason did not explain the Miranda warnings to Mr. Dotson and in fact covered up the warnings with her hand as she had Jessie sign the statement. Thus, Mr. Dotson never gave a knowing and intelligent

waiver. Second, Mr. Dotson told Sgt. Mason and Sgt. Stark, that he did not want to speak to them anymore. According to Stark's report, they did not honor this assertion of the right to silence, but instead kept on talking with Mr. Dotson until he agreed to speak with someone else. Third, during questioning by Lt. Armstrong, Mr. Dotson repeatedly requested that the questioning cease so that he could talk to his mother, which was an invocation of his right to silence. Fourth, Mr. Dotson repeatedly asked for a lawyer, but questioning did not cease until Mr. Dotson gave an oral inculpatory statement. After that, the police sent Jessie's mother in as their agent to get additional inculpatory evidence.

"At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise." *Miranda*, 384 U.S. at 467–68. But "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators." *Id.* at 469. "Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege . . . ." *Id.* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74.

"[A] suspect may waive his Fifth Amendment privilege, 'provided the waiver is made voluntarily, knowingly and intelligently.'" *Colorado v. Spring*, 479 U.S. 564,

572 (1987) (quoting *Miranda*, 384 U.S. at 444). A waiver is not voluntary if the suspect's "will has been overborne and his capacity for self-determination critically impaired . . . ." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The Supreme Court "has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960); *Payne v. Arkansas*, 356 U.S. 560, 566 (1958) ("That petitioner was not physically tortured affords no answer to the question whether the confession was coerced."). Further, any waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

The totality of the circumstances establish that Mr. Dotson's *Miranda* rights were not honored. Mr. Dotson did not knowingly, intelligently, or voluntarily waive his rights. The statement should never have come into evidence. Without the statement, there is no conviction. Mr. Dotson was prejudiced.

Trial Counsel was constitutionally ineffective for failing to move to suppress Mr. Dotson's statement on these grounds.

Prosecutorial misconduct and the intentional suppression of exculpatory evidence excuses any perceived procedural barrier.

### 3.   The State of Tennessee destroyed evidence in bad faith.

The Memphis Police Department allowed Granada Entertainment USA to film its detectives during their investigation into the Lester Street murders for a reality -television show called *The First 48*. Isaac Mathes, *The First 48* cameraman, was allowed into the Lester Street residence to film, as the police were processing the crime scene. *The First 48* filmed interviews with witnesses and with Dotson family members. Additionally, the cameraman recorded the Memphis Police Department's interrogation of Mr. Dotson on March 7, 2008, including his false confessions to his mother and to Lt. Armstrong. Trial Tr. vol. 26, 1663–64.

In a declaration that will be filed with later proceedings in this Court, Isaac Mathes has sworn that he was the only field producer working for *The First 48* on the Lester Street episode. Mathes confirms that the following photograph is of him while he was filming the crime scene.



Mathes declares that he "shot a great deal" of footage from the crime scene and was later disappointed to learn that it did not make it into the episode because the owner of the property declined to sign a location release.

Mathes shot footage mainly at 722 Lester Street and at the Memphis Police Department. He "was always mindful that he was working with the approval of the

Memphis Police Department. If the detective told me to stop filming or leave, I would comply."

Mathes recalls filming the interrogation of Jessie Dotson. Mathes describes his vantage point as being at a 90-degree angle to the table.

> I was responsible for maintaining all equipment in the field that belonged to Granada USA and was aware of where our camera was situated. During an interview or interrogation, we only had access to the one room with the two-way mirror that looked at the subjects from a 90-degree angle. When the interrogation room was empty, I would sometime go in there. I have no memory of installing, maintaining, or operating any equipment in the interrogation room.

That vantage point is depicted in the image below:[21]



The Lester Street episode of *The First 48* shows Mr. Dotson from the 90-degree angle, shown above, but also from a direct angle, as seen below[22]:

---

[21] *The First 48, Lester Street, supra.*

[22] *The First 48, Lester Street, supra.*



Mathes explains how he obtained this footage as follows:

I believe that the Memphis Police Department also had a camera with a microphone in the interrogation room because detectives could watch and listen to the interrogation as it was happening live in the lieutenant's office. I recall filming the detectives gathered around the monitor, watching the interrogation.

Mathes swears in his declaration that the image above was obtained as "the result of me recording with my camera the image displayed on the monitor in Lt. Armstrong's office. So I was re-recording an image being acquired by someone else's camera." Mathes further clarifies that the image above "did not originate with me, but was my recording of an image being played back on the monitor."

In an in-person interview, conducted at Sgt. Stark's home in December 2023, Stark described to Ms. Henry and Mr. Leonard the video camera with audio capability that was hidden in the smoke detector in the ceiling of the interrogation room.

Investigation reveals that at least two video recordings of Jessie Dotson's interrogation existed. One was filmed by *The First 48* cameraman Isaac Mathes, who was permitted to film the interrogation through a two-way mirror. The other was recorded by the Memphis Police Department.

The Memphis Police Department and the State of Tennessee have repeatedly denied that the Memphis Police Department taped Mr. Dotson's interrogation. Based on our investigation, this representation appears to be false. It is not known if the Memphis Police Department destroyed its recording of Mr. Dotson's interrogation. If they did, then the destruction is plainly the unconstitutional destruction of exculpatory evidence. If it still exists, it should be immediately turned over to counsel for Mr. Dotson.

Attorneys for *The First 48* have long maintained that the show immediately destroys all film that is not edited for use in the master tape used to the air the program. They claim that this is their practice to avoid being subpoenaed into court to produce the raw footage. They state that they make this practice clear to the law enforcement entities with whom they contract, including the Memphis Police Department.

Agents for *The First 48* have never been called to court to represent under oath that the raw footage in this case has been destroyed. They have only stated that it is their practice to do so. There is reason to believe that they deviated from their practice here because footage from Mr. Dotson's interrogation that was not aired in the initial episode of *The First 48* was broadcast in the post-trial airing of *After the First 48*.

Undersigned counsel, Ms. Henry and investigator Mr. Leonard, attempted to interview other members of the crew that worked on *The First 48* Lester Street episode. However, an attorney representing the show, Amanda Loh, contacted Ms. Henry stating that it is her position as corporate counsel that all current and former employees, whether salaried or contract, were represented by her and that any further requests for interviews would need to go through her. She stated that they will assert all applicable media shield laws and that likely any further interviews will need to be litigated through requests for depositions.[23]

Regardless of what *The First 48* may believe, they are not a journalistic entity entitled to media shield laws in the State of Tennessee. Moreover, once a contract was signed between Granada USA and the Memphis Police Department giving Granada US access to police activity which is specifically shielded from public records under Tennessee state law, Granada USA became an agent of the Memphis Police Department. This placed an obligation on the Memphis Police Department to protect the raw footage from destruction. The Memphis Police Department has no authority to contract away their obligations under the constitution and law to maintain evidence in a capital murder case. Quite the opposite. Once the Memphis Police Department gave access to *The First 48*, then the Memphis Police Department was constitutionally required to protect the evidence from destruction. Here, the Memphis

---

[23] It should be noted that Mr. Mathes is not employed by A&E, Granada USA, or the new entity that has acquired Granada USA which is ITV USA. Mr. Mathes did not state that he had counsel and voluntarily agreed to a lengthy interview at his home, followed up another lengthy telephone conversation for the purpose of drafting his sworn declaration.

Police Department not only knew, but gave their blessing to the destruction of this evidence (assuming it is indeed destroyed).

Also destroyed, allegedly, is the raw footage of the interviews of several important witnesses including:

- **Cierra Young**. Cierra is the daughter of Cecil Young, Sr., who was the first person to tell police that Cecil and others had robbed "Doc Holiday" of several weapons. Cierra described Doc Holiday as a Memphis rapper and Gangster Disciple. Cierra was 12 years old at the time and stated that she was present when her father was surveying the numerous weapons he had stolen.

- **"Doc Holiday" a/k/a Timothy Williams.** There is more than one "Doc Holiday" in Memphis. The Lester Street episode of *The First 48* suggests that the police interviewed a "Doc Holiday." But investigation reveals that the person depicted as "Doc Holiday" is not the person Cierra was referring to. The Gangster Disciple/Rapper Doc Holiday, whose real name is Timothy Williams, had tattoos on his arms at the time (not present on the person in the episode) and has lighter skin. Timothy Williams sent threatening texts to Cecil Dotson stating, "You don't have to answer your phone, but you do have to answer for your actions." The rapper Doc Holiday wrote a rap about Lester Street which lyrics include:

66

> On top of all of this, Frank took the fuckin' stand, in exchange so he wouldn't do that time in the can[24]
>
> Throwin' up the rape she ain't even on your piece, I shoulda known somethin' was wrong when I seen you, you were speechless
>
> Goin' downtown, volunteerin' information, let me ask the world a question, who brought Willie in this nation[25]
>
> It was not Dre, it was not I, not Dread, not Shy, no not Shy, we know he's informant or quackin' ass bitch, if I had to take the stand, I wouldn't tell them bitches shit

- **Willie Boyd Hill ("Frank"/"Fred")**. Willie Boyd Hill is a Gangster Disciple. He and Cecil Dotson, Sr. had a falling out two weeks before the murders. Hill told the police how an altercation had occurred on Valentine's Day when Cecil was in the club with Erica Smith. Hill's girlfriend, Tammy Branch, called Cecil's other main girlfriend[26], Marissa Williams, who came to the club. Cecil became hostile and angry. He purposefully wrecked Erica's new car. He became belligerent and was banging on Tammy's apartment door. Tammy called the police. When the police came, Cecil told them that Willie and Tammy's apartment was a drug house. Tammy was arrested. Willie Hill told the

---

[24] These lyrics suggest that witness, Willie Boyd Hill, whose nickname is Frank, was given a deal in exchange for his testimony. This deal was not disclosed.

[25] The word "nation" refers to the Gang Disciples Nation.

[26] There are at least two others.

police that Cecil's actions were a major gang violation punishable by a pumpkin head or a DV (death violation). The Gangster Disciples Chief of Security, Markell Vester ("Kado"), was informed. Kado told Doc Holiday. A meeting was held. Hill was supposed to write Cecil up.[27]

- **Erica Smith**. Erica Smith is the mother of Cecil Dotson, II ("Man-Man"). She gave three different statements to the police. She and Cecil Dotson, Sr. had a volatile relationship. They repeatedly called 911 on each other. The two had been sending threatening texts to one another. Erica was jealous of Marissa. She was angry with Cecil for accepting paternity of Ceniyah, while fighting paternity over Cecil Dotson, II and Erica's other children. After DNA proved that Cecil, Sr. was Cecil Dotson, II's father, he obtained full custody and would deny Erica visitation. Cecil, Sr. had moved to alter child support payments and the pair were due in juvenile court for a hearing in the same month the murders took place. Erica would come by the house and harass Cecil, Sr. and Marissa. A particularly angry exchange took place the morning of January 14, 2008, just after Marissa had helped bail Cecil, Sr. out of jail

---

[27] A confidential informant has stated that Doc would have had to tell "Goldie" (Clinton Lewis) who would have had to report to Craig Petties. This investigation is ongoing. Former Organized Crime Unit Sgt. Skelton described "Goldie" in an interview with Henry and Leonard as a "snitch" who was a "pain in the ass" because he would give them information on a case to make an arrest and then go out and "do what he did – steal cars, pimp, sell drugs" and the case would have to be dismissed.

for                    armed                    robbery.







After the Valentine's Day incident, Erica Smith sent the following text message to Cecil, Sr.:



Erica's actions on March 2 and 3 leading up to her call to 911 are suspicious. Despite the fact that she repeatedly went by the house and the door was open, she claims to have not gone inside or to have seen the bodies. She was frantically looking for Cecil, Sr. at work and checking at the school to see if the kids had come to school on Monday. Despite the fact that she had called 911 numerous times before, including on February 29, 2008, she waited to call this time. She even stated to others before she called the police, "I hope they are all dead in there." She is a potential suspect. Yet, we do not have the tapes of her interviews.

- **Cedrick Atkins**. Atkins was an informant for a Bartlett police officer. Atkins told the police that he had been in a hotel room with Cecil Dotson, Sr., recently and that Cecil had told him about having ripped off a gang

member to the tune of $300,000.[28] *The First 48* shows that Armstrong discounted this information because he doubted that Cecil would share such information under these circumstances. Atkins was interviewed by Henry and Leonard on January 11, 2024, and he confirmed that the conversation took place, but additional detail confirming its veracity was obtained. Atkins and Dotson were in the hotel room with two women, Destiny and Charlotte. Both women worked as strippers and were friends. Atkins dated Destiny and Dotson dated Charlotte. Atkins knew Dotson from seeing him at the club with Charlotte. They ended up in the hotel room together, "because you know we liked them ladies." Atkins said that Cecil was heavily intoxicated and told him about how he had gotten into some trouble because of his $300,000 debt.

In addition to the missing interrogation tapes and interview tapes, video of the crime scene appears to have gone missing and may have been destroyed. We know from Mathes that he taped the crimes scene. But newly discovered photographs show that law enforcement also made a crime scene video as seen in the photos below:

---

[28] There are also rumors that Cecil Dotson, Sr. had used $300,000 in counterfeit money to buy drugs.

73



We know that the person in the white suit, holding the camera, is not Isaac Mathes, because he was not wearing the protective garb that the crime scene detectives wore. See photo of Mathes at the scene above. Additionally, Sgt. Mullins testified, "He wore the booties. The white suits are as much for our protection as anything else. But the booties [are] for everybody."

Crime scene video evidence is critical in a case such as this. Especially where there is a question of gang involvement. But the video has not been preserved and may be destroyed.

74

Also unaccounted for is the evidence identified by Sgt. Skelton with the Organized Crime Unit. Skelton was called to the scene because he is an expert in assessing crime scenes for evidence of gang activity. He identified a backpack with bandana in the living room; photographs of high-ranking Gangster Disciples, including Big Brim (a/k/a Rico Harris a/k/a Rico Mickens[29]—brother of Corey Mickens)[30], Doc Holiday, and photos and funeral pamphlets for the murder of "Gage"; and a box of live 9mm and .380 ammunition. All of this evidence was still at the scene on March 7, 2008, when Skelton was called in. Skelton left the evidence in the custody of Sgt. Mullins at about 5:15 PM on March 7. But by this time, Sgt. Mason had gotten C.J. to say that "Junior" did it, and all investigation of gang activity was halted. As the case coordinator, Sgt. Walter "Rick" Davidson testified. "I had Sergeant Max following up on the gang avenue or the issues of gang members possibly being involved up until the point of the children telling us who actually committed the murders. Then all of that was for nothing." Trial Tr. vol. 24, 1145. After C.J. had named Jessie Dotson, "the gang issue was out." *Id.* at 1162.  There are no supplements from Sgt. Mullins regarding Skelton's review of the home. There are no evidence

---

[29] On September 24, 2008, Rico Harris was indicted for trafficking cocaine in a scheme involving Mexican cartels. *United States v. Turner*, *et al.*, Case No. 08-20308 (W.D. Tenn.)

[30] Corey Mickens was convicted of the brutal murder of Marshall Shipp and beating (pumpkin head) of Ricky Aldridge – one of the most notorious Gangster Disciple Murders in Memphis at the time. Mickens is serving life without parole. The reported case in *State v. Mickens*, 123 S.W.2d 355 (Tenn. 2003), provides a basic primer on Gangster Disciple actions and hierarchy.

receipts for any of the evidence identified by Skelton. We still do not know where this evidence is.

Also missing is the recording made by a confidential informant that was working with Sgt. Max (referenced in the testimony of Davidson above). This informant had told the police that Cecil had "hit a lick" and stolen drugs from the cartel. The CI was given a key fob with a hidden microphone and was to meet with a woman who had information about the murders. The whereabouts of this recording are unknown. The same confidential informant has been interviewed by Henry and Leonard who confirmed what he told the police.

In *Arizona v. Youngblood*, the Supreme Court held that law enforcement's "failure to preserve potentially useful evidence does not constitute a denial of due process of law" unless it is done in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001). The duty to demonstrate bad faith, however, is alleviated if the "exculpatory value . . . was apparent before the evidence was destroyed, [and was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

The destruction of evidence here violates the principles of *Youngblood* and *Trombetta*. At trial, the State argued that the only reason that they were looking at gangs is because Jessie made the suggestion to them—that Jessie was the first person to suggest the gangs had been involved. This is simply not true. The police were looking at the gang angle from the beginning. In addition to the evidence above, the

police also knew that the Gangster Disciple Overseer Eric Brown ("Big Easy") had just been murdered by Vernon Motley (a Vice Lord). Sgt. Mullins worked the case. Vernon Motley's girlfriend, Tammy Randolph, is a cousin of Cecil and Jessie Dotson. They also knew that Cecil's best friend, James "Gage" Woods, who is referenced in Doc Holiday's rap, was murdered the year before.

The State also had the benefit of an FBI behavioral analyst who told them that the crime was consistent with the sort of crimes committed by gangs with ties to the Mexican drug cartels. Included in that analysis of the scene is the fact that the male victims had their pants pulled down; children were tortured; the adult victims were all shot in the leg, which is suggestive of torture; there was evidence of sexual violence at the scene (including semen in the mouth of a 2-year-old boy); crack cocaine inside the vagina of one of the female victims; a bag of marijuana in Cecil Sr.'s hand, and a baggie of shell casings that were left behind. All of this is consistent with a gang blackout to send a message of warning to others—this is what happens when you play with the gang. The FBI behavioral analyst's report has not been turned over but is briefly mentioned by Ray Lepone in his post-conviction testimony. "Then we had FBI profilers come in saying that it might be a Mexican gang." P.C. Tech. R., vol. 3, 313.

At trial, Sgt. Mullins opined that the crime scene was staged because it was not consistent with Jessie's confession. Thus, Mullins concluded Jessie must have staged the crime scene to make the police believe gangs were involved. But this logic is backwards. The scene is consistent with a gang blackout and inconsistent with Jessie's testimony. Thus, Jessie's confession is what is unreliable.

Any evidence suggesting gang involvement was exculpatory and should have been preserved. But as Davidson testified, once Sgt. Mason got C.J. to identify Jessie, all evidence of "the gang issue was out." Trial Tr. vol. 24, 1162.

### 4. The prosecution suppressed exculpatory evidence in violation of *Brady v. Maryland.*

Mr. Dotson incorporates the above facts and law as if fully set forth herein. If it is learned that the evidence discussed in Claim 3 above was not destroyed, but in fact still exists, then the suppression of that evidence constitutes a violation of *Brady v. Maryland,* 373 U.S. 83 (1963). Moreover, if the evidence does exist, then the false testimony of law enforcement constitutes a violation under *Napue v. Illinois,* 360 U.S. 264, 269 (1959) and *Giglio v. United States*, 405 U.S. 150, 154 (1972). This claim requires leave of court to conduct discovery for further development and is pled in the alternative.

### 5. The prosecution suppressed evidence of favorable treatment and deals made with State witnesses.

The police and prosecutors improperly provided food, clothing, and other gifts to Priscilla Shaw, Nicole Dotson, C.J. Dotson, and Cedrick Dotson in an effort to ingratiate themselves with these witnesses and ensure that they testified favorably for the state. The state also made Priscilla Shaw and Nicole Dotson part of the prosecution team by enlisting their aid in plotting how to get Jessie Dotson angry on the witness stand. This crossed an ethical line and borders on witness tampering. The defense was entitled to know about these actions and could have used them to impeach the witnesses' credibility and the credibility of the prosecution's theory.

78

Further, the state suppressed deals made with Willie Boyd Hill in exchange for his testimony. Doc Holiday's rap states that Hill "took the stand" to avoid "time in the can." It is well-established that deals made with witnesses must be disclosed and are powerful impeachment. The state's failure to disclose their deal with Hill violated the principles of *Brady* and its progeny. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Mr. Dotson was prejudiced as a result because the state relied on Hill's testimony that Gangster Disciples would never harm women or children to debunk the defense. Mr. Dotson is entitled to habeas relief on this claim.

6. **The prosecution failed to disclose lies, threats, promises, and other coercive interrogation methods police used to interrogate Jessie, which coerced him into making a false confession.**

Mr. Dotson incorporates by reference all of the factual averments contained in this petition. In summary, Lt. Armstrong lied to Jessie and told him his bloody shoeprints were found at the scene. He threatened to kill Jessie. He threatened to arrest Jessie's mother and sister. He threatened to let the Gangster Disciples in the jail kill Jessie. All of this should exist on tape. Whether it is on tape or not, these facts are exculpatory because the defense could have used them to bolster the defense that Jessie falsely confessed. It is not enough to say that Jessie could testify to such threats. When it is Jessie's word versus the police, the state had an obligation to disclose the evidence which would have corroborated Jessie's testimony.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963). "Impeachment evidence . . . falls within the *Brady*
rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). The *Brady* rule mandates
that "the individual prosecutor has a duty to learn of any favorable evidence known
to the others acting on the government's behalf in the case, including the police."
*Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also United States v. Risha*, 445 F.3d
298 (3d Cir. 2006) (extending *Brady* to information possessed by state officials who
worked closely with the federal government); *Smith v. Sec'y of N.M. Dept. of Corr.*, 50
F.3d 801 (10th Cir. 1995) (imputing to the prosecution evidence held by another
jurisdiction investigating a related matter); *United States v. Antone*, 603 F.2d 566
(5th Cir. 1979) (imputing to the prosecution evidence held by state law enforcement
officials who had "extensive cooperation" with federal authorities). Quite simply, "[a]
rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a
system constitutionally bound to accord defendants due process." *Banks v. Dretke*,
540 U.S. 668, 696 (2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)).

To establish a *Brady* violation, "a habeas petitioner must establish three
elements: 'The evidence at issue must be favorable to the accused, either because it
is exculpatory, or because it is impeaching; that evidence must have been suppressed
by the state, either willfully or inadvertently; and prejudice must have ensued.'"
*Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010) (quoting *Strickler v. Greene*,
527 U.S. 263, 281–82 (1999)). In assessing materiality, such evidence must be
"considered collectively, not item by item." *Kyles*, 514 U.S. at 436. The existence of a

*Brady* violation constitutes cause that will excuse procedural default. *Strickler*, 527 U.S. at 289.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *accord Miller v. Pate*, 386 U.S. 1, 7 (1967); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.* at 269. "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Carter v. Mitchell*, 443 F.3d 517, 535 (6th Cir. 2006) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). "A false-testimony claim is cognizable on federal habeas review because the 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *McNeill v. Bagley*, 10 F.4th 588, 604 (6th Cir. 2021) (*Abdus-Samad v. Bell*, 420 F.3d 614, 625 (6th Cir. 2005)).

The failure to disclose this evidence materially prejudiced Jessie Dotson because it goes directly to the heart of his defense. To convict Mr. Dotson, one must believe his false confession and disbelieve his sworn testimony. Anything that would support his false confession defense should have been disclosed.

### 7. The prosecution failed to disclose that Mr. Dotson's false confession was obtained in violation of Miranda.

Mr. Dotson incorporates by reference the facts and law as stated above as if incorporated herein by reference. In summary, Mr. Dotson maintains that his false confession was obtained in violation of *Miranda* because: 1) contrary to their testimony, Sgts. Mason and Stark did not allow Jessie to read the Miranda warning and asked him to sign it without giving him a chance to do so; 2) police failed to honor his invocation of his right to silence; 3) police failed to honor his invocation of his right to counsel; and 4) the police used his mother as an agent to circumvent his invocation of right to counsel. Separate and apart from whether he is entitled to relief based on the *Miranda* violation as a free-standing claim, Mr. Dotson alleges as a separate claim that the failure to disclose the evidence, including video and audio evidence, which would have established these violations is a violation under *Brady*, *Giglio,* and *Napue*.

First, it is a *Brady* violation because the evidence is exculpatory in two ways. It shows that he did not waive his rights and establishes his claim that his statement should have been excluded. And, even if the Court would not have excluded his statement, the facts that the police were willing to, and did, violate constitutional mandates undermines the integrity of the investigation, which is itself a legitimate defense as explained by the United States Supreme Court in *Kyles v. Whitley*.

Second, it is a false testimony claim because contrary to the testimony at trial, Mr. Dotson did not read the *Miranda* warning out loud and sign it after doing so. This false testimony went uncorrected. Mr. Dotson could have used the fact that the police

were willing to testify falsely about his signing the *Miranda* waiver to attack their credibility and strike at the heart of the case. If the police were lying about this, what else are they lying about? If the police lie about the *Miranda* warnings, then they would be willing to obtain a false confession by means of threats and coercion.

Mr. Dotson's constitutional rights were violated, and he was prejudiced as a result.

### 8. Sgt. Caroline Mason engaged in misconduct by suggesting Jessie as a suspect to C.J. and tampering with C.J.'s memory.

Mr. Dotson incorporates by reference the facts and law as stated above and is incorporated herein by reference. In summary, the state knew from Linda Steele that Sgt. Mason's tactics and approach with C.J. violated the forensic standard of care. They knew from Linda Steele that C.J. was not psychologically stable at the time he was improperly questioned by Sgt. Mason. They failed to disclose this expert opinion to trial counsel. The reliability of C.J.'s identification was a central component of the state's case. The fact that the state knew that Sgt. Mason's tactics had tampered with C.J.'s memory is evidence that should have been disclosed to trial counsel. Had trial counsel possessed this information, they could have moved pre-trial to exclude C.J.'s testimony. At the very least, they could have used this information to impeach the credibility of the police. They could have shown the jury that the Memphis Police Department was so desperate to take credit for solving the crime on *The First 48* that they were willing to cut corners and violate procedure. In so doing, they created an unreliable memory in C.J. that then became cemented in his head and that of his younger brother. Demonstrating this to the jury would have made it more likely for

the jury to credit Jessie Dotson's testimony that he confessed only out of fear for himself and his family.

Mr. Dotson was prejudiced by the state's constitutional violations and is entitled to habeas relief.

> **9.** **The prosecution failed to disclose C.J.'s records, including an evaluation that showed significant neurocognitive impairments.**

Mr. Dotson incorporates by reference the facts and law as stated above as if incorporated herein by reference. The District Attorney file contained medical records of Cecil Dotson, Jr., including a May 8, 2008, neuropsychological evaluation at Le Bonheur Children's Medical Center that reveals significant impairment in his long-term memory. This information was relevant to his competency to testify and was critical impeachment material. It was also relevant to Dr. Aldridge's expert testimony. Trial counsel made multiple, wide-ranging *Brady* requests, including a broad request for any favorable evidence, including any information that would tend to impeach the credibility of any state witness and any information that would suggest a mental or organic abnormality. Trial Tech. R. vol. 2, 234–35. Trial counsel also made specific requests for records relating to C.J. and Cedrick's mental condition. These medical records were in the possession of the state, and the prosecution had a duty to disclose them under the authority of *Brady* and *Kyles*.

In addition, the prosecution failed to disclose Linda Steele's report that neither Cedrick nor C.J. were psychologically stable enough to be interviewed. See Claims 1.a, 8. The suppression of this report violates *Brady* and *Kyles*.

84

Mr. Dotson was prejudiced by the state's constitutional violations because the testimony of the children was a key component of the state's case. The state relied on the testimony in closing argument. There is no evidence tying Mr. Dotson to the scene of the crime, nor does the crime scene evidence corroborate the testimony of C.J., Cedrick, or Mr. Dotson's false confession. He is entitled to habeas relief.

> **10.    The prosecutor deliberately elicited testimony from Lt. Armstrong that Mr. Dotson invoked his right to counsel in violation of Mr. Dotson's due process rights.**

Mr. Dotson incorporates by reference the facts and law as stated above as if incorporated herein by reference. The prosecution team in this case was extremely experienced and very prepared. They spent hours upon hours preparing witnesses to testify, particularly Lt. Armstrong. Experienced prosecutors know that it is a constitutional violation to comment on a defendant's invocation of his right to counsel in front of the jury. Experienced prosecutors know that they must caution law enforcement to not volunteer such information in front of the jury. Here, the prosecution went over the questions that they intended to ask on direct examination. The prosecution asked questions which deliberately elicited testimony from Lt. Armstrong that Mr. Dotson invoked his right to counsel. *See* Claims 20.26, 16, 17. This was improper and not accidental.

As a result, Mr. Dotson's constitutional rights to a fair trial, due process, and to be free from cruel and unusual punishment were violated. Mr. Dotson is entitled to habeas relief.

### 11. Prosecutorial misconduct in closing arguments violated Mr. Dotson's due process rights.

During closing argument, the prosecutor made numerous comments that violated Mr. Dotson's due process rights. A habeas petitioner is entitled to relief on the basis of a prosecutor's comments when "the prosecutor's comments' so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly DeChristoforo*, 416 U.S. 637, 642 (1974)). When addressing claims of prosecutorial misconduct, a court must first determine whether the challenged statements were actually improper; if they were, the court must "look to see if they were flagrant and warrant reversal." *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). In determining whether a statement was flagrant, a court considers four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.*

"[T]he Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). "[E]xpressions of personal belief of the innocence or guilt of an accused are error regardless whether such expressions are phrased in such a way as to suggest knowledge of outside evidence not before the jury." *United States v. Bess*, 593 F.2d 749, 755 (6th Cir. 1979). "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal

belief in the witness's credibility." *United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019) (quoting *Francis*, 170 F.3d at 550); *see also ABA Standards for Criminal Justice, Prosecution Function* 3-8(b) (3rd ed. 1993); Tenn. Sup. Ct. R. 8, Rules of Professional Conduct 3.4(e). Additionally, a prosecutor may not misstate the evidence or assume the existence of prejudicial facts not in evidence. *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001) Further, it is improper to use closing argument to inflame the passions and prejudices of the jury. *United States v. Young*, 470 U.S. 1, 9 n.7 (1985); *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000).

In closing argument at the guilt-innocence phase, the prosecutor denigrated the defense by referring to alternate theories as "smoke and mirrors," Trial Tr. vol. 30, 2364, 2366, 2367, 2375, 2381, "absurd," *id.*, 2384, "ridiculous," i*d.*, 2391, 2395, and "insane," *id.*, and by referring to defense counsel as a "tricky lawyer," *id.*, 2396. During the prosecutor's rebuttal in the guilt-innocence phase, he argued the jury should not discredit the testimony of two of the children "because of some tricky lawyer or expert." *Id.*, 2396.[31] The prosecutor further argued it was not the fault of the Memphis Police Department that *The First 48* footage was destroyed, "[s]o now [the defendant] can say whatever he wants." *Id.*, 2383. Counsel objected. Evidence was never presented that employees from *The First 48* destroyed the tape recording of the interrogation, and this interjected the prosecutor's personal opinion. The prosecutor also argued that defense counsel should have put him on the stand so that

---

[31] This error is all the more egregious because the prosecution had suppressed evidence of the unreliability of the children's memories.

he could testify he did not coach the child witnesses, which the Tennessee Court of Criminal Appeals found improper. *Dotson*, 2013 WL 4728679, *77. During rebuttal argument in the penalty phase, the prosecutor improperly encouraged the jury to experience the victims' fear after asking them to experience 30 seconds of silence. Trial Tr. vol. 30, 2396.

Further, the prosecutor inflamed the jury and urged them to exact personal retribution by commenting that the defendant "stamped them out like they were insects in a two-hour period," Trial Tr. vol. 31, 2548, and arguing: "What's going to stop him? You. You. And how are you going to do it? With the law, with the law. We're not asking anything of you but to follow the law. And the law does give you your verdict in this case, shall be death." *Id.*

The prosecutor also made the following constitutionally improper, burden-shifting, remarks:

- "C.J. knows what happened because he was there and he saw Jessie Dotson do it." Trial Tr. vol. 30, 2304–05 (personal belief regarding witness testimony, vouching);

- Defense expert Dr. Aldridge testified regarding interviewing children (and not about how lawyers conduct a proper cross-examination), that one should ask open-ended questions. Regarding defense counsel not asking C.J. and Cedrick the open-ended question: "Who did this to you?" the prosecutor asserted 'So why? Why wouldn't they ask him? Because they didn't want the answer." *Id.*, 2307 (burden shifting);

- The prosecutor continued along these lines, contrasting his strategy of asking C.J. open-ended questions with the defense's approach. "Never once, not once did they say C.J., can you tell me what happened and describe." *Id.* (burden shifting);

- Regarding the Gangster Disciples, "Right out there with his siblings, his family members, yeah, the GDs did this. Lie after lie after lie." *Id.*, 2310 (personal belief regarding witness testimony);

- "[W]e know who the killer is." *Id.*, 2313 (personal belief);

88

- Cecil was "[t]urned face over in his own house with his pants pulled down." *Id.*, 2362 (fact not in evidence, factually inaccurate);

- 'The defense doesn't have to put on any proof, but they still get to do some things. And they did them in this trial. Smoke and mirrors." *Id.*, 2363–64 (comment on defense strategy);

- 'There's so much smoke in this courtroom right now I'm surprised you can even see Jessie Dotson sitting over there, taking your attention off of the facts and the proof in this case and putting it on everyone else." *Id.*, 2364 (comment on defense strategy);

- "Using confusion and mere possibility to make you think there's reasonable doubt in this case." *Id.*, 2364 (burden shifting);

- Regarding Roderick: "We've got to pull him out of school." *Id.*, 2366 (fact not in evidence);

- "The women would have been in shock." *Id.*, 2369 (fact not in evidence);

- "As soon as he shot Cecil, [Shindri] was jumping up to the back. That's why she's up on the chair. She's like oh, my God. She's in shock." *Id.*, 2369–70 (facts not in evidence);

- "What do you think the women are going to do? They don't have a gun. They just saw two men murdered in front of them. You don't think they're going to be scared to death and maybe hoping, hoping he would stop there and not kill women. They might have believed in their hearts that they wouldn't die. What are they going to do?" *Id.*, 2371 (facts not in evidence; factually untrue);

- "Cecil Dotson, Senior's, pants were pulled down. If you look at the blood, Jessie turned him and then pulled his pants down. What's the purpose of that?" *Id.*, 2376 (facts not in evidence, incorrect);

- "You want to bring in experts and confuse kids? Fine. You want to sit a chair here in front of that poor kid and lead him through things so he says yes, sir, which their expert told them not to do, fine. But don't not believe that kid. Because he took courage to come in here and he survived this for a reason." *Id.*, 2382 (personal belief, vouching);

- "[W]hat do you have to do to somebody to make them confess to that? I don't think that exists. I don't think there is anything a human being could do to another human being to make them confess to slicing up kids, sorry." *Id.*, 2382 (personal belief, vouching);

- "Why did [Skahan] leave ['a doubt that may arise from possibility'] out? Because that's exactly all they've done in this case, is try to throw possibilities at you, try to take your focus away from Jessie Dotson." *Id.*, 2386 (burden shifting);

89

- "The big one, attack the police. That's defense 101. If they've got a strong case, if they've got a strong case, go after the police because they're a bunch of big, bad mean people that don't care about anybody. Really?" *Id.*, 2389 (ad hominem);

- "They're getting blamed for a case they didn't solve. C.J. solved it." *Id.*, 2389 (personal belief, vouching);

- "Because [Jessie Dotson] lied to you and you know he did [in his testimony]." *Id.*, 2393 (personal belief regarding witness testimony);

- "The first thing you need to look at and I don't think it's dispositive. I don't think he could have fit under there." *Id.*, 2393 (personal belief);

- "So [Jessie's] lying. . . . But see, when you're going to get up on the witness stand and lie in a case like this, you're going to get caught." *Id.*, 2394 (personal belief regarding witness testimony);

- "The bleach explanation is ridiculous. The coerced statement is ridiculous." *Id.*, 2395 (personal belief regarding witness testimony);

- "Did you see the cross of his mother? He didn't touch her. A couple questions and sat down. Why? Because truth that strong you can't touch, not even with good lawyering skills." *Id.*, 2395 (personal belief regarding witness testimony, comment on defense strategy);

- "And his mother did something that she had to do. She had to tell you the truth. Just like Jessie told her the truth." *Id.*, 2395 (personal belief regarding witness testimony);

- "And any other verdict than guilty just tells those boys they survived for nothing." *Id.*, 2397 (inflammatory); and

- 'It's time. It's time for everybody to get out of this house. It's time for every victim to leave this house. And there's only one way justice. It's the only way. It's the only way. *Id.*, 2397 (inflammatory).

The prosecutors in Mr. Dotson's case made flagrant improper statements which so infected the trial with unfairness that his conviction was a denial of due process rights. Mr. Dotson was prejudiced and is entitled to habeas relief.

## 12. The State intentionally schemed to induce Mr. Dotson to become frustrated and erupt on the witness stand in an effort to prey on racial prejudices of the jury.

According to a former Assistant Shelby County District Attorney General with knowledge, Ray Lepone often brags on the research he conducted in advance of Jessie

Dotson's testimony. Lepone enlisted the help of Jessie's family to help him come up with a way to make Jessie angry on the witness stand. His hope was to make Jessie lose his temper and in turn "scare" the jury, playing on the stereotype of the Black Male Superpredator.

Equal justice under the law requires a trial to be free from racism, even subtle appeals to racial bias. The insidiousness of the prosecution's motive here was to take Mr. Dotson's righteous anger at being falsely accused of a crime and frustration at a system that was inherently biased and use that against him to make his anger make him look scary and unremorseful.  When pressed, Jessie re-enacted for the jury what Lt. Armstrong said to him during the interrogation and in doing so imitated Armstrong's anger, tone, and volume. Everyone agreed that the ploy worked. The jury was scared. But such a ploy is ethically improper and constitutionally unfair.

A prosecutor:

is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). By intentionally appealing to implicit racial bias and dog whistling, the state deprived Mr. Dotson of a fair trial, due process, and equal protection under the law. This bias carried over into the sentencing phase where statistics already show that a Black man facing the death penalty is far

more likely to receive a death sentence than a White man. The state improperly inflamed these passions and Mr. Dotson was prejudiced as a result.

### 13. The cumulative effect of the prosecutorial misconduct render Mr. Dotson's conviction and death sentence unconstitutional.

Prosecutorial misconduct denied Mr. Dotson his rights to a fair trial, due process, and to be free from cruel and unusual punishment as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The cumulative effect of the prosecutorial misconduct render Mr. Dotson's conviction and death sentence unconstitutional in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) (holding all instances of constitutional error must be viewed "in conjunction" with each other).

### 14. The involvement of *The First 48* denied Mr. Dotson his right to due process.

The presence of *The First 48* infected this case from the beginning and resulted in the denial of due process to Mr. Dotson. Early on in the investigation, *The First 48* was permitted to enter the crime scene and obtain vital footage. At Mr. Dotson's trial, issues such as blood spatter, the ability of a single individual to perpetrate the crime, and the extent to which the crime scene had been staged were crucial questions, which the prosecution devoted significant attention to during its case in chief.

The most crucial evidence in this case is undoubtedly the statement Jessie Dotson gave to Lt. Armstrong. There is no dispute that *The First 48* was permitted to

film the interrogation.[32] Although the circumstances of the interrogation were hotly debated at trial, *The First 48* was permitted to destroy its footage, except for the highly edited and sensationalized final product.

There is also a strong likelihood that the presence of *The First 48* field producer contaminated the crime scene. More than 30 people were permitted access to the crime scene, including a civilian employee of *The First 48* that did not wear protective gear to avoid crime scene contamination. The presence of the field producer for the reality TV show served no investigative purpose and their presence only added to the risk of the improper handling of evidence.

After being given unprecedented access to the crime scene and the accompanying investigation, the police permitted *The First 48* to destroy admissible evidence, including the crucial portions of Mr. Dotson's statement.[33] *The First 48* employees were permitted to enter and likely contaminate the crime scene. The entire premise of *The First 48* is that officers will quickly apprehend and prosecute a suspect. In this case, the presence of a cameraman drove the police to find a suspect before the conclusion of the program and without adequate care.

---

[32] It also appears that police videotaped the interview.

[33] It is quite possible that *The First 48's* actions were unlawful. Tennessee law makes it a Class C Felony "for any person, knowing that an investigation or official proceeding is pending or in progress, to: (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; Tenn. Code Ann. § 39-16-503(a)(1).

As is discussed above, in a variety of constitutional contexts, the law recognizes that the state may not do through a private party that which it is constitutionally prohibited from doing. *See, e.g., Fulminante*, 499 U.S. at 286*; Moulton*, 474 U.S. at 176; Massiah, 377 U.S. at 206; *Coolidge*, 403 U.S. at 487; *Beckstead*, 500 F.3d at 1158 n.3. But here, this is exactly what happened. *The First 48* field producer operated at the instruction of police. If asked to stop filming by an officer, he complied. He entered the crime scene at the instruction of police. The City of Memphis executed a contract with Granada Entertainment USA, the corporate entity behind *The First 48*. In short, there was an agency relationship between the Memphis Police Department and *The First 48*. Restatement (Second) of Agency § 15 (1958).

Indeed, the presence of *The First 48* was so detrimental that then District Attorney General Bill Gibbons urged the Memphis Police Department to end its contract. In a letter to Chief of Police Goodwin, DA Gibbons wrote:

July 24, 2008

Director Larry A. Godwin
Memphis Police Department
201 Poplar Avenue, 12th Floor
Memphis, TN 38103

### RE: Renewing Contract With The First 48 Television Show

Dear Director Godwin:

As you know, I fully supported your decision to terminate the Memphis Police Department's contract with "The First 48" television show which airs facts and details that are not public record of ongoing investigations and pending criminal cases.

It has come to my attention that the assistant district attorneys who actually prosecute the cases aired on this show are confronting numerous unnecessary pretrial and trial issues as a direct result of this show. Further, several judges have expressed to prosecutors in this office their concern that events of a pending criminal case are edited, taken out of sequence, and then aired nationally.

Under Tennessee Supreme Court Rule 3.6, we are generally not allowed to make comments for public dissemination about an investigation or pending case. Except for information already contained in a public record, commenting on potential evidence or information that would be materially prejudicial is generally prohibited. Examples set forth in the comments to the rule include:

1. The character, credibility, reputation, or criminal record of a party, suspect, or witness;
2. The expected testimony of a party or witness;
3. The existence or contents of any confession, admission, or statement given by a defendant or suspect;
4. The performance or results of any examination or test; and
5. The identity or nature of physical evidence expected to be presented.

Director Larry Godwin
Page 2
July 24, 2008


Under a renewed contract with "The First 48", MPD would be agreeing to the dissemination of such information through the airing of comments by MPD detectives during the investigative stage - and their interviews with suspects and potential witnesses.

The Tennessee Supreme Court has imposed on me an affirmative duty to discourage other law enforcement personnel from making or issuing public statements that prosecutors would be prohibited from making (Rule 3.8). It is because of this affirmative duty I am sending this letter. It is my hope that you will not renew the Memphis Police Department's contract with "The First 48" - a show that clearly airs potential evidence and information on pending criminal cases.

The only way to avoid this problem would be an agreement by "The First 48" to run programs related to Memphis cases only after we have disposed of those cases - a condition which I doubt is agreeable to the producer of the program.

Sincerely,


WILLIAM L. GIBBONS
District Attorney General

WLG/mc

cc:     Deputy District Attorney James Challen
        Assistant District Attorney Tom Henderson
        Assistant District Attorney Reggie Henderson
        Assistant District Attorney Ray Lepone
        Assistant District Attorney Paul Hagerman
        Jennifer Donnals


*The First 48*'s pernicious influence continued into Mr. Dotson's trial. The record unambiguously establishes that at least one member of the venire prejudiced members of the jury by mentioning that Mr. Dotson had previously been incarcerated, a fact told by *The First 48* program. *See* Trial Tr. vol. 17, 836; *The First 48*, *Lester Street* (A&E television broadcast July 15, 2008). The presence of a cameraman was

instrumental in the trial judge's admittedly inappropriate denigration of trial counsel. *See* Claim 30.

From his interrogation to his death sentence, the actions of *The First 48* cast a shadow on this case that deprived Jessie Dotson of due process. Whatever the journalistic or entertainment value of the program may have, there is little redeeming about the destruction of evidence. Accordingly, any searching evaluation of the role of *The First 48* in this case must conclude that the presence of the program, its partnership with police, and its destruction of evidence denied Jessie Dotson a fair trial.

Moreover, *The First 48*'s airing of the show was so prejudicial that Mr. Dotson had to seek a change of venue. Mr. Dotson lost the right to be tried by a Shelby County Jury because the unfair and illegal public dissemination of the television show so tainted the jury pool, Mr. Dotson was denied jurors who would uniquely understand the gang problem in Memphis. The Nashville jury was not a jury of Mr. Dotson's peers. A Memphis jury understands the dynamics between the gangs and law enforcement. A Memphis jury would have been more receptive to why Mr. Dotson would be frightened of "the 4th Floor" of 201 Poplar. A Memphis jury would have been more accepting of why Jessie Dotson, who became a gang member in prison, could not call the police because to call the police is to violate the street code and would result in his own DV—death violation.

Because *The First 48* only became involved in this case at the invitation of the Memphis Police Department, the Memphis Police Department is responsible for the

due process violations which occurred as a result of their involvement in the case. Mr. Dotson is entitled to habeas relief on this claim because his trial was unfairly tainted.

### 15. The admission of Mr. Dotson's custodial statements violated his Fifth Amendment rights.

On March 7, 2008, Mr. Dotson was placed under arrest and transported to the Memphis Police Department. He was initially interrogated by Sgts. Mason and Stark. Eventually, Mr. Dotson refused to answer any more of their questions. According to Sgt. Mason, Mr. Dotson stated "that he didn't want to talk to us anymore, to get somebody else in there for him to talk to." Trial Tr. vol. 25, 1502. Upon his refusal to speak with officers any further, Lt. Armstrong entered the interrogation room and began the interrogation anew. During this interrogation by Lt. Armstrong, Mr. Dotson purportedly confessed to the crimes.

Although the entire interrogation was captured by *The First 48* field producer who was filming events, the tape was not retained by law enforcement. Nor did trial counsel move to preserve the tape. This permitted *The First 48* to destroy evidence in a capital case. Mr. Dotson testified that Lt. Armstrong threatened him during the course of the interrogation. Trial Tr. vol. 29, 2224. On August 5, 2008, approximately five months after the offense in this case, Shelby County terminated its relationship with *The First 48*. PC Tr. vol. 12, 321.

There is little doubt as to the governing legal principles.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or

> otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966).

Mr. Dotson advised the officers that he did not want to talk to them any longer, indicating in some manner that he wished to remain silent. At that point, his Fifth Amendment privilege was implicated, and the interrogation should have ceased, despite the previous dubious waiver. Because it did not, Mr. Dotson's constitutional rights were violated, and his statements after this point in time were inadmissible. Even under a plain error standard, Mr. Dotson is entitled to relief as to this Fifth and Fourteenth Amendment claim.

### 16. Mr. Dotson's due process rights were violated when law enforcement witnesses and the prosecution were permitted to comment on his invocation of the right to counsel.

Multiple law enforcement witnesses and the prosecution unconstitutionally commented on Mr. Dotson's invocation of his right to counsel. The first reference to Mr. Dotson's invocation of the right to counsel occurred when Sgt. Mullins—the lead crime scene investigator—responded to a question from defense counsel regarding whether he would have documented any statements by Mr. Dotson regarding grabbing or ripping out the hair of one the juvenile victims. Sgt. Mullins responded stating, "If I was able to interview Jessie Dotson, I would have asked a lot of questions before he asked for his attorney. Now how many questions he was asked before he

asked for an attorney, I couldn't tell you. I would have asked a lot of questions before such time." Trial Tr. vol. 22, 808. Lt. Armstrong gave similar testimony. In response to defense counsel's question regarding whether Lt. Armstrong questioned Mr. Dotson regarding details about the crime scene, Lt. Armstrong responded: "I did. From the crime scene I could tell some of the women's clothing had been altered and I asked him about that. And as I tried to ask him additional questions about that, he asked for an attorney." Trial Tr. vol. 26, 1676–77. The prosecutor then hammered home the point by asking "He asked for a lawyer?" To which, Lt. Armstrong responded, "Yes, he did." *Id.*, 1677.

*Miranda* could not be clearer: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474. "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). "[T]he use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). The Sixth Circuit has held that a defendant's *Miranda*-related invocation of counsel falls within the rule of *Doyle* and that a defendant's invocation of his right to counsel "clearly invoke[s] the privilege against self-incrimination." *Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000). *Jaradat v. Williams*, 591 F.3d 863, 867 (6th Cir.

2010); *accord Territory of Guam v. Veloria*, 136 F.3d 648, 651 (9th Cir. 1998). The Due Process Clause "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965).

Here, the record unambiguously establishes that the prosecution and the police impermissibly asked the jury to make inferences about Mr. Dotson's guilt because he invoked his right to counsel. The officers' testimony attempted to explain away evidentiary deficiencies by casting blame upon Mr. Dotson for invoking his right to counsel. Both Sgt. Mullins's and Lt. Armstrong's testimony indicated their belief that the only reason for evidentiary inadequacies was Mr. Dotson's refusal to continue to engage with law enforcement without an attorney. As such, the testimony infringed on Mr. Dotson's constitutional rights and was not harmless. Mr. Dotson is entitled to habeas relief on this claim.

### 17. The trial court erred in failing to grant a mistrial sua sponte when Mullins testified Jessie had invoked his right to counsel.

The trial court observed Sgt. Mullins's comment upon Mr. Dotson's invocation of his right to counsel. The trial court did not sua sponte grant a mistrial. This was constitutional error.

One of the primary duties of a trial judge is to run his or her courtroom in a way that guarantees litigants a fair and impartial trial. One part of that responsibility "is the affirmative obligation to guard against improper trial tactics that might prevent a fair verdict." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992). A mistrial should be granted only in instances of "manifest

necessity." *Johnson v. Karnes*, 198 F.3d 589, 594 (6th Cir. 1999). "[W]hen 'bad-faith conduct by [a] judge or prosecutor' forces a defendant to move for a mistrial, re-prosecution is barred even though the defendant consented to the mistrial. *Tinsley v. Million*, 399 F.3d 796, 812 (6th Cir. 2005) (quoting *United States v. Dinitz*, 424 U.S. 600, 611 (1976)).

Sgt. Mullins clearly commented on Mr. Dotson's invocation of his right to counsel. *See* Claim 10. The law on this is clear and well established. As such, it was error for the trial court to have failed to declare a mistrial after Sgt. Mullins's comments. Mr. Dotson's constitutional rights were violated and as a result he was prejudiced.

### 18. The admission of testimony regarding petitioner's history of imprisonment violated his right to a fair trial.

Prior to trial, the defense submitted a motion in limine to prohibit the prosecution from referencing the fact of Mr. Dotson's prior incarceration. That motion was denied, because the trial court found it relevant to motive, intent, and state of mind. Nonetheless, the trial court imposed limits upon testimony regarding the fact of Mr. Dotson's prior incarceration. Specifically, the testimony had to concern motive and state of mind related to Mr. Dotson's "unwillingness to go back to jail" as they were "highly probative of the defendant's intent, motive, and state of mind at the time of the commission of the offense." Order Denying Motion To Preclude the State From Referencing Defendant's Prior Incarceration. Trial Tech. R. vol. 4, 554.[34]

---

[34] The Tennessee Supreme Court's technical record's copy of this order is missing pages.

Lt. Armstrong violated the trial court's ruling by testifying that, "Before going into the interview room, I knew that Jessie was very familiar with the criminal justice system because he had recently been released from prison." Trial Tr. vol. 26, 1670. Lt. Armstrong was not among the individuals who had any knowledge of Mr. Dotson's intent, motive, or state of mind at the time of the offense. After trial counsel's objection to the testimony was overruled, the prosecutor again solicited prohibited information from Lt. Armstrong. The prosecutor asked "Why is it important to know who you're dealing with before you go in and talk to somebody? Just background information in general." *Id.*, 1672. In response Lt. Armstrong stated, "Before you interview them, you want to know how many times they've been arrested. . . . You want to know if it's the first time they've been arrested of anything, a violent crime, age." *Id.* Finally, after this exchange, the trial judge awoke to the testimony and stated:

> Before we go any further, ladies and gentlemen, there has been testimony in this case about whether or not Mr. Dotson had been in jail. There's been some testimony with regard to the fact that he's been in jail. I want you to understand the fact that he has been in jail has no bearing whatsoever on your decision in this case. You're to decide this case based upon the facts that are presented in this case. The only reason that issue has even come before you is it plays into certain parts of the proof. That's the only thing you're to consider that for. Does everybody understand that?

*Id.*, 1672–73.

Although this claim was presented both as an evidentiary claim under Tennessee Rule of Evidence 404(b) and a due process violation, the state courts did not analyze the due process component of this claim.

103

"When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).

Central to the Sixth and Fourteenth Amendment guarantee of a right to a fair trial is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). "[A]t times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542–43 (1965). Supreme Court caselaw demonstrates that a court's core concern in this area is to avoid procedures that undermine the presumption of innocence by conveying a message to the jury that the defendant is guilty. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986).

In light of these principles, the governing law places numerous limitations upon indicators of incarceration. *Deck v. Missouri*, 544 U.S. 622, 630 (2005) ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process."); *Estelle v. Williams*, 425 U.S. 501, 504 (1976) ("Courts have, with few exceptions, determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption so basic to the adversary system.").

There is little reason to believe that these visual markers of incarceration differ in any significant way from what occurred in this case—explicitly telling the jury Mr. Dotson was incarcerated. Lt. Armstrong's statement that he "knew that Jessie was very familiar with the criminal justice system" indicates to the jury not only that Mr. Dotson was incarcerated on a prior occasion but implies he was a savvy, seasoned criminal.[35] Not only does this sort of propensity evidence violate the rules of evidence, it constitutes a due process violation as it undermined Mr. Dotson's presumption of innocence and led the jury to believe he was not only dangerous but posed a risk of future danger. The comments also express a view of Mr. Dotson as a recalcitrant criminal, serially involved in the criminal justice system. This compelled the jury to convict and sentence Mr. Dotson to death for impermissible reasons.

---

[35] As explained, Mr. Dotson suffers from neurocognitive impairments and severe mental illness. He is not savvy.

      **19.  Mr. Dotson was denied due process when the Chief Justice
of the Tennessee Supreme Court denied him funding for
experts necessary to develop his post-conviction claims.**

Tennessee Supreme Court Rule 13 provides that in capital post-conviction

matters the post-conviction court "may in its discretion determine that investigative

or expert services or other similar services are necessary to ensure that the

constitutional rights of the defendant are properly protected." Tenn. S. Ct. R.

13(5)(a)(1); *see also* Tenn. Code Ann. § 40-14-207. The rule permits expenditures up

to $25,000 for capital post-conviction petitioners, but that cap may be exceeded upon

a finding of extraordinary circumstances by the post-conviction court. Tenn. S. Ct. R.

13(5)(d)(5).

Between March 2017 and September 2018, Mr. Dotson moved *ex parte* for

funding for four experts: Dr. Bhushan S. Agharkar, a psychiatrist; Dr. James R.

Merikangas, a neurologist; Dr. Richard Leo, a psychologist and false confession

expert, and Dr. James S. Walker, a neuropsychologist. *Dotson*, 673 S.W.3d at 213–

14. The post-conviction court found that the requisites of Rule 13 had been satisfied

and granted Mr. Dotson's motions. *Id.* Additionally, the post-conviction court found

that the case presented extraordinary circumstances and authorized Mr. Dotson to

exceed the $25,000 cap on expert assistance. *Id.*

These orders were forwarded to the director of the Administrative Office of the

Courts (AOC) for approval. With respect to the funding request for Dr. Agharkar, the

AOC reduced the allowable rate from $350 per hour to $250 per hour, consistent with

the rates set in Rule 13. *Id.* The Chief Justice concurred in the reduction. *Id.* As to

the other three orders, the Chief Justice summarily denied funding. *Id.*

Mr. Dotson raised numerous challenges to Rule 13 in state court, which were uniformly rejected by the Tennessee Supreme Court. First, the court rejected Mr. Dotson's claim that the AOC director and the Chief Justice,[36] acting alone, were not authorized to exercise judicial authority over the post-conviction court's order. In doing so, the Court held that Rule 13 does not authorize substantive review of the post-conviction court's order. *Id.* at 215. In the view of the Tennessee Supreme Court, the AOC director and Chief Justice merely made an "administrative funding decision." *Id.* The court held:

> [The Tennessee Supreme Court], through the AOC Director, has to efficiently and fairly manage the limited pool of funds for indigent non-capital and capital defendants facing trial and for indigent petitioners in capital post-conviction cases. Rule 13, section 6(b)(2) requires the AOC Director to give due consideration to state revenues when deciding compensation and reimbursement claims.

*Id.*

Second, the court held the lack of notice, a hearing, or any discernable standard was not a violation of due process. *Id.* at 217. The court found that Mr. Dotson did not have a constitutionally protected interest in the Rule 13 funding and therefore typical due process protections did not apply to the funding decision. *Id.* ("[U]nlike the financial assistance benefits in *Goldberg* [*v. Kelly*, 397 U.S. 254 (1970)], our General Assembly makes a finite appropriation of these indigent funds, requiring administration funding decisions to be made."). It reasoned that "[b]ecause the

---

[36] According to the Tennessee Supreme Court, when the Chief Justice is overseeing funding requests, he acts in an administrative capacity with no judicial function.

Petitioner cannot establish a constitutionally protected right, he cannot establish that the prior approval provisions of Rule 13 deny him procedural due process." *Id.*

Finally, the court held that the absence of any appellate remedy for the denial by the AOC director and the Chief Justice did not raise a constitutional due process problem. *Id.* at 222. The court reasoned that "[e]ven though there is no review of the reasons for the administrative funding decisions, the effects of those decisions are subject to review." *Id* at 221. In essence, the court below held "[a] full and fair hearing requires only 'the opportunity to present proof and argument on the petition for post-conviction relief.'" *Id.* at 222 (citing *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995)); *but see House v. Bell*, 547 U.S. 518, 522 (2006) (holding that House had "made the stringent showing" of innocence to excuse procedural default).

"[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985). Thus, while Tennessee has no constitutional obligation to provide collateral appeals, *McKane v. Durston*, 153 U.S. 684, 687 (1894), it "has created appellate courts as an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant" and therefore its procedures "must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Lucey*, 469 U.S. at 393, 410 (cleaned up).

It is well-settled that a fundamental requirement of due process in any proceeding which is to accorded finality is "notice reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see, e.g.*, *Louisville & N.R. Co. v. Schmidt*, 177 U.S. 230, 235 (1900) (requiring, for due process purposes, that "the person condemned has had sufficient notice and adequate opportunity has been afforded him to defend.") This is so because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 170 (Frankfurter, J. concurring). "The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is done in a corner [or] in any covert manner." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571 (1980).

The Rule 13 expert funding process denied Mr. Dotson due process of law. Because Tennessee is a state that directs ineffective assistance of counsel claims to collateral proceedings, he was also denied the ability to demonstrate his Sixth Amendment rights were violated. *Sutton v. Carpenter*, 745 F.3d 787, 795 (6th Cir. 2014). As such, Mr. Dotson is entitled to relief on these claims.

Furthermore, pursuant to 28 U.S.C. § 2254(b), "there is the absence of available State corrective process" and the circumstances "render[ed] such process ineffective to protect the rights of the applicant." Because the denial of due process made it so Mr. Dotson could not develop his ineffective assistance of counsel claims in state court, he is alleviated of the duty to exhaust these claims and the state courts are owed no deference. 28 U.S.C. § 2254(b).

### 20. Counsel provided ineffective assistance of counsel in violation of Mr. Dotson's rights. [37]

Mr. Dotson received constitutionally ineffective assistance of counsel at all stages of his state court litigation—pre-trial, voir dire, guilt-innocence phase of trial, penalty phase of trial, and on appeal, in violation of his Sixth, Eighth, and Fourteenth Amendment rights. In any criminal case, an accused is constitutionally entitled to competent counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). In a capital case, the stakes are higher because death is indisputably different from all other sentences. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, & Stevens, JJ.). Capital cases are more complex and, as a result, more is demanded of counsel. *See Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510, 515–16 (2003). The constitutional adequacy of counsel is assessed according to the familiar two-part test set forth in *Strickland*, 466 U.S. at 687–88. The first prong asks whether counsel's performance "fell below an objective standard of reasonableness," and the second asks whether counsel's inadequate representation was prejudicial. *Id.*

Counsel's performance is deficient if it is unreasonable under "prevailing professional norms." *See Wiggins*, 539 U.S. at 521–22; *Strickland*, 466 U.S. at 688. Tennessee has declared that the ABA's Guidelines define professional norms for

---

[37] For each ineffective assistance of counsel claim, Mr. Dotson incorporates all averments in this petition as if set forth fully herein.

defense counsel in capital cases. *Baxter v. Rose*, 523 S.W. 2d 930 (Tenn. 1975).[38] The ABA Guidelines establish objective professional norms in place during the trial, appeal, and post-conviction proceedings in Mr. Dotson's case. Appointed Counsel for Mr. Dotson fell below objective standards of professional reasonableness as expressed by, *inter alia,* the following Guidelines: 4.1 (Defense Team); 5.1 (Qualifications); 6.1 (Workload); 7.1 (Monitoring/Removal); 8.1 (Training); 9.1 (Funding/Compensation); 10.3 (obligations of counsel regarding workload); 10.4 (Defense Team); 10.5 (Relationship with the Client); 10.7 (Investigation); 10.8 (Duty to Assert Legal Claims); 10.9 (Duty to Seek a Settlement); 10.10.1 (Trial Preparation); 10.10.2 (Voir Dire and Jury Selection); 10.11 (Penalty Phase Defense).

Mr. Dotson's court-appointed lawyers utterly failed in their constitutional duties to him. Trial counsel, among other things, failed to interview the state's witnesses, failed to research the law, failed to maintain a reasonable caseload, failed to have a member of the team who was competent to screen for mental health issues, failed to obtain critical records, failed to follow up on red flags in the case that would have led to crucial mitigating evidence of Mr. Dotson's neurocognitive impairments, failed to communicate with the client, failed to communicate with the client's family,

---

[38] The ABA revised Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, published in 2003, articulates professional norms for capital defense counsel, ensuring that constitutionally relevant evidence necessary to a reliable individualized assessment of the defendant is presented to the sentencing jury for consideration. ABA, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), reprinted in 31 HOFSTRA L. REV. 913, 1027 (2003) [hereinafter ABA Guidelines].

failed to conduct a minimally competent voir dire, failed to investigate and prepare for the penalty phase of the case, and failed to prepare the only mitigation witness they did have—their mitigation investigator.

Mr. Dotson was prejudiced by counsel's unprofessional errors both individually and cumulatively. There is a reasonable probability that but for counsel's deficient performance, he would not have been convicted of first-degree murder. Further, there is a reasonable probability that but for counsel's deficient performance, at least one juror would have voted for a life sentence, which under Tennessee law would have resulted in a life sentence.

### 20.1 Counsel failed to investigate, discover, and present that Mr. Dotson's alleged confessions were coerced and involuntary and failed to file a motion to suppress those alleged confessions pre-trial.

The Memphis Police Department coerced Mr. Dotson into making a false confession in violation of the Fifth, Sixth and Fourteenth Amendments of the Constitution. Trial counsel rendered ineffective assistance by failing to file a pre-trial motion to suppress the alleged confessions Mr. Dotson made to his mother and Lt. Armstrong, challenging the validity and admissibility of the alleged confessions. Instead, counsel filed a motion to prevent the admission of the statement to his mother after trial began, before she testified, asserting she was acting as an agent of the police. Trial Tr. vol. 26, 1714–30. The court denied that motion. *Id.*, 1730.

Courts evaluate the totality of the circumstances in the voluntariness analysis, including the "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the

repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006).

Counsel rendered ineffective assistance by failing to adequately investigate each of these factors necessary to demonstrate that Mr. Dotson's statements were not voluntary, and by filing a pre-trial motion to suppress the alleged confessions on this basis. Further, counsel were ineffective in filing a motion to suppress at trial that did not adequately show how each of these factors required suppression of his statements.

Mr. Dotson was prejudiced by the admission of involuntary, coerced, and false statements admitting to a crime he did not commit, where there was no physical evidence that proved he committed this crime. Mr. Dotson would have prevailed on an adequately investigated and presented motion to suppress filed pre-trial or at trial, the statement would not have been admitted, and there is a reasonable probability he would not have been found guilty or would have received a sentence less than death. *See United States v. Fluckes*, 297 F. Supp. 3d 778, 792 (E.D. Mich. 2018) (finding counsel ineffective for failing to file motion to suppress coerced statement).

Counsel was further ineffective with respect to challenging the admission of Mr. Dotson's alleged confessions on the basis that they were fruit of the poisonous tree of his warrantless arrest without probable cause. When Mr. Dotson was handcuffed and taken in for interrogation, police did not have a warrant for his arrest. Police admitted that the only basis for the arrest was the statement of a child, which

113

they admitted was an insufficient basis for arrest. *See State v. Bishop*, 2012 WL 938969, *9 (Tenn. Crim. App. Mar. 14, 2012) (probable cause based on a witness statement requires determination of whether officers had reasonably trustworthy information from the statement to believe that the defendant was responsible for the offense). Rather, they stated that the statement of the child created a basis for an interview to see if "the kid got it wrong."

The police arrested Mr. Dotson for investigative purposes only—as they had neither a warrant nor probable cause for the arrest. Such investigative arrests have been condemned as constitutionally dubious by federal and state courts. *See, e.g.*, *Brown v. Illinois*, 422 U.S. 590 (1975); *State v. Bishop*, 2012 WL 938969 (Tenn. Crim. App. Mar. 14, 2012).

Despite the state and federal constitutional issues implicated by the circumstances of Mr. Dotson's arrest, trial counsel failed to challenge his arrest as purely investigatory. The law was clearly in Mr. Dotson's favor, as there is a legal presumption that warrantless seizures are unreasonable, and evidence obtained as a result is subject to suppression. Nonetheless, trial counsel never filed a motion or otherwise argued that suppression was appropriate based on the warrantless arrest. Trial counsel similarly failed to argue that Mr. Dotson's arrest lacked probable cause, rendering all statements made by Mr. Dotson thereafter fruit of his unlawful seizure. Based on the state of the law at the time, there is no arguable strategic reason for counsel to have declined to make such a challenge. Trial counsel's failure is constitutionally deficient performance. Because counsel's failure resulted in Mr.

Dotson's Fourth Amendment claim being reviewed only for plain error on appeal, counsel's deficiency was prejudicial. That is to say, there is a reasonable probability that Mr. Dotson would have succeeded in a Fourth Amendment challenge to his warrantless arrest without probable cause either at the pre-trial stage or on appeal had trial counsel raised and preserved this issue. Because he did not, Mr. Dotson is entitled to habeas relief as to his claim of ineffective assistance of counsel.

### 20.2    Counsel failed to obtain *The First 48* footage.

Counsel were aware of *The First 48* filming shortly after it was completed. Lead counsel was appointed to the case on March 11, 2008. Granada Entertainment ran the *Lester Street* episode on July 15, 2008. Counsel waited until February 2009, nearly a year after filming, to try to obtain the footage obtained by Granada. On February 12, 2009, Investigator Rachael Geiser attempted to obtain a copy of the raw footage recorded for the *Lester Street* episode by serving a judicial subpoena on the production company. The production company responded by letter dated February 26, 2009, stating that the company no longer possessed raw audio-visual footage and asserting its privilege under Tennessee's media shield law, Tennessee Code section 24-1-208.

Counsel rendered ineffective assistance of counsel by delaying efforts to obtain the footage and identify and interview Granada film crew members and producers. It was clear from the beginning of counsel's representation that Mr. Dotson's alleged confessions would be a key part of the state's case against him. Counsel should have issued a subpoena to have the footage brought to the preliminary hearing. Mr. Dotson was prejudiced by the inability to present evidence in the form of video footage

115

showing Memphis Police Department detectives coercing him into making a false confession and failing to advise him of his *Miranda* rights. As a result, the trial court denied the motion to suppress the alleged confession, which was an essential piece of evidence against him. Had the trial court seen the video footage of his interrogation and suppressed his involuntary statements, there is a reasonable probability that he would not have been convicted and/or that at least one juror would not have voted for the death penalty.

### 20.3    Counsel failed to subpoena *The First 48* crew members.

Counsel were constitutionally ineffective for not obtaining a subpoena for *The First 48* crew members, particularly the field producer, as part of the investigation. The field producer was present to observe and film the processing of the crime scene, witness interviews, and Mr. Dotson's interrogation. He also had information about whether any of the unused portions of the footage remained available. Talking with the field producer would have revealed that the Memphis Police Department made its own recording of Mr. Dotson's interrogation.

Judge Beasley was clear that he would support counsel issuing a subpoena to Granada Entertainment to answer questions: "So nothing would preclude you from subpoenaing the cameraman who videotaped it to come down here and say yes, I recorded 11 hours of interviews by Lt. Armstrong and Mr. Dotson." Trial Tr. vol. 11, 44. Gerald Skahan states that other judges in Memphis have found that Granada was protected by Tennessee's Media Shield Law, and Judge Beasley states: "I don't see any reason you can't subpoena the cameraman to come down here and say I videotaped 11 hours of interview." *Id.,* 45. Mr. Skahan again states that other judges

have ruled that Granada employees are protected and do not have to come and testify, and Judge Beasley emphatically disagrees: "This is my court, Mr. Skahan, and I'm going to give you a ruling and my opinion. I don't believe that that's what the law is designed . . . . " *Id.* (interrupted by Mr. Skahan). Then Judge Beasley emphatically states his support for Mr. Skahan issuing a subpoena for Granada:

> Now so you have the same right to subpoena that witness down here, to come down here. And if A&E wants to contest that issue, they can come down here and contest it. But you have a right under the interstate agreement on witnesses to subpoena that cameraman to come down here. If you think that's going to be an issue, you have a right to do that and I'll back you on that.

*Id.*, 46.

Counsel's failure to obtain a subpoena to *The First 48's* field producer was professionally unreasonable, and Mr. Dotson was prejudiced as a result. *See, e.g.*, Claim 14.

### 20.4   Counsel failed to challenge the state's destruction of the unedited video recording of Mr. Dotson's interview with police and his interactions with his mother.

The state violated the state and/or federal constitutions by failing to preserve videotape of Mr. Dotson's custodial interrogation and police interactions with Ms. Shaw. *See Youngblood*, 488 U.S. at 58; *Trombetta*, 467 U.S. at 488–89; *State v. Ferguson*, 2 S.W.2d 912, 917 (Tenn. 1999). Trial counsel performed deficiently when they failed to argue that the state violated due process by failing to preserve this evidence that was helpful to the defense and that the state knew was helpful to the defense. The exculpatory value of the videotape depicting Mr. Dotson's custodial interrogation and police interactions with Ms. Shaw before she spoke with her son

117

was apparent before it was destroyed. The videotape contained critical evidence of the events surrounding Mr. Dotson's statements. The state's agreement with Granada Entertainment did not relieve the state of its duty to preserve evidence helpful to Mr. Dotson's defense. Trial counsel failed to subpoena in a timely manner *The First 48* raw footage. Having failed to do that, counsel were further deficient for failing to challenge this destruction of evidence and requesting a "severe remedy" from the trial court.

In Tennessee, a "trial court is afforded wide discretion in fashioning a remedy when it concludes that a trial without the lost or destroyed evidence would not be fundamentally fair." *State v. Merriman*, 410 S.W.3d 779, 796 (Tenn. 2013) (citing *Ferguson*, 2 S.W.2d at 917. "It is logical that a more severe remedy may be warranted when the conduct is egregious or the evidentiary value of the lost evidence is more significant." *Id.* In *Merriman*, the Tennessee Supreme Court affirmed the trial court's dismissal of the indictment for driving under the influence and related offenses where the state lost the squad car's dashcam recording of a stop. *Id.*at 796–97. A Tennessee "trial court's determination of the appropriate remedy for the state's failure to preserve the evidence is reviewed under an abuse of discretion standard." *Id.* at 797. When the evidence shows that the state had a duty to preserve the evidence and that the state failed in its duty, the court must then conduct a balancing analysis, considering: (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or

118

substitute evidence that remains available; and (3) the sufficiency of the other evidence used a trial to support the conviction. *Ferguson*, 2 S.W.3d at 917.

In Mr. Dotson's case, this balancing analysis requires the "more severe remedy" of dismissing the indictment. The state was negligent in not preserving the videotape either it and/or *The First 48* made of Mr. Dotson's confession. The destroyed videotape was extremely important to showing Mr. Dotson's confession was coerced and was a false confession, and there is little secondary or substitute evidence available to show that. The full tape was particularly important given the fact that the state held over Mr. Dotson's head the possibility of playing just the clip from *The First 48* where he confessed, and the defense would have no videotape to put that in context. Last, Mr. Dotson's confession was the primary evidence against him.

Trial counsel should have objected to the state's failure to preserve this evidence and asked the trial court to craft an appropriate remedy for the violation—dismissing the indictment—or, at a minimum, precluding the state from introducing Mr. Dotson's statements into evidence and instructing the jury that it could infer that events *The First 48* raw footage depicted were unfavorable to the state. There is a reasonable probability counsel would have prevailed in obtaining such a remedy and that, had the trial court ordered any of these remedies, Mr. Dotson would not have been convicted of first-degree murder and/or sentenced to death.

### 20.5   Counsel failed to challenge *The First 48*'s invocation of media shield law.

Counsel rendered ineffective assistance of counsel by failing to follow the statutory procedure to divest Granada, the production company responsible for *The*

119

*First 48*, of their privilege under Tennessee's Media Shield Law, Tennessee Code section 24-1-208. The statute provides that "any person seeking information or the source thereof protected under this section may apply for an order divesting such protection. Such application shall be made to the judge of the court having jurisdiction over the hearing, action or other proceeding in which the information sought is pending." Tenn. Code Ann. § 24-1-208(c)(1). Indeed, this statutory provision was cited in Granada's February 26, 2009, letter responding to Investigator Rachael Geiser's judicial subpoena seeking the footage related to the *Lester Street* episode. Thus, trial counsel were aware, or should have been, that obtaining the raw footage required filing an application in the trial court to divest the production company of its privilege. Trial counsel filed no such application and was therefore unable to obtain the raw footage necessary to corroborate Mr. Dotson's argument that his alleged confessions had been coerced and that he was not advised of his *Miranda* rights. Mr. Dotson was prejudiced by trial counsel's failure and is entitled to habeas relief.

### 20.6 Counsel failed to move to strike the state's death notice on the basis that Mr. Dotson was ineligible for the death penalty because of being intellectually disabled and suffering from co-morbid neurocognitive disorders, brain damage, and psychiatric illness.

Counsel were ineffective in failing to plead and prove that Mr. Dotson is not eligible for the death penalty as a result of being intellectually disabled and suffering from neurocognitive disorder, brain damage, and psychiatric illness—the combination of which make him constitutionally ineligible for the death penalty and

make his capital sentence otherwise unconstitutional under the Eighth and Fourteenth Amendments. In *Atkins v. Virginia*, 536 U.S. 304 (2002), *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court identified categories of defendants who it held could not reliably be sentenced to death: the intellectually disabled and juveniles. Because the Court's rationale resulting in those categorical exclusions applies with at least equal force to those who have neurocognitive disorders, brain damage, or psychiatric illness, executing individuals with these conditions is likewise unconstitutional. Counsel rendered deficient performance, and Mr. Dotson was prejudiced by counsel's failure to object to and prove that he was ineligible for the death penalty on the basis of these comorbid medical, psychiatric, and cognitive conditions.

### 20.7 Counsel rendered ineffective assistance by failing to develop a meaningful relationship with Jessie and his family.

Trial counsel did not meet or communicate frequently or meaningfully enough with Mr. Dotson or his family to provide effective representation. Forming a relationship with Mr. Dotson's family was of critical importance, as they were an important source of mitigation information and guilt-innocence issues. Counsel also failed to develop a relationship with Mr. Dotson's family. Mr. Dotson himself was also the source of information about his and his family's social history as well as information needed to prove his innocence. Counsel neither gained Mr. Dotson's trust nor spent sufficient time with him to gather this information nor to help him make a well-informed decision about whether to testify on his own behalf. Counsel did not

adequately advise him about testifying and did not come close to adequately preparing him to testify.

### 20.8   Counsel failed to object to the trial court's use of stun cuffs.

Trial counsel rendered ineffective assistance by failing to object to the trial court's order to place stun cuffs on Mr. Dotson, as it negatively impacted his ability to participate in his trial and prejudiced him in the eyes of the jury. *See* Claim 29. Mr. Dotson suffered prejudice by being unconstitutionally and routinely restrained during his trial. The state filed no motion requesting such measures, nor did the trial court conduct a hearing to determine the necessity of stun cuffs. The court's order made no factual findings supporting its decision authorizing the use of stun cuffs. Trial Tr. vol. 4, 557.

The Supreme Court has held that the Fourteenth Amendment's Due Process Clause generally forbids shackling a criminal defendant at trial absent a special need. *See Deck v. Missouri*, 544 U.S. 622, 626 (2005). In *Deck*, the Court considered whether shackling a convicted offender during the penalty phase of a capital case violated the federal constitution. *Id*. at 624. In answering this question, the Court held the Constitution forbids the use of visible shackles during a capital trial's penalty phase, as it does during the guilt-innocence phase, absent a trial court determination that restraints are justified by a state interest specific to the particular defendant on trial. *Id.* (citing *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)).

The right of a criminal defendant to remain unshackled throughout trial is an important one. First, the criminal process presumes that a defendant is innocent until

proven guilty. *Coffin v. United States*, 156 U.S. 432, 453 (1895) (presumption of innocence "lies at the foundation of the administration of our criminal law"). The use of visible restraints during the guilt-innocence phase of a criminal trial undermines the presumption of innocence and the related fairness of the factfinding process, by suggesting to the jury "that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Deck*, 544 U.S. at 630 (quoting *Holbrook*, 475 U.S. at 569). Second, the use of shackles interferes with the defendant's ability to communicate with counsel and participate in his own defense. *Id*. Third, the use of shackles in the presence of the jury undermines the dignity of the courtroom. *Id*. Lastly, as the Supreme Court has acknowledged, the use of visible restraints, particularly in the penalty phase, is inherently prejudicial to the defendant because it implies that the defendant is dangerous. *Id*. at 632–33. An integral part of the jury's determination of whether a defendant should be sentenced to death is the threat of danger he poses to his community. *See, e.g., Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (recognizing that a "defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system"). The perception shackling creates has the power to tip the scales in favor of the death penalty.

As the Court explained in *Deck*, the prohibition against using visible shackles during a criminal trial has deep roots in common law. *Deck*, 544 U.S. at 626. "In the 18th century, Blackstone wrote that 'it is laid down in our antient books, that, though under an indictment of the highest nature,' a defendant 'must be brought to the bar

without irons, or any manner of shackles or bonds; unless there be evidence danger of an escape'" *Id.* (citing 4 W. Blackstone, Commentaries on the Laws of England 317 (1769)). American courts have traditionally followed Blackstone's English rule, while making clear that exceptions exist in extreme and exceptional cases. *Id.* While earlier courts disagreed as to the degree of discretion to afford trial courts in making a shackling finding, "they settled virtually without exception on a basic rule embodying notions of fundamental fairness: Trial courts may not shackle defendants routinely, but only if there is a particular reason to do so." *Id.* at 627. A court may physically restrain defendants for security purposes if the court finds particularized reasons to do so. *Id.* at 627–32.

Each of these concerns was implicated by the stun cuffs placed on Mr. Dotson during his trial. As the Supreme Court acknowledge, it was inherently prejudicial by implying that he was dangerous. It undermined the presumption of innocence by suggesting to the jury that Mr. Dotson was unsafe and needed to be restrained. It interfered with Mr. Dotson's ability to communicate with counsel and participate in his own defense. Thus, trial counsel were ineffective for failing to challenge the use of stun cuffs on Mr. Dotson, and this failure prejudiced Mr. Dotson.

### 20.9    Counsel failed to challenge Juror Stephen Ray who admitted on voir dire that he would not be able to consider mitigation.

Juror Stephen Ray commented on his juror questionnaire that "I have no problem with the death penalty as I believe that no person has a right to take another person's life under the circumstances." Trial Tr. vol. 13, 215. When questioned expressly about whether he could consider mitigation for an offender that killed

multiple individuals including children, Ray responded "I would find it very difficult to find how you mitigate the murder of children quite frankly." Trial Tr. vol. 13, 217. The trial court briefly interrupted to ensure that Mr. Ray understood that the mitigation and aggravation discussion pertained to punishment only. *Id.*, 217–18. Ray responded, "I understand but my answer is still the same. I don't see that there can be mitigating circumstances to killing a child." *Id.*, 218. When asked by the court if he could weigh the proof in accordance with the law, Ray chirped, "Well I'm an open-minded individual. I can consider it. But once again, we're talking about a two-year-old child, I don't know how it exists." *Id.*, 219. In spite of the dismal prospects for Ray's fairness, trial counsel did not query further and simply stated, "I think we're done." *Id.* Ray would go on to serve as jury foreperson.

The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to an impartial and unbiased jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). "Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). Voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

Allowing Ray to serve as a juror was deficient performance. Given the circumstances of Mr. Dotson's case and the fact that the death of young children would figure prominently at trial, including as statutory aggravating circumstances,

there is no strategic reason for permitting such a juror to serve, particularly when counsel failed to utilize all of the peremptory strikes. Moreover, Mr. Dotson was prejudiced by having Ray, as he expressed a particular susceptibility to unfair judgment should the proof involve the murder of a child. Ray's unwillingness to consider mitigation rendered the jury unfairly biased in favor of death. Under these circumstances, the Sixth Circuit has repeatedly found actual bias. *Miller v. Webb*, 385 F.3d 666, 674 (6th Cir. 2004) (finding actual bias when a juror made an unequivocal statement of partiality and there was neither a subsequent assurance of impartiality nor rehabilitation by counsel or the court through follow-up questions); *Hughes v. United States*, 258 F.3d 453, 460 (6th Cir. 2001).

### 20.10  Counsel failed to exhaust peremptory challenges.

Trial counsel did not exhaust their peremptory challenges, utilizing only eight of 15 strikes. This constituted deficient performance, which prejudiced Mr. Dotson. As noted in the preceding claim, juror Stephen Ray was permitted to sit as a juror— indeed to sit as foreperson—in spite of his pronounced unwillingness to consider mitigation evidence in the case of a murdered child. Ray could have easily been removed from the jury without compromising any other strategic imperatives.

The Sixth Circuit has recognized that, absent a showing of a strategic decision, "failure to request the removal of a biased juror can constitute ineffective assistance of counsel." *Hughes v. United States*, 258 F.3d 453, 460 (6th Cir. 2001) (quotation marks omitted); *see also United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) ("The primary purpose of the voir dire of jurors is to make possible the empaneling of

an impartial jury through questions that permit the intelligent exercise of challenges by counsel.").

Here, there is little doubt that Ray was biased against Mr. Dotson. Without having heard any of the evidence, Ray had already concluded that he did not "see that there can be mitigating circumstances to killing a child." Trial Tr. vol. 13, 218. *Morgan v. Illinois*, 504 U.S. 719 (1992) "allows for the identification and exclusion of jurors who are biased for or against the death penalty before being presented with any evidence and would always vote in accordance with their biases without regard to the particular facts of the particular case." *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013). Mr. Ray held beliefs that "prevent[ed] or substantially impair[ed] the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 420 (1985). As such, trial counsel rendered ineffective assistance of counsel by failing to move for cause or to use a peremptory strike to remove Ray from the jury.

### 20.11 Counsel failed to object to death qualification of the jury, which led to the exclusion of qualified Black jurors.

Death qualification is "the exclusion for cause, in capital cases, of jurors opposed to capital punishment[.]" *Wainwright v. Witt*, 469 U.S. 412, 439 (1985) (Brennan, J., dissenting). The practice of death qualification unconstitutionally skews the jury composition and makes it exceedingly likely that the jury will convict and sentence the defendant to death. This process is "pregnant with discrimination." *Furman v. Georgia*, 408 U.S. 238, 257 (1972).

There are large racial divides regarding attitudes about the death penalty. Eighty-five percent of Black respondents believe that Black people are more likely than White people to receive the death penalty.[39] Pew Research Center, *Most Americans Favor the Death Penalty Despite Concerns About Its Administration* 11 (2021) (hereinafter Pew Research Center). Abundant empirical evidence indicates that the single most likely demographic group to end up on death row are Black defendants convicted of killing a White victim.[40] Likely as a consequence of this reality, Black individuals disproportionately oppose the death penalty and are struck from capital juries at higher rates. Pew Research Center at 8. As the 11th Circuit noted in *McGahee v. Alabama Department of Corrections*:

---

[39] Empirically, this conclusion is not wrong. Although Black people constitute approximately 13% of the nationwide population, 41% of the individuals on death row are Black. U.S. Census Bureau, *Quick Facts United States*, https://www.census.gov/quickfacts/fact/table/US/IPE120222 (last accessed Jan. 17, 2024); Death Penalty Information Center, *Race and the Death Penalty by the Numbers*, https://deathpenaltyinfo.org/policy-issues/race/race-and-the-death-penalty-by-the-numbers (last accessed Jan. 17, 2024); *accord McCleskey v. Kemp*, 481 U.S. 279, 321 (1987). This is also true in Tennessee where of the 45 death row inmates, 23 are Black constituting 51% of the death row population even though only 12% of Tennessee's population is Black. Tenn. Dept. Corr., *Death Row Facts*, https://www.tn.gov/correction/statistics/death-row-facts.html (last accessed Jan. 17, 2024; U.S. Census Bureau, *Tennessee: 2020 Census*, https://www.census.gov/library/stories/state-by-state/tennessee-population-change-between-census-decade.html (last accessed Jan. 17, 2024); *see also* Death Penalty Information Center, *Doomed to Repeat: The Legacy of Race in Tennessee's Contemporary Death Penalty* (2023).

[40] Death Penalty Information Center, *Ways that Race Can Affect Death Sentencing*, https://deathpenaltyinfo.org/policy-issues/race/ways-that-race-can-affect-death-sentencing (last checked Jan. 17, 2024).

> [T]he State's claim that several African-Americans were of 'low intelligence' is a particularly suspicious explanation given the role that the claim of 'low intelligence' has played in the history of racial discrimination from juries. The fact that one of the State's proffered reasons for striking multiple African-American jurors is unsupported by the record and historically tied to racism should have been included in the third step of *Batson*, where all relevant circumstances must be examined to determine whether the State has struck any of the jurors based on their race.

560 F.3d 1252, 1265 (11th Cir. 2009).

Given the racial disparities in attitudes about the death penalty, a process of death qualifying a jury has the primary consequence of removing Black jurors. In other contexts of the law, this phenomenon might be referred to as "disparate impact." *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 530 (2015); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (stating that rules may be "fair in form, but discriminatory in operation"). In addition to the "death qualification" process disproportionately excluding minorities from jury service, the process also has a marked tendency to favor conviction of the accused. As Justice Stevens noted, "the process of obtaining a 'death qualified jury' is really a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction." *Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring). "Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution." *Witherspoon v. Illinois*, 391 U.S. 510, 523 (1968). Because of its marked tendency to exclude Black jurors and to stack the deck in favor of conviction and death, the death qualification process in this case violated Mr. Dotson's Sixth, Eighth, and Fourteenth Amendment rights.

### 20.12  Counsel failed to voir dire on race and implicit bias.

Trial counsel were ineffective for failing to conduct voir dire with the jury on race and implicit bias. Nearly four decades ago, the United States Supreme Court identified implicit bias at work in capital sentencing:

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.

*Turner v. Murray*, 476 U.S. 28, 35 (1986); *see also Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) ("[T]he possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice[.]"). As such, the law recognizes that a lawyer must be aware of and attempt to identify and exclude jurors harboring such implicit bias.

When questioned about implicit bias, trial counsel responded "[y]ou're going to have to define that for me." PC Tr. vol. 1, 52–53. Trial counsel's response reveals that he had no familiarity with implicit bias, let alone voir dire techniques that might ferret out jurors harboring implicit bias. This was deficient performance which prejudiced Mr. Dotson. Gang affiliation permeated Mr. Dotson's trial. Law enforcement initially focused on Cecil Dotson, Sr.'s gang affiliation. Numerous witnesses were gang affiliated. Part of the defense strategy was to suggest the

possibility that the murders were committed because of Cecil Dotson, Sr.'s criminal associations. Issues of race were deeply implicated. Street gangs such as the Gangster Disciples conjure a decidedly racialized version of danger. As one district court summarized: "Gangster Disciples tend to be relatively young, lower-income, African American males." *United States v. Darden*, No. 3:17-CR-00124, 2019 WL 3946133, at *15 (M.D. Tenn. Aug. 20, 2019), *rev'd sub nom. United States v. Burks*, 974 F.3d 622 (6th Cir. 2020). As a result, it was crucial for trial counsel to voir dire jurors with respect to racial attitudes, especially subtler forms of bias that could affect jurors' views of Mr. Dotson, who is Black, or that could impact their impressions of evidence and its credibility.

Mr. Dotson was prejudiced by this failure. As noted in Claim 12, the prosecution intentionally appealed to implicit racial bias in seeking to paint Mr. Dotson as a superpredator. As a result of counsel's failure to ask questions in voir dire to discover jurors' potential racial prejudice and implicit bias, jurors were seated who held such prejudice and bias. As is detailed in Claim 27, Juror Gerald Copeland, the only Black male juror, perceived hostility from other jurors on account of his race. Racial animus infected jury deliberations. Trial counsel's failure to voir dire on this topic was therefore prejudicial.

### 20.13 Counsel were constitutionally ineffective in failing to investigate and present available and powerful mitigating evidence.

Mr. Dotson's appointed lawyers came nowhere close to fulfilling their constitutional obligation to conduct a thorough investigation and to obtain "reasonably available" mitigating evidence.

A capital defense attorney must prepare for the penalty phase of a trial as early as possible. In capital sentencing, the Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering as a *mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis original).

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604).

The Eighth Amendment prohibits a situation in which a sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," creating an unacceptable risk exists that the death penalty

132

will be imposed despite factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304. A jury can only consider evidence in mitigation if defense counsel at trial competently investigates and presents the available evidence at trial.

The ABA's standards for capital defense work have long been referred to by the Supreme Court as "guides to determining what [performance] is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (relying on the ABA Guidelines).[41] Since 1975, Tennessee has accepted that the ABA Guidelines set out the standard for competent representation. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The ABA Guidelines unequivocally provide that lead counsel assemble a defense team "as soon as possible after designation" to conduct a thorough and independent investigation relating to sentencing. ABA Guideline

---

[41] While the ABA Guidelines are only guides and not "inexorable commands," *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009), the standards are "valuable measures of the prevailing professional norms of effective representation," *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).

10.4(C).[42] "Because the sentencer in a capital case must consider in mitigation anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." ABA Guideline 10.7 cmt.

The "core" defense team that lead capital defense counsel should immediately assemble upon appointment includes: (1) at least one co-counsel; (2) an investigator; and (3) a mitigation specialist. ABA Guideline 10.4(C). "Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and professional standards." ABA Guideline 10.4(B).

The Supreme Court has long recognized that capital sentencing counsel have an "obligation to conduct a thorough investigation of the defendant's background," *Williams v. Taylor*, 529 U.S. 362, 396 (2003), in an effort "to discover all reasonably

---

[42] *See also* ABA Guideline 10.7 cmt. ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations."); ABA Guideline 1.1 cmt. ("Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty."); *id.* ("[I]t is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible . . . ."); ABA Guideline 1.2 cmt. ("[E]arly investigation to . . . uncover mitigating evidence is a necessity . . . ."); ABA Guideline 10.2 cmt. ("[Early] investigation may uncover mitigating circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence.").

available mitigating evidence," *Wiggins*, 539 U.S. at 524 (cleaned up). Counsel's duty to conduct a reasonable sentencing phase investigation is not discharged merely by conducting a limited investigation. The defense team must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006). This is a time-consuming and work-intensive process. Even so, the fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388–89; *Wiggins*, 539 U.S. at 527, 534. In such an instance, the central inquiry is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Wiggins*, 539 U.S. at 522–23.

The ABA Guidelines set out a non-exhaustive framework for areas of investigation into "reasonably available" mitigating evidence. Specifically, the Guidelines instruct that counsel must explore:

> (1) Medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); (2) Family and social history, (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning

disabilities) and opportunity or lack thereof, and activities; (4) Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services); (5) Employment and training history (including skills and performance, and barriers to employability); [and] (6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA Guideline 10.7 cmt.

The Commentary to Guideline 10.7 further provides:

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

*Id.*

Notably, *Strickland* does not require attorneys to investigate every possible line of mitigating evidence irrespective of its potential usefulness, or to present such evidence in every case. But "'strategic choices made after less than complete investigations are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 689). Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary." *Id.* This Court must consider whether the known evidence would lead a reasonable attorney to investigate further. *Id.* at 527.

With respect to every single one of these areas and judged by every relevant metric and guideline, Mr. Dotson's trial counsel were woefully deficient. Counsel hired Inquisitor, Inc., to investigate Mr. Dotson's life history, and Inquisitor investigator Glori Shettles conducted the mitigation investigation.[43]

Mr. McAfee was the attorney responsible for the penalty phase presentation, but he admittedly had no plan for the penalty phase and spent over 75% of his time preparing for the guilt-innocence phase of trial. Counsel did not supervise or direct the mitigation investigation. Ms. Shettles's billing records demonstrate that she was scrambling to prepare for the sentencing hearing in the weeks before trial began, and even *after* the trial began, despite the fact that she had begun working on the case almost two years earlier.

The defense team's investigation was ineffective due to the following non-exhaustive list of failures: the failure to interview key members of Mr. Dotson's family, his friends, or key members of his community (including, but not limited to social workers, counselors, juvenile court officials, and teachers); the failure to obtain

---

[43] Ms. Shettles conducted the mitigation investigation for many inmates on Tennessee's death row, and her investigations often fall short of a constitutionally adequate mitigation investigation. Of course, conducting a constitutionally adequate mitigation investigation is the responsibility of counsel. Counsel's decision to use Ms. Shettles despite problems with her investigation methods and results, and further to provide no oversight or direction to her investigation, constituted deficient performance, which prejudiced Mr. Dotson.

and synthesize all reasonably necessary records; the failure to investigate, develop, and present proof of his intellectual disability; the failure to investigate, develop, and present proof of his use of psychotropic medication and other drugs; and the failure to investigate, develop, and present proof of his neurological and serious mental impairments.

Notwithstanding these failures, Ms. Shettles did ultimately provide trial counsel with a mitigation timeline that summarized school records, juvenile justice records, and prison records, attaching witness summaries as exhibits. This timeline details a history of neurocognitive impairments; head injuries; mental illness; learning disabilities; speech and language impairments; physical and emotional abuse; parental neglect and abandonment; childhood exposure to parental and domestic violence; poor nutrition, poverty, and deprivation. She also provided counsel with a three-page document entitled "Significant Life Events & Themes," which summarized mitigation themes including family dysfunction; mental illness; domestic violence; physical abuse; chaotic home environment; parental neglect and abandonment; deprivation of food and medical care; inappropriate sexual behavior by Mr. Dotson's mother; transience of residences and schools; and exposure to community violence, criminal activity, and drug use, including Mr. Dotson's mother using drugs with him. Counsel was not sufficiently involved in Ms. Shettles's investigation to direct her to follow up on information contained in her reports and memos. Counsel's failure to supervise is in direct contradiction to ABA Guidelines

Standard 10.4(B), which tasks lead counsel with "overall responsibility for the performance of the defense team," including "direct[ing] and supervis[ing] its work."

At the sentencing hearing, trial counsel presented only Ms. Shettles's testimony. Trial counsel did nothing to prepare themselves or her for her testimony; instead, Mr. McAfee simply instructed her to "just talk." As a result, Mr. Dotson's case for life consisted of 44 transcript pages in which Ms. Shettles barely scratched the surface of the mitigating information she had provided counsel. There were no exhibits. There was no expert testimony. There was no corroboration.

Little if any of the information on these documents was presented at the penalty phase. Indeed, Ms. Shettles's testimony was so brief, there was only time for passing references to the mitigating circumstances she had uncovered. While Ms. Shettles mentioned that Mr. Dotson suffered physical abuse and parental neglect, that he had a learning disability and disciplinary problems in school, and had several juvenile adjudications, she made only passing references to these topics and failed to describe Mr. Dotson's background in any detail. Ms. Shettles had learned that Mr. Dotson was sexually abused as a child by his older sister. Ms. Shettles did not even testify in passing about these details. Trial counsel's file also included a 1991 psychological evaluation of Mr. Dotson by Robert M. Parr, Ph.D. The evaluation "largely reflect[ed] limited intellectual functioning" and psychological testing revealed "moderate mental retardation range of functioning." This information was also not presented at trial.

Trial counsel failed to meet the constitutional standard of objective reasonableness. A reasonable mitigation investigation would have revealed that Mr. Dotson grew up in an unstable and poverty-stricken home characterized by violence, transience, and profound neglect. Mr. Dotson suffered from physical abuse, emotional abuse, and sexual abuse; head injuries; brain damage; intellectual disability, learning disability, and other neurological and neurocognitive impairments; mental illness; parental neglect and abandonment; exposure to domestic violence; polysubstance abuse; poor nutrition, poverty, and deprivation. Such an investigation would have also revealed intergenerational dysfunction and trauma, as well as severe mental illness and abuse in other members of Mr. Dotson's family. Because of counsel's deficient performance, the jury and the court heard a lackluster presentation that failed to even scratch the surface of the available mitigating evidence. Further, trial counsel presented mitigation testimony only through the mitigation investigator Glori Shettles, rather than through lay witnesses—who could have provided first-hand accounts of Mr. Dotson's life and upbringing—or experts—who could have offered professional insights into the ramifications of such experiences. Had counsel investigated, prepared, and presented readily available evidence, there is a reasonable probability that at least one juror would have voted for life.

Further, trial counsel's ineffective assistance in presenting mitigation evidence deprived Mr. Dotson of his right to proportionality review. Tennessee's death penalty statute requires courts performing proportionality review to consider the defendant's background and character. Tenn. Code Ann. § 39-13-206(c)(1)(D); *see Lockett*, 438

U.S. at 604–05. To fulfill its purpose, proportionality review must consider all available evidence respecting a defendant's background and character. Any impediment to a court's consideration of such evidence invalidates the court's review. *See Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982); *Lockett*, 438 U.S. at 604–05.

Because of trial counsel's ineffectiveness, when the Tennessee Supreme Court performed its proportionality review, it did not have information contained in Dr. Walker's report, including, among other things, evidence that Mr. Dotson: (1) suffered head trauma as a child and adolescent; (2) has a history of losing consciousness; (3) has organic brain damage; (4) may experience visual hallucinations; (5) was placed in special education classes as a child; (6) has limited intellectual functioning; (7) was regularly beaten by his mother; and (8) suffers from significant mental health disorders. Nor did the Court have the other evidence identified herein, including but not limited to evidence that he was sexually abused as a child, has neurocognitive and neurological disorders and severe mental illness, and is intellectually disabled.

### 20.14  Counsel were ineffective in the use of experts.

Trial counsel failed to obtain appropriate expert assistance for both the guilt-innocence and penalty phases. Counsel had virtually no contact with any of the experts they hired, leaving communication to the Inquisitor investigators Rachael Geiser and Glori Shettles. Counsel failed to provide any of the experts with the necessary written materials to render an opinion. *See* ABA Standard 4.1 cmt. (requiring the defense team to prove "social history information to experts to enable them to conduct competent and reliable evaluations"). Nor did counsel provide adequate, if any, communication or guidance. Without any explanation, counsel failed

to communicate with several retained experts that they had decided not to further utilize their services or did not intend to call the expert as a witness.

Trial counsel hired Richard Leo, Ph.D., J.D., to investigate whether authorities had coerced Mr. Dotson into making false statements against himself. One of the most damaging parts of the state's case was Mr. Dotson's alleged confessions to Lt. Armstrong and to Mr. Dotson's mother, Priscilla Shaw. Dr. Leo, a highly regarded national expert, was retained as a consultant and potential expert witness on police interrogation and false confessions. But counsel barely spoke to him, provided him minimal materials to review, never asked for his analysis or advice, and never asked him to provide testimony. In fact, Dr. Leo only learned of the trial verdict from a newspaper story.

Mr. Dotson was prejudiced by counsel's failure to effectively use Dr. Leo's services. If counsel effectively utilized Dr. Leo, he could have testified that: law enforcement used interrogation techniques that (1) violated national training methods and accepted best practices and (2) increase the likelihood of eliciting false confessions—including lengthy interrogation, sleep deprivation, false evidence ploys, psychological abuse, threats, and promises. Further, Dr. Leo would have testified that Mr. Dotson's confession contains numerous indicia of unreliability associated with false confessions and no indicia of reliability. In addition, he would have testified that Mr. Dotson's intellectual and cognitive limitations created a heightened risk for making a false confession.

Trial counsel's failure to use experts plagued other parts of the guilt-innocence phase. For example, Sgt. Mullins was permitted to testify as a blood spatter expert. Had trial counsel sought and obtained a qualified expert, trial counsel could have demonstrated Sgt. Mullins's lack of expertise and cast significant doubt on many of the dubious conclusions he was permitted to offer. Sgt. Mullins was inadequately questioned regarding the nature of the training he received, including the number and nature of courses he completed. He repeatedly utilized inaccurate or non-existent terminology to describe blood spatter. Moreover, Sgt. Mullins's blood spatter analysis was not subjected to peer review, a crucial element of blood stain analysis. Had counsel utilized a competent expert, Sgt. Mullins's conclusions would have been challenged and the authorities' failure to conduct an appropriate forensic investigation could have undermined the credibility of the entire investigation.

Likewise, the failure to obtain appropriate experts to analyze the crime scene permitted the state to weave a narrative of how Mr. Dotson committed the crime alone without challenge. Mullins was allowed to testify as an expert that Mr. Dotson must have staged the crime scene because the crime scene was not consistent with Mr. Dotson's (false) confession. But there is no scientific basis to render such an opinion. In spite of the extensive carnage, no blood was found on Mr. Dotson, he exhibited no cuts or wounds, *see* Trial Tr. vol. 24, 1140 (Sgt. Davidson: "Mr. Dotson, he didn't have any cuts on his hands. Had he have had cuts on his hands, I would have taken photographs but he had no cuts on his hand . . . ."), and no fingerprint, DNA, or footprint evidence linked him to the crime. A forensic expert could have

testified about the improbability that Mr. Dotson could complete the murders alone and certainly could have testified regarding the near impossibility of completing such an attack and leaving no physical evidence. Similarly, forensic evidence that did not match Mr. Dotson, such as sperm in the mouth of Cecil Dotson II and unidentified human hairs on and around other victims, could have played prominently in a capable expert's testimony. As it was presented, the police acknowledged the presence of this evidence but quickly dismissed it. An expert could have highlighted this exculpatory evidence and undermined officers' conclusion that these forensic leads were meaningless. This was prejudicial.

Furthermore, such an expert could have testified about the highly inappropriate nature of allowing *The First 48* personnel to traipse through the crime scene without protective gear. Authorities permitted over 30 individuals to enter the crime scene while evidence was being gathered. A qualified expert could have testified regarding how the methods the Memphis police utilized were inappropriate, inconsistent with scientific methods, and risked contamination.

Trial counsel also failed to get a qualified medical expert who could have assessed C.J.'s capacity to testify in light of the extreme injuries and memory loss he experienced from the attack. Given the extensive injuries to the child and the importance of his testimony, it was essential to provide objective indicators of the child's incapacity. Such testimony was also strategically valuable. Trial counsel were concerned that they would appear callous in questioning a small child. But by presenting the child's incapacity in the sanitized terms of medicine, an expert could

144

have undermined C.J's testimony without subjecting the child to "the crucible of cross-examination" regarding his tragic medical condition. *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

Trial counsel failed to utilize a gang expert who would have provided vital testimony that the crime scene and murders are consistent with a "blackout" ordered by a gang. A gang expert could have explained that gangs, particularly those connected with Mexican cartels, will brutalize children and women in an effort to get information. Here, the infant's fingers were severed. The two-year old had semen in his mouth and saliva on his penis. The children and the adults were beaten. This crime scene is not the work of one person, but rather a gang seeking retaliation and sending a message.

Moreover, had counsel called a crime scene expert, pathologist, gang expert, and ballistics expert, they could have provided the jury with proof that corroborated Mr. Dotson's testimony. Instead, they rested their entire case on Mr. Dotson and a perfunctory presentation of Dr. Nancy Aldridge. Particularly given that the seasoned prosecutor was able to accomplish his ploy and get Mr. Dotson to become upset on cross-examination, it was all the more crucial to provide the jury with additional evidence supporting Mr. Dotson's side of the story.

Counsel in a capital case have a duty to retain a mental health expert, secure a thorough mental health evaluation, provide records and information to those experts, and make an informed decision about the presentation of expert mental health testimony. ABA Guideline 4.1 cmt. Counsel were aware of strong indications

of mental illness and neurocognitive impairments and accordingly retained two mental health experts—James S. Walker, Ph.D., a neuropsychologist, and Geraldine Bishop, Ph.D., a psychologist, to evaluate Mr. Dotson. Yet counsel failed to make effective use of those experts and presented no expert testimony at the penalty phase.

Dr. Walker interviewed and conducted a forensic psychological evaluation, including neuropsychological testing, of Mr. Dotson in October 2009. He provided counsel with a draft report that indicated that Mr. Dotson is severely impaired and suffers from cognitive disorder not otherwise specified, adjustment disorder with depressed and anxious mood, and alcohol and cannabis dependence. The report noted that Mr. Dotson has "antisocial personality characteristics," but did not diagnose him with antisocial personality disorder. The report also documented that Mr. Dotson suffered severe physical abuse by his mother and father, including regular beatings by his mother; was subjected as a child to violence and the constant threat of violence both in his home and in the neighborhood; suffered head trauma as a child and adolescent; has a history of losing consciousness; may experience visual hallucinations; was placed in special education classes as a child; and has limited intellectual functioning. He reported that Mr. Dotson has a Global Assessment of Functioning (GAF)—a measurement of an individual's overall psychological, social, and occupational functioning and/or impairment—level of 60. A GAF score of 60 indicates a high level of global impairment; the next lower group—those with a GAF score of 50—have impairments serious enough to require inpatient or residential psychiatric care.

146

After counsel received Dr. Walker's draft report, they never followed up with him, never discussed the results of his testing or his conclusions, never asked him to finalize his report, and did not call him to testify on Mr. Dotson's behalf. Trial counsel testified at the post-conviction hearing that they did not present Dr. Walker's testimony because he had noted in his report that Mr. Dotson expressed antisocial characteristics. PC Tr. vol. 10, 110. Counsel never discussed that aspect of Dr. Walker's draft report, or anything else, with Dr. Walker or any other mental health expert. With further discussion with Dr. Walker or other mental health experts, counsel would have learned that Dr. Walker's evaluation did not support an antisocial personality disorder diagnosis, which is far different than antisocial personality characteristics.[44] Further, antisocial personality disorder is not an appropriate diagnosis for someone like Mr. Dotson, because an evaluator must rule out organicities—like organic brain damage, which Mr. Dotson suffers from—in order to render an antisocial diagnosis.

Dr. Walker's draft report provides significant mitigating evidence that should have been presented during the sentencing phase of Mr. Dotson's trial. "Cognitive disorder not otherwise specified" is more commonly known as organic brain damage. As a result of his brain damage, Mr. Dotson has multiple cognitive deficits, which

---

[44] In addition, Mr. Dotson does not meet the diagnostic criteria even for antisocial personality characteristics, as a mental health evaluation when Mr. Dotson was age 19 showed that he did not exhibit a pattern of antisocial behavior, and an antisocial personality disorder diagnosis requires evidence of a conduct disorder with onset before the age of 19.

interfere with his capacity to process information, exercise reason, reflect on behavioral options, and respond to situations in adaptive ways. Alerted to this brain damage by Dr. Walker's report, counsel should have hired an expert to perform a neurological examination of Mr. Dotson, to examine the neurological basis of his behavior, cognition, emotion and memory, and the impact of neurological damage and disease upon these functions. Further, Dr. Walker's diagnosis of adjustment disorder with depression and anxiety was important mitigating evidence. The expert report connects the diagnoses to his traumatic upbringing, with Dr. Walker noting that Mr. Dotson "suffered from severe physical abuse perpetrated by his mother and father as a young child" and "was subjected to terrifying events in his neighborhood on a regular basis, including the constant presence of the threat of violence."

Mr. Dotson has a history of alcohol and cannabis dependence that began at a very young age, likely an attempt to self-medicate to alleviate the depression and panic he experienced during his childhood and adolescence. This was yet another factor that impaired his judgment and decision-making ability. His substance abuse intensified the effects of, and dysfunction caused by, his other mental disorders. Mr. Dotson's GAF reflects the various severe psychological and mental health issues that severely impair his overall functioning. The numerous severe deficiencies indicated in Dr. Walker's report, particularly organic brain damage, were valuable mitigating factors that should have been presented to the jury during the sentencing phase of his trial.

Recognizing that, without Dr. Walker, they had no mental health defense, counsel retained Dr. Geraldine Bishop less than two months before the start of jury selection. Her billing records show she began working on Mr. Dotson's case on August 31, 2010—just 21 days before the start of jury selection—and worked on his case for only 12 hours total. As with other experts, trial counsel gave no guidance to, and indeed had almost no interaction with, Dr. Bishop. The bulk of the minimal time Dr. Bishop spent on Mr. Dotson's case was devoted to reviewing the crime facts, which had nothing to do with mitigation. Her work on the case was so perfunctory that lead counsel, Gerald Skahan, testified in post-conviction that he could not recall whether she even worked on Mr. Dotson's case and thought that she was a man. PC Tr. vol. 11, 280. Mr. McAfee had only a vague recollection of her work on the case and had no explanation as to why they retained her at such a late date. PC Tr. vol. 10, 118–20. In the middle of trial, but before the penalty phase, Ms. Shettles sent an e-mail to trial counsel indicating that Dr. Bishop had concluded that Mr. Dotson suffered childhood trauma and was expecting to testify at the penalty phase. But counsel did not call Dr. Bishop to testify at the sentencing hearing.

Counsel failed to follow-up with Dr. Walker about his findings and conclusions made almost a year before trial, then retained Dr. Bishop less than three weeks before trial in a desperate scramble to put together a mitigation case at the last minute. They failed to communicate or guide these experts or to make use of their findings and testimony. Counsel utterly failed to adequately investigate, prepare, and present mitigation evidence during penalty phase, and Mr. Dotson was prejudiced as a result.

The failure to use Dr. Walker or another qualified expert also undermined key themes in the guilt-innocence phase. As an individual with significant neurocognitive deficits, low IQ, and a startling history of trauma and abuse, Mr. Dotson had many of the characteristics we commonly see in individuals who provide false confessions. Such evidence would have been crucial for Dr. Leo, or another false confession expert, to be aware of and utilize in his assessment of Mr. Dotson. Because trial counsel failed to properly utilize Dr. Leo and Dr. Walker, the jury was never presented this information.

Accordingly, the failure to utilize experts both during the guilt-innocence phase and at sentencing was deficient performance. Mr. Dotson was prejudiced by this deficient performance because crucial parts of his defense were not developed and the lack of experts permitted the state's theories to go unchallenged, even when they relied on scientifically dubious analysis.

### 20.15 Counsel were constitutionally ineffective in failing to investigate, prepare, and present his intellectual disability claim under *Atkins v. Virginia*, 536 U.S. 304 (2002).

Counsel failed to conduct a constitutionally adequate investigation into Mr. Dotson's intellectual disability and failed to move to strike the state's death penalty notice on the basis that Mr. Dotson was ineligible for the death penalty due to his intellectual disability. *See State v. Strode*, 232 S.W.3d 1, 3 n.3 (Tenn. 2007) ("Our criminal code provides that 'no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death.'") (citing Tenn. Code Ann. § 39-13-203 (b) (2003)); *Atkins v. Virginia*, 536 U.S. 304, 321

(2002) (concluding that in light of "evolving standards of decency," execution of mentally retarded offenders is excessive under the Eighth Amendment). Mr. Dotson suffered prejudice from this deficient performance, as he is intellectually disabled and there is a reasonable probability the trial court would have struck the state's death penalty notice had the issue been properly raised.

Further, even if the trial court had not granted a motion to strike the death notice, trial counsel were deficient for not conducting an investigation, preparing, and presenting evidence of his intellectual disability during the penalty phase, as there is a reasonable probability one juror would not have voted for death on that basis. Understanding Mr. Dotson's intellectual disability and intellectual limitations was also essential for both the trial court and the jury to understand how the Memphis Police Department were able to coerce him into making a false confession.

### 20.16  Counsel failed to prepare Jessie to testify.

Trial counsel utterly failed to adequately prepare Mr. Dotson to testify on his own behalf. As a result, his testimony, particularly that during cross-examination, was perceived as aggressive. Trial Tr. vol. 29, 2165–68 (voir dire), 2168–2209 (direct), 2209–28 (cross-examination) As Mr. Dotson re-enacted the threatening questioning by Lt. Armstrong that led to his false confession, he jumped up, became loud, used profanity, and banged his fists against the witness stand. Trial Tr. vol. 29, 2175, 2201, 2225. Trial counsel failed to prepare Mr. Dotson for ways to relate to the jury what Lt. Armstrong did to him without coming across to the jurors as being himself as aggressive and threatening as Lt. Armstrong had been during his interrogation. In

light of the allegations against Mr. Dotson, it was essential that the jurors be able to relate to him, consider his account of what occurred both the night of the crime and during his interrogation, and ultimately to believe him. Trial counsel's failure to prepare Mr. Dotson adversely affected the defense's case and prejudiced Mr. Dotson.

Trial counsel's failure to properly prepare Mr. Dotson, a person with neurocognitive deficits and severe mental illness, was made manifest when prosecutor Lepone exploited Jessie's weaknesses causing him to become angry on cross-examination. To compound the problem, trial counsel failed to re-direct Mr. Dotson, leaving the jury with the lasting impression of an angry Jessie Dotson. Dotson's anger and frustration could have been contextualized as justifiable because he is an innocent man accused of the worst mass murder in Memphis history. Because Jessie was not properly prepared, the jury was not provided this context.

### 20.17 Counsel failed to fully investigate, develop, or present evidence that Mr. Dotson was not competent to stand trial or to testify.

Trial counsel rendered ineffective assistance by failing to investigate, develop, or present that Mr. Dotson was not competent to stand trial or to testify based on prison conditions, being held in isolation, being improperly medicated, having neurocognitive deficits, and having cognitive impairments. Counsel failed to object to his standing trial or to his testifying on any of these bases or to consult a psychiatrist or other expert to assess the impact of these conditions on Mr. Dotson. The ABA Guidelines explain that under prevailing professional norms, counsel have an affirmative duty to "monitor the client's personal condition for any potential legal consequences. For example, actions by prison authorities (e.g., solitary confinement,

152

administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing or have legal implications, and changes in the client's mental state . . . may bear upon his capacity to assist counsel, and ultimately, to be executed." ABA Guidelines 10.5 cmt.

Mr. Dotson was prejudiced because his testimony was critical to his defense, but he was not competent to withstand cross-examination. As explained above, prosecutor Lepone researched and plotted to exploit Mr. Dotson's weaknesses. This worked to Mr. Dotson's great disadvantage which the state capitalized on in closing argument.

### 20.18 Counsel failed to adequately cross-examine Priscilla Shaw.

The prosecution relied heavily on the testimony of Jessie Dotson's mother, Priscilla Shaw. The prosecution painted Shaw as a loving mother who was in deep pain for having to testify against her son. The narrative was effective. It also was not true.

Priscilla Shaw is no June Cleaver. She is mentally ill, cognitively compromised, and drug addicted. Had counsel conducted the proper investigation, they would have learned of Ms. Shaw's brutal abuse of all of her children, including Jessie. They would have learned of her extreme neglect of her children. Once the state opened the door to Shaw's character, trial counsel could have shown Shaw to be the unstable, addicted, neglectful, abusive mother that she was and severely undermined the reliability and effectiveness of her testimony.

Further, trial counsel failed to impeach Shaw when she testified that she did not know what Jessie had told the police. This was a lie. In a recent interview, Shaw described in detail how Lt. Armstrong told her what Jessie had said to him during his seven-hour overnight interrogation. Jail phone calls also reveal that Lt. Armstrong lied to the family and told them that the victim's blood was on Jessie's shoes. Trial counsel could have brought out those lies through Priscilla Shaw to show that the police manipulated her into believing that Jessie was guilty and used her as their agent.

Mr. Dotson was prejudiced by counsel's unprofessional errors because Shaw's testimony was material to the State's case.

### 20.19 Counsel failed to adequately cross-examine Erica Smith.

Trial counsel failed to impeach Erica Smith's credibility by failing to point out the extremely volatile relationship between her and Cecil Dotson, Sr. The acrimony between Erica Smith and Cecil was long-standing and increasing in ferocity up to the day of the murders. Among other things, trial counsel could have shown:

- Erica Smith is a member of the Gangster Disciples

- Erica Smith alleged that Cecil Dotson, Sr. was the father of three of her children and sought child support for all. Cecil denied paternity. DNA testing showed that Cecil was the father of only one of Erica's children, Cecil Dotson, II (Man-Man).

- Erica Smith believed that Cecil Dotson tricked her into giving up full custody of Man-Man.

- Cecil Dotson paid Erica's bills but was in the process of cutting her off.

154

- Cecil Dotson committed an armed robbery on January 9 and was locked up from January 9-January 13. When he was arrested, Cecil listed Erica Smith as his wife. But Marissa Williams helped post his bond. The following morning, Cecil and Erica exchange heated and threatening text messages where Cecil says he will get money the way he knows how. Many of the text messages are above.

- On January 18, 2008, the Juvenile Court sets a hearing to modify child support payments from Cecil Dotson to Erica Smith.

- On February 13, 2008, Cecil Dotson, Sr., calls 911 to complain about Erica Smith harassing him and Marissa. The police arrive and Erica Smith is asked to leave.

- On February 14, 2008, Cecil and Erica are in a club together, and Willie Boyd Hill's girlfriend calls Marissa to the club setting in motion the events described above—Cecil beating Erica and intentionally wrecking her car.

- On February 15, 2008, a Gangster Disciple meeting is held about Cecil's behavior, and he is to be written up. Erica knew about the meeting and may have been present.

- On February 17, 2008, Erica Smith sends Cecil a text message saying, "You fucked yourself."

- On February 29, 2008, Erica Smith calls 911 on Cecil complaining that he would not let her see Man-Man.

- On March 2, 2008, Erica begins frantically calling around trying to find out where Cecil is. She goes to the house, but supposedly does not go in. The door is open, and she would have been able to see C.J. in the bathtub and Hollis Seals's feet, even without entering.

- On March 3, 2008, Erica tells Nicole Dotson, Jessie's sister, that "I hope they are all dead in there."

- On March 3, 2008, Erica went to the children's school to see if they attended school.

- On March 3, 2008, Erica Smith checks to see if Cecil came to work.

- Despite her repeated willingness to call 911 to complain about Cecil, Erica does not do so until her sister goes to 722 Lester and tells her to call the police. [45]

- In the interview with C.J. by Pat Lewis, C.J. said that the "baby mama" was at the door.

Erica Smith's actions are suspicious. It is not credible to believe that she did not enter the residence before calling 911. She has posted on social media: "I know the truth." She continues, "I could have lost all three kids, but I lost one . . . it's so much CJ don't know. and I [won't] speak on nothing."

Where Smith is a Gangster Disciple who had knowledge of Cecil's gang violation, trial counsel could have used her cross-examination to further the defense

---

[45] Erica's sister, Lashunda, was not interviewed by trial counsel. Undersigned have not been able to locate Lashuna Smith, but efforts to do so are ongoing.

of Gang involvement, and that Smith may have been involved, or at least had guilty knowledge. Counsel's unprofessional errors prejudiced Mr. Dotson.

### 20.20 Counsel failed to challenge C.J. Dotson's competency to testify, to prepare for his cross-examination, and to effectively cross-examine him.

Counsel were ineffective in failing to challenge the competency of Cecil Dotson, Jr. ("C.J.") to testify. The trial court has discretion to determine whether a witness is competent to testify, and the witness "must be able to observe, recollect, and communicate the facts." *State v. Samuel*, 243 S.W.3d 592, 601 (Tenn. Crim. App. 2007) (citation omitted). Counsel failed to obtain medical records relevant to his competency to testify, including a May 8, 2008, neuropsychological evaluation at Le Bonheur Children's Medical Center, which revealed significant impairment in his long-term memory. The District Attorney General had those records, but counsel did not request them. Because the records constitute impeachment material, the state was obligated to provide them even in the absence of a specific request. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Counsel had retained Dr. Aldridge, an expert in the forensic evaluation of children, and should have used her assistance to challenge C.J.'s competency to testify. Counsel were also ineffective in failing to adequately prepare for cross-examining C.J. For example, counsel failed to obtain C.J.'s medical records and consult with a competent expert in advance of trial. As a result, counsel could not effectively cross-examine him and could not offer objective evidence of C.J. cognitive deficits in the trial. Mr. Dotson was prejudiced by counsel's deficient performance, as the jury heard highly prejudicial and inaccurate testimony from C.J.

### 20.21 Counsel failed to object and move to strike inflammatory, irrelevant testimony about Sgt. Davidson's emotional distress while investigating the crime.

Counsel rendered ineffective assistance of counsel in failing to object to the prosecutor asking Sgt. Davidson if he had "ever seen anything like this?" Trial Tr. vol. 23, 1046. Sgt. Davidson's personal opinion of how this crime scene compared to other crime scenes was irrelevant. In the absence of an objection, Sgt. Davidson responded, "it was a tough thing to handle, I'll just say." *Id.* The prosecutor asked, "did you want to get the person or persons who actually did it . . . ?" *Id.* Sgt. Davidson confirmed that he did and would not have rested in the effort. *Id.* The prosecutor asked, again with no defense objection, whether Sgt. Davidson wished he had not been on duty that night, and Sgt. Davidson agreed he wished he had not. *Id.*, 1047. Sgt. Davidson testified that, as he prepared for trial and reviewed photographs of things he had done, he remembered holding a child whose throat was slit and moving the child's head in order to take pictures. *Id.*, 1047–48.

These questions, and Sgt. Davidson's testimony, were irrelevant to any issue in the case, as Sgt. Davidson's emotional distress during the investigation and during preparation for trial was not at issue. The testimony was inflammatory and improper. Trial counsel were ineffective in failing to object and move to strike. Mr. Dotson was prejudiced by the jurors' hearing this irrelevant, inflammatory, and prejudicial testimony. Because counsel failed to object, the state was able to present evidence that the crimes to which Mr. Dotson allegedly confessed were so egregious that they traumatized a seasoned police detective.

### 20.22  Counsel failed to effectively investigate alternate suspects identified by C.J. Dotson and to effectively cross-examine Willie Boyd Hill.

Trial counsel rendered ineffective assistance in their cross-examination of the state's witnesses. They failed to carefully review all records, including all discovery, to integrate it into the defense theory of the case, to anticipate the weaknesses of the state's proof based on this preparation, to have a plan for cross-examination, and to conduct constitutionally adequate cross-examination of the state's witnesses.

In an early interview with police detectives, C.J. Dotson identified "Roderick" and "Cassandra" as the people who committed the crime. Instead of conducting an adequate guilt-innocence investigation into the identity of Roderick and Cassandra, counsel asked Willie Boyd Hill (a.k.a. "Frank") on cross-examination about his Facebook friend Roderick Deshun Hill. Trial Tr. vol. 24, 1251–52. Counsel introduced Roderick Deshun Hill's Facebook page as an exhibit, along with a picture of Willie Boyd Hill's sister Cassandra. Trial Exs. 251–52. The state located Roderick Deshun Hill and presented him as a witness. Trial Tr. vol. 28, 1986–87. He confirmed his Facebook page, Trial Ex. 252, and stated that he did not personally know Willie Boyd Hill. Roderick Deshun Hill was 16 years old at the time of trial and 13 at the time of the crime. The idea that he was the perpetrator of the Lester Street violence was not credible.

In guilt-innocence phase closing argument, the state mocked the ridiculous error: "We brought you Roderick in here, didn't we? We brought you that middle school kid who was 13 years old at the time in here and let you see him and talk to him, Roderick." Trial Tr. vol. 30, 2312. In rebuttal closing, the prosecutor again

159

ridiculed the mistake: "Then they bring in a Facebook page of Roderick. We've got to pull him out of school." *Id.*, 2366. The prosecutor's mocking continued later in his rebuttal argument. *Id.*, 2381.  Mr. Dotson was prejudiced by these errors.

> **20.23  Counsel failed to challenge Sergeant Mullins as an expert on bloodstain pattern analysis and general crime scene investigation.**

Trial counsel failed to object to Sgt. Mullins's testimony as an expert in bloodstain pattern analysis, as he was not qualified. Trial Tr. vol. 18, 160–61. Sgt. Mullins had been to "blood stain pattern analysis school," *id.*, 160, but his use of incorrect terminology and misidentification of several impact stains as cast-off stains shows his lack of expertise. Counsel also failed to object to Sgt. Mullins testifying as an expert in general crime scene investigation, which he was not qualified to do and on which he offered erroneous testimony. For example, he testified that control samples of the carpet were taken to give the examiners a visual of samples without blood stains. Trial Tr. vol. 19, 263. But the reason for taking a control sample of carpet is to make sure the background substrate is not interfering with the tests of the blood-stained samples.

Trial counsel should have objected to qualifying Sgt. Mullins as an expert and conducted a voir dire to demonstrate his insufficient qualifications. They also should have retained an expert in blood spatter analysis and made effective use of that expert to challenge the state's evidence.

Mr. Dotson was prejudiced by this failure to object and challenge Sgt. Mullins, as a proper voir dire would have resulted in a limitation of Sgt. Mullins's inaccurate and damaging testimony. In *State v. Halake*, 103 S.W.3d 661 (Tenn. Crim. App. 2001),

the Tennessee Court of Criminal Appeals reversed a conviction where a court erred in allowing an officer to testify as an expert in blood spatter analysis, explaining: "Blood spatter analysis is a complicated subject, as the analyst studies the blood spatter and determines what blow created the spatter, thereby recreating the events of the crime. *Id.* at 672.

Mr. Dotson was prejudiced by trial counsel's failure to submit the state's case to constitutionally sufficient adversarial testing.

### 20.24 Counsel failed to object to and move to exclude Dr. Funte's testimony regarding autopsies she did not perform and about which she had no personal knowledge.

Counsel rendered ineffective assistance by not challenging the testimony of Dr. Lisa Funte, a medical examiner with the Shelby County Regional Forensic Center, regarding three autopsies that she did not perform in violation of the right to confrontation protected by the Sixth and Fourteenth Amendments. Because trial counsel did not object, the Tennessee Supreme Court reviewed the claim for plain error. *Dotson*, 450 S.W.3d at 70. Under this level of review, the court concluded that he was not entitled to relief. *Id.* at 72. Mr. Dotson was prejudiced because this error was reviewed for plain error rather than de novo review—the standard the appellate court would have used if counsel had properly objected to her testimony regarding these victims. *See State v. White*, 362 S.W.3d 559, 565 (Tenn. 2012) (observing appellate court reviews questions of constitutional dimension de novo).

In addition to the confrontation issue, the autopsy photos of those three victims—Cecil Dotson, Sr., Hollis Seals, and Cemario Dotson—were inflammatory and prejudicial. They were the most gruesome of the photos admitted at trial, and

161

they would have been excluded but for counsel's failure to object to this inadmissible evidence. *See* Claim 32.

### 20.25 Counsel failed to object to inadmissible testimony and stipulated to evidence that was otherwise inadmissible.

Counsel rendered ineffective assistance of counsel by stipulating to the admission of the following inadmissible evidence: the chain of custody on the knife removed from C.J., the FBI model, the brand of kitchen knives involved, the Magna bike, the distance between Kimball Cabana Apartments and Lester Street, the manufacturer and caliber of the pistol Willie Boyd Hill gave to Hollis Seals (1403 Silver) and its magazine capacity. Trial Tr. vol. 38, 18; Trial Tr. vol. 22, 990–91; Trial Tr. vol. 27, 1793; Trial Exs. 461–62.

### 20.26 Counsel failed to object or move for a mistrial after Sgt. Mullins testified that Mr. Dotson invoked his right to counsel or to raise the issue in the motion for new trial.

Mr. Dotson incorporates all relevant averments in the petition, including Claims 10, 16–17, as if set forth fully herein. Because counsel did not object to Sgt. Mullins's testimony commenting on his invocation of his right to counsel and did not raise the issue in his motion for new trial, the Tennessee Supreme Court reviewed the claim for plain error. *Dotson*, 450 S.W.3d at 59. Sgt. Mullins's testimony as to this issue clearly violated Mr. Dotson's constitutional rights. Counsel's failure constituted deficient performance, and Mr. Dotson was prejudiced as a result.

**20.27 Counsel failed to object to introduction of inflammatory photographs and stipulated to admissibility of prejudicial photographs.**

Trial counsel filed pre-trial motions to prohibit photographs of the victims before or after death and to limit photographs to black and white prints. Trial Tech. R. vol. 2, 273–75, 278–79. However, prior to trial, the parties announced they had reached an agreement regarding which photos would be presented. Trial Tr. vol. 38, 14. On direct appeal, Mr. Dotson argued that the trial court erred in admitting photographs of the victims' facial injuries and crime scene photographs of three of the child victims. The Tennessee Supreme Court noted that the defendant raised no objections to the admission of those photographs at trial and at a pre-trial hearing objected only to six photographs depicting the children's injuries, which were taken at the hospital. *Dotson*, 450 S.W.3d at 92. Thus, the court concluded that Mr. Dotson had waived review of this issue. *Id.*

The state entered nearly 200 color photographs of the crime scene as exhibits at trial, many of which were cumulative graphic photos, which served no probative purpose and were unfairly prejudicial. Mr. Dotson was prejudiced by counsel's failure to object to the admission of these inflammatory photographs.

**20.28 Counsel made an improper, prejudicial admission in opening statement of sentencing hearing.**

In his opening statement in the penalty phase of the trial, defense counsel told the jury that Mr. Dotson's case had more aggravating circumstances than he had ever seen. Trial Tr. vol. 31, 2470. This conveyed to the jury that Mr. Dotson was the worst of the worst and, thus, deserving of the death penalty. This

concession was deficient performance, violated counsel's duty of loyalty, and constituted a conflict of interest. "[T]he duty of loyal advocacy is more vital to effective assistance than the absence of third party conflicts of interest[.]" *Fisher v. Gibson*, 282 F.3d 1283, 1304 (10th Cir. 2002). As the Tenth Circuit held: [A]n attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988). Counsel's admission that Mr. Dotson's actions warranted the death penalty was prejudicial, as the jurors heard that the lawyers charged with saving his life were in agreement with the prosecutors that there were so many aggravating circumstances, death would be the appropriate sentence.

### 20.29 Counsel failed to file a motion in limine to prevent prosecutorial misconduct in argument, despite the pattern and practice of the Shelby County District Attorney's Office to commit such.

At the time of Mr. Dotson's trial, the Shelby County District Attorney General's office had a widely known and pervasive pattern of prosecutorial misconduct. *See, e.g.*, *Thomas v. Westbrooks*, 849 F.3d 659, 662 (6th Cir. 2017) (granting habeas relief for a *Brady* violation); *State v. Jackson*, 444 S.W.3d 554, 560 (Tenn. 2014) (granting the defendant relief for a *Brady* violation and improper argument); Fair Punishment Project, *The Recidivists: Four Prosecutors Who Repeatedly Violate the Constitution* (2017) (noting District Attorney General Weirich's numerous ethical violations). As

long-time practitioners in Shelby County, trial counsel was well aware of the Shelby County District Attorney's Office propensity for misconduct.

Trial counsel rendered ineffective assistance of counsel by failing to preemptively file such a motion, or otherwise object to improper argument pre-trial. As is documented above, the prosecution engaged in numerous forms of prosecutorial misconduct that was objectionable. Mr. Dotson was prejudiced by the prosecutor's comments as they were extensive, repeatedly shifted the burden of proof, and alluded to facts not in evidence. *See, e.g.*, Claims 11, 12, 13, 20.30.

### 20.30 Counsel failed to object to prosecutorial misconduct in closing argument.

Trial counsel failed to object to the instances of prosecutorial misconduct detailed in this petition. The failure to object to prosecutorial misconduct constitutes deficient performance. *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (holding that the failure to object to prosecutorial misconduct constituted ineffective assistance of counsel). The Sixth Circuit has explained that an ineffective assistance of counsel claim premised on trial counsel's failure to object to prosecutorial misconduct "hinges on whether the prosecutor's misconduct was plain enough for a minimally competent counsel to have objected." *Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000).

Here, trial counsel overlooked numerous, meritorious objections that unduly prejudiced Mr. Dotson. The prosecutor repeatedly referenced facts not in evidence, attempted to shift the burden of proof to Mr. Dotson, vouched for witnesses, and offered his personal opinion. The failure to object to the prosecution's repeated misconduct prejudiced Mr. Dotson by permitting the jury to consider unlawful and

prejudicial information in violation of his due process rights. *See, e.g.*, Claims 11, 12, 13, 20.29.

### 20.31 Counsel failed to object to the anti-sympathy instruction given by the trial court following the penalty proof.

Trial counsel failed to raise an objection to the flawed anti-sympathy instruction. Likewise, on appeal, appellate counsel failed to raise a challenge to the anti-sympathy instruction. For the reasons detailed in Claim 37, trial and appellate counsels' failure to raise this challenge was deficient performance in that it overlooked a meritorious legal claim. This deficient performance prejudiced Mr. Dotson. *Joseph v. Coyle*, 469 F.3d 441, 461 (6th Cir. 2006) (holding that failure to object to erroneous jury instructions constituted ineffective assistance of counsel); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) ("Failure to object to a jury instruction can constitute such a grave error."); *Gray v. Lynn*, 6 F.3d 265, 269 (5th Cir. 1993) ("The failure by [petitioner's] counsel to object to the erroneous instruction cannot be considered to be within the wide range of professionally competent assistance." (cleaned up)). *See* Claim 37.

### 20.32 Counsel failed to object to jury instructions that prohibited the consideration of lesser included offenses.

Tennessee's sequential jury instructions do not comport with due process. A jury that follows the pattern jury instructions will be prohibited from ever considering lesser included offenses. Counsel failed to object to these jury instructions and permitted the jury to be instructed in a confusing manner that, if the jury followed

the instructions, barred the jury from considering lesser included offenses that are not death eligible in Tennessee.[46]

In Tennessee "the jury is not permitted to consider any lesser-included offenses until it has unanimously determined that the defendant is not guilty of the charged (greater) offense." *State v. Davis*, 266 S.W.3d 896, 903 (Tenn. 2008). This structure is sometimes referred to as "acquittal-first" by Tennessee courts. *Id.* Tennessee law does, however, mandate that "a trial court must instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense." *State v. Langford*, 994 S.W.2d 126, 128 (Tenn. 1999).

Tennessee defines first-degree murder as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Second-degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Finally, voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Notably, "the law in Tennessee is clear that voluntary manslaughter is a separate criminal offense and that the State bears the burden of proving the defendant's mental state for this offense beyond a reasonable doubt." *State v. Moore*, No. E201500585CCAR3CD, 2016 WL 2865759, at *17 (Tenn. Crim. App. May 12, 2016); Tenn. Code Ann. § 39-13-211(a). In Mr. Dotson's case, the jury was instructed regarding first-degree murder, second degree murder,

---

[46] In Tennessee only first-degree murder, including felony murder, are death eligible offenses. *See* Tenn. Code Ann. § 39-13-202.

voluntary manslaughter, reckless homicide, and negligent homicide with respect to the deceased victims. Trial Tr. vol. 29, 2245. With respect to the surviving victims, the jury was instructed as to attempted first-degree murder, attempted second degree murder, and attempted voluntary manslaughter. *Id.,* 2245–46.

Under these instructions, the jury was required to initially consider first-degree murder. Per the jury instructions, the jury was required to evaluate the most serious charge first and could only move on to lesser included offenses "[i]f you find the defendant not guilty of that offense or if you have a reasonable doubt as to his guilt." Trial Tr. vol. 30, 2400. Only then could the jury "proceed to the next page and the next charge." *Id.* Assuming the jury followed the jury instructions, as we must, the jury never considered lesser included offenses. *Saulsberry v. Lee*, 937 F.3d 644, 649 (6th Cir. 2019) ("We must presume juries follow instructions.") (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Now consider the elements of voluntary manslaughter. As mentioned above, voluntary manslaughter may either be an *intentional* or knowing killing committed while in a state of passion. The existence of a state of passion is what distinguishes first-degree murder from voluntary manslaughter under the statutory scheme. In other words, an individual may commit an intentional killing that does not constitute

first-degree murder if he was in a state of passion. [47] But under the structure of these instructions the jury is never given the opportunity to consider whether the defendant committed an intentional killing while in the heat of passion. This is because first-degree murder and voluntary manslaughter share two elements: an intentional killing. [48] By considering the more serious charge first, the jury is denied the opportunity to even consider the existence of the state of passion.

In Mr. Dotson's sentencing hearing for the attempted first-degree murder charges related to the surviving victims, the trial court remarked that Mr. Dotson acted "in the heat of passion." Trial Tr. vol. 32, 35. This came on the heels of the trial court finding it appropriate to instruct the jury as to voluntary manslaughter. At least in the mind of the trial court, the facts of the case suggested the possibility of voluntary manslaughter, at least with respect to some of the victims.

Even more problematically, Tennessee places the burden of proving the existence of a state of passion upon the prosecution. As the Tennessee Court of Criminal Appeals explained:

> This case highlights a problem that occurs because of the way our legislature has defined, and our courts have typically interpreted the crime of voluntary manslaughter as a separate offense rather than a

---

[47] The first-degree murder statute provides that the killing must be both "premeditated and intentional." Tenn. Code Ann. § 39-12-202(a)(1). The distinction between the two is not always evident. For example. Tennessee law defines "premeditation" as an intent to kill that was formed before the act itself. Tenn. Code Ann. § 39-13-202(e). This definition is somewhat circular as it seems to suggest that so long as the defendant act intentionally, he must have acted with premeditation.

[48] Voluntary manslaughter may also be a knowing killing, tracking the language of second-degree murder as well. Tenn. Code Ann. § 39-13-211(a).

mitigated murder. Such treatment puts the state in the unusual position of trying to prove an intentional or knowing killing and at the same time trying to prove that the killing is mitigated because it was committed in a state of passion produced by adequate provocation. In a case like this, where the defendant stands charged with attempted first degree murder, a much more serious offense, the state should not be expected to prove or even try to prove that the killing was mitigated by passion produced by adequate provocation. In these cases, the burden, for all practical purposes, falls on the defendant to establish the elements of passion and provocation; that burden then shifts to the state to prove the absence of those factors. In consequence, passion and provocation most often operate as a partial defense in a first or second degree murder prosecution or, as in this case, an attempted first degree murder prosecution. *That said, it is perhaps time that the law is changed to conform to the reality that occurs in the trial court.*

*State v. Mason*, No. M2002-01709-CCA-R3CD, 2004 WL 1114581, at *3 (Tenn. Crim. App. May 19, 2004) (emphasis added); *see also State v. Ra-El*, No. W2013-01130-CCA-R3CD, 2014 WL 3511038, at *6 (Tenn. Crim. App. July 11, 2014) (Witt, J., concurring) ("In such cases, whether we admitted it or not, we treated the passion/provocation formulation not as a true element of the proscribed offense to be established by the State but rather as a dispensational defense to a defendant who committed an otherwise intentional or knowing killing.").

Mr. Dotson's jury instructions acutely show this problem. The jury was told that it should convict Mr. Dotson of first-degree murder if he 1) "unlawfully killed the alleged victim"; and 2) "acted intentionally." Trial Tran. vol. 29, 2247. It was also told that Mr. Dotson was guilty of voluntary manslaughter if he 1) "unlawfully killed the alleged victim"; 2) "acted intentionally or knowingly"; and 3) "the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Trial Tran. vol. 29, 2249. But because the first-degree murder instruction is placed first, a jury that is following the instructions

170

as written and intended to be used will not be allowed to ever consider the existence of the state of passion under the voluntary manslaughter statute.

This flaw directly relates to a second flaw of the sequential jury instructions. As Tennessee courts have observed, the existence of a state of passion exists as an ambiguous quasi-element. In cases like this, it is completely illogical to think or expect that the prosecution will attempt to prove the existence of an intentional killing and simultaneously act to establish the existence of a state of passion. *Ra-El*, 2014 WL 3511038, at *6 (referring to this dynamic produced by the sequential jury instructions produce as "sophistry"). Under these circumstances, the burden of proving the existence of the state of passion falls to the defendant, an unconstitutional burden shifting. *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978). Accordingly, the sequential jury instruction in this case denied Mr. Dotson due process.

### 20.33  Counsel failed to challenge reference to moral certainty in reasonable doubt instructions.

The jury instructions both during the guilt-innocence phase and sentencing phase used the term "moral certainty" in connection with the reasonable doubt instruction. At the outset, the jury was given the following instruction:

> A reasonable doubt is that doubt created by an investigation of all the proof in the case and an inability after such an investigation to let the mind rest easily as to the certainty of guilt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge but moral certainty is required and this certainty is required as to every element of proof requisite to constitute the offense.

Trial Tr. vol. 18, 58–59. During the sentencing phase, the jury was given a substantially similar instruction and the court instructed:

171

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such an investigation to let the mind rest easily as to the certainty of your verdict. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law, but moral certainty is required. And this certainty is required as to every proposition of proof requisite to constitute the verdict.

Trial Tr. vol. 31, 2550.

The moral certainty instruction can easily be construed to permit a jury to utilize a lower standard of proof than reasonable doubt. *See generally Victor v. Nebraska*, 511 U.S. 1 (1994) (criticizing the "moral certainty" instruction); *Cage v. Louisiana*, 498 U.S. 39, 40 (1990) (same). Additionally, this instruction can easily be understood to mean that a juror's moral, religious, or philosophical beliefs should be utilized in deciding the weighty issue of life and death. *Payne v. Tennessee*, 501 U.S. 808, 836 (1991) ("'If a person is to be executed, it should be as a result of a decision based on reason and reliable evidence.'") (quoting *Gholson v. Estelle*, 675 F.2d 734, 738 (5th Cir. 1982)). For these reasons, the instruction violated Mr. Dotson's due process rights and unconstitutionally lowered the burden of proof.

### 20.34 Counsel failed to object to *Dyle* instruction regarding eye-witness identification.

In the guilt-innocence phase of trial, counsel rendered ineffective assistance of counsel by failing to object to the eyewitness identification instruction given to the jurors. The jurors were told to consider several factors regarding the credibility of identification testimony, among which was "the degree of certainty expressed by the witness regarding the identification." Trial Tr. vol. 18, 62. Counsel compounded this error by telling the jury to consider the degree of certainty. Trial Tr. vol. 30, 2320.

Eyewitness testimony from C.J. and Cedrick was an important part of the state's case. It was critical for the jurors to have the proper tools to weigh their credibility.

The instruction given in this case is set forth in *State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995). Developments in the science of psychology have led other courts to see why at least a portion of the *Dyle* instruction is based on fallacy and is unfairly harmful to defendants, as it was to Mr. Dotson. The Supreme Court of Massachusetts explains:

> [I]n cases tried hereafter, the challenged language should be omitted from the standard instruction concerning eyewitness testimony. It is probably true that the challenged instruction has merit so far as it deals with the testimony of a witness who expressed doubt about the accuracy of her identification, whether that identification was made during her testimony, or at a "showup" or lineup. Where, however, the witness has expressed great confidence in her identification of the defendant, the challenged instruction may pose a problem because . . . there is significant doubt about whether there is any correlation between a witness's confidence in her identification and the accuracy of her recollection.

*Commonwealth v. Santoli*, 680 N.E.2d 1116, 1121 (Mass. 1997).

Since 1977, scientific evidence has clearly established that a witness's certainty has, at best, a weak correlation to the accuracy of the identification. Trial counsel should have objected to the instruction and refrained from furthering its false implications. As a result, Mr. Dotson's rights to due process and a fair trial were violated.

### 20.35 Counsel failed to request missing evidence instruction regarding *The First 48* footage.

Mr. Dotson received constitutionally ineffective assistance from his trial counsel when trial counsel failed to request a jury instruction on missing evidence

from the footage shot by the television show, *The First 48*. On June 16, 2010, counsel filed *Brady* requests related to the interviews filmed by *The First 48*, pursuant to a contract with the Memphis Police Department. Counsel asserted that the information recorded by the production company, Granada Entertainment, was exculpatory.

The trial court granted the motions on August 11, 2010, ordering disclosure of recorded interviews with three individuals: (1) an unidentified person claiming to have personal knowledge that Cecil Dotson, Sr. owed $300,000 in proceeds from illegal drug sales to certain individuals; (2) a former member of the Gangster Disciples who gave the police information regarding a death violation given to Cecil Dotson and a blackout team that may have been sent to eliminate the Dotson family based on Cecil Dotson's past action; and (3) "Doc Holiday," a person with information regarding Gangster Disciple hierarchy, specifically, which member(s) had authority to dispense a blackout team. However, by the time the trial court granted the motions, Granada claimed to no longer possess any raw footage that would have included the relevant interviews. And the state never provided trial counsel with supplementary information or interview transcripts for the unavailable filmed interviews.

At trial, the missing footage and the state's responsibility for its destruction was at issue. Several MPD officers were cross-examined about the role of *The First 48* in the investigation, and the jury heard that the unaired footage was not made available to defense counsel. The prosecutor implored the jury to "remember" that the footage "wasn't in the . . . control" of MPD "because they're getting blamed for it."

174

Trial Tr. vol. 30, 2383. He further argued that the fact that destruction of the remaining footage was "a golden nugget" for Mr. Dotson. *Id.*, 2382.

Despite the clear agency relationship between MPD and Granada based upon the contract between the two entities, and despite the undoubted destruction of filmed interviews supporting Mr. Dotson's theory of defense, Mr. Dotson's counsel failed to request a missing evidence instruction. Such an instruction was available under Tennessee law, based upon the degree of negligence involved and the significance of the destroyed evidence. *See State v. Ferguson*, 2 S.W.3d 912, 917 (1999). Without the missing evidence that would have supported his defense, Mr. Dotson's trial was fundamentally unfair, and the minimum way of protecting his rights under these circumstances was a jury instruction that the jury may infer that the absent evidence would be favorable to the defendant based upon the state's failure to fulfill its duty to preserve evidence beneficial to defendant. *See id.* at 917 n.11 (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984); *State v. Willis*, 393 P.2d 274, 276 (Ariz. 1964)). Counsel's failure to obtain such an instruction prejudiced Mr. Dotson's defense, as the jury was not aware that it was permitted to draw the logical inference that the missing evidence was favorable to his defense. He is entitled to relief on this claim of ineffective assistance of counsel.

### 20.36 Counsel failed to raise on appeal claims of prosecutorial misconduct for eliciting the inflammatory, irrelevant testimony of Sgt. Davidson's emotional distress while investigating the crime.

Appellate counsel were ineffective in failing to raise a claim on appeal that the prosecutor engaged in misconduct in eliciting the inflammatory and irrelevant

testimony that Sgt. Davidson found investigating the Lester Street homicides and preparing for Mr. Dotson's trial emotionally distressing. *See* Claim 20.21. The testimony served no purpose other than to arouse the passions of the jury. Mr. Dotson was prejudiced by appellate counsel's failure to raise a meritorious claim.

### 20.37 Counsel failed to raise on appeal the jury instruction claims, above, on appeal.

Mr. Dotson has raised numerous claims of ineffective assistance of counsel based on trial counsel's failure to object to/seek various jury instructions that could have fundamentally altered the outcome of his trial. Even though trial counsel failed to address these issues adequately during trial, if raised on appeal, they could nonetheless have been reviewed for plain error. Nonetheless, appellate counsel failed to raise any of these jury instruction issues on direct appeal.

Many less meritorious issues were raised on direct appeal in this case, which suggests that the failure to raise the issue was an oversight and not deliberate strategy. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[W]hen ignored issues are clearly stronger than those presented, . . . the presumption of effective assistance of counsel [is] overcome.") (cleaned up); *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). In such circumstances, "the ineffectiveness prong of *Strickland* turns on whether an objectively reasonable attorney would have presented the issue for plain error review because it had a reasonable likelihood of success." *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir.1998).

As set forth in the preceding claims, Mr. Dotson had a strong likelihood of success as to multiple jury instruction claims, even under plain error review.

Accordingly, appellate counsel was constitutionally ineffective in failing to assert these claims on direct appeal. Appellate counsel waived Mr. Dotson's right to review of these claims, and because he was reasonably likely to succeed on such review, he suffered prejudice on direct appeal. He is entitled to habeas relief as to this claim.

### 20.38 Counsel failed to raise on appeal claims of prosecutorial misconduct for the improper and incendiary comments made during closing.

In the rebuttal argument of the sentencing phase, the prosecutor stated: "And now Jessie is begging for his [life]? Did Marissa get a jury? What about Shindri? Did she get a jury? Did somebody have to find aggravating circumstances for her to get the death penalty?" Trial Tr. vol. 31, 2547. These comments were plainly improper, and counsel was deficient for failing to object. *Dotson*, 2022 WL 860414, at *59.

The Sixth and Fourteenth Amendments preserve a criminal defendant's rights to confront witnesses and to be tried by a jury. The prosecution cannot nullify these rights by then using the defendant's exercise of those constitutional guarantees against him at trial. *See United States v. Lawrence*, 735 F.3d 385, 433 (6th Cir. 2013); *accord Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001). The prosecution's comments were plainly a commentary on Mr. Dotson's decision to exercise his Sixth Amendment right to a jury trial. *See also* Claims 11, 12, 13.

### 20.39 The cumulative effect of ineffective assistance of counsel violated Mr. Dotson's constitutional rights.

As a result of the constitutional errors described above individually and cumulatively, and viewed in light of the entire record, Mr. Dotson was prejudiced by counsel's multiple instances of deficient performance. There is a reasonable

probability that, but for counsel's errors, the result of the trial would have been different, that he would not have been found guilty or, if the jury *had* found him guilty, there is a reasonable probability that at least one juror would have voted for life which, in Tennessee, results in a life sentence. The cumulative effect of ineffective assistance of counsel violated Mr. Dotson's Sixth, Eighth, and Fourteenth Amendment rights.

> **21.    Trial Counsel McAfee had a conflict of interest involving his representation of a high-ranking Gangster Disciple that impeded avenues of investigation and substantially impaired McAfee's performance.**

Trial counsel Marty McAfee was appointed to represent Martin Lewis in a multi-count indictment on April 23, 2008. *United States v. Lewis*, 2:02-cr-20449 (W.D. Tenn. April 23, 2008) (Order of Appointment). Lewis was an indicted co-defendant with Craig Petties and Clinton Lewis (a/k/a Goldie). Lewis was convicted of racketeering conspiracy, murder in aid of racketeering, conspiracy to commit murder for hire, and aiding and abetting money laundering. *United States v. Lewis*, 2:02-cr-20449 (W.D. Tenn. June 14, 2013) (Redacted Judgment). In short, during the period of time that Mr. McAfee represented Mr. Dotson, he simultaneously represented a highly ranking Gangster Disciple who was convicted alongside Petties.

As is described above, Petties was a major player in the Memphis drug trafficking pipeline and he established an important connection with high-ranking members of the Beltran-Leyva Organization, including Edgar "La Barbie" Valdez Villareal. Petties, and his underlings such as Mr. Lewis, engaged in wide-ranging criminal activity in support of their drug trafficking empire. Press Release, U.S. Dep't

Justice, Drug Trafficking Ringleader Craig Petties Sentenced To Life In Federal Prison (Aug. 22, 2013) (describing Petties as the "ringleader of one of the largest and most violent criminal organizations to ever operate in the state of Tennessee").  Early in the investigation, even prior to Mr. McAfee's appointment, it was evident that the case would involve the Gangster Disciples and/or connections to Mexican drug cartels. Cecil Dotson, Sr. was a Gangster Disciple, only a few steps removed from high-ranking players like Petties and Lewis. Police investigative efforts focused on Cecil Dotson's gang affiliations, his narcotics trafficking, and criminal associates. Numerous tips to the police line "Crime Stoppers" reported that Cecil Dotson had run afoul of the Gangster Disciples. The fact that police officers considered such reports credible—such that they drove the initial investigation—demonstrates the investigative importance of these connections to the case. *See also* American Bar Association*, American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 31 Hofstra L. Rev. 913, 1015 (2003) ("The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.").

The Sixth Amendment "guarantees a criminal defendant the effective assistance of counsel and, in doing so, secures him the assistance of counsel free from conflicts of interest." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 844 (6th Cir. 2017). An attorney provides ineffective assistance of counsel when they

represent multiple defendants whose interests are adverse to each other. *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); Model Rules of Pro. Resp. r. 1.7 cmt. 24. An "actual conflict" for Sixth Amendment purposes is "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). When a petitioner demonstrates that an actual conflict of interest adversely affected his lawyer's performance, prejudice his presumed. *Wood v. Georgia*, 450 U.S. 261, 273 (1981); *Leonard*, 846 F.3d at 844.

Here, Mr. McAfee's simultaneous representation of Lewis and Mr. Dotson created an actual conflict of interest, which prejudiced Mr. Dotson. Mr. McAfee was substantially impaired in his ability to conduct investigation in Mr. Dotson's case. Any investigation that tended to show that members of the Gangster Disciples were connected to the crime was adverse to Mr. Lewis, who himself was under indictment for running a racketeering conspiracy—i.e., the Gangster Disciples—that was responsible murder, drug trafficking, and other serious crimes. What was helpful to one client, was harmful to the other. *Holloway*, 435 U.S. at 482 (describing such situations as a "struggle to serve two masters").

### 22. Mr. Dotson is intellectually disabled and therefore ineligible for the death penalty under *Atkins v. Virginia*.

Mr. Dotson is intellectually disabled and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Supreme Court barred the execution of intellectually disabled persons finding that doing so is "cruel and unusual" in violation of the Eighth Amendment. *Id.* at 312. The Court recognized:

> [Intellectually disabled] defendants in the aggregate face a
> special risk of wrongful execution because of the possibility that

> they will unwittingly confess to crimes they did not commit, their
> lesser ability to give their counsel meaningful assistance, and the
> facts that they are typically poor witnesses and that their
> demeanor may create an unwarranted impression of lack of
> remorse for their crimes.

*Id.* at 305.

The *Atkins* Court stated that intellectual disability requires "not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318. The *Atkins* Court incorporated both the American Psychiatric Association (APA) as contained in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) and the American Association for the Mentally Retarded (AAMR) definitions for mental retardation. *Id.* at 309 n. 3. In the years since the *Atkins* decision, the AAMR has changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). It published its most recent manual, the 12th Edition, in 2021. Additionally, the DSM-V-TR was published in 2022.

The AAIDD 12th Edition defines intellectual disability as being characterized "by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." It also recognizes that the disability "originates during the developmental period, which is defined operationally as before the individual attains age 22." The DSM-V-TR, in turns, defines intellectual disability as:

> A. Deficits in intellectual functions, such as reasoning, problem
>    solving, planning, abstract thinking, judgment, academic

learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

*Atkins* and *Hall v. Florida*, 572 U.S. 701 (2014), left to the states "the task of developing appropriate ways to enforce" the restriction on executing the intellectually disabled. *Id.* at 719. Tennessee law states that "no defendant with intellectual disability at the time of committing first degree murder shall be sentenced to death." *See* Tenn. Code Ann. § 39-13-203(b) (2021). In May 2021, the first prong of the Tennessee statute was changed to remove the language that significantly subaverage general intellectual functioning must be "evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." *See* Tenn. Code Ann. § 39-13-203(a)(1) (2014). Under the amendment, a defendant has an "intellectual disability" when he has: "(1) [s]ignificantly subaverage general intellectual functioning; (2) [d]eficits in adaptive behavior; and (3) [t]he intellectual disability manifested during the developmental period or, by eighteen (18) years of age." Tenn. Code Ann. § 39-13-203(a)(1–3).

Intellectual functioning incorporates the "common definitional characteristics of intelligence, such as reasoning, planning, solving problems, thinking abstractly,

comprehending complex ideas, learning quickly, and learning from experience." ROBERT L. SHALOCK ET AL., INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 25 (AAIDD, 12th ed. 2021). Generally, an individual with an IQ test score that is approximately two standard deviations below the mean is considered intellectually disabled. *Hall*, 572 U.S. at 711. As a result, a score of approximately 70 or below constitutes intellectual disability. *Id.* But "[t]he professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range." *Id.* at 712. Every IQ test has a standard error of measurement (SEM): "A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself." *Id.* at 713. The failure of courts to account for the SEM in evaluating intellectual disability is constitutional error. *Brumfield v. Cain*, 576 U.S. 305, 316 (2015). Caselaw also recognizes the "Flynn Effect," which "refers to the observed phenomenon that IQ test scores tend to increase over time. Thus, the most current versions of a test should be used at all times and, when older versions of the test are used, the scores must be correspondingly adjusted downward." *Coleman v. State*, 341 S.W.3d 221, 242 n.55 (Tenn. 2011). In short, "[i]ntellectual disability is a condition, not a number." *Hall*, 572 U.S. at 723.

Mr. Dotson meets all three *Atkins* requirements, as well as those of the Tennessee statute. He has significantly subaverage intellectual functioning, significant adaptive deficits, and his disability manifested prior to age 18.

Mr. Dotson's IQ scores demonstrate that he has significantly subaverage intellectual functioning. At age 14, his Full-Scale IQ was measured at 80 during January 6, 1989, testing at the Memphis City Schools Mental Health Center with the Wechsler Intelligence Scales for Children-Revised (WISC-R). The WISC-R was normed in 1972. Applying the Flynn Effect, the score adjusts to 74.9. Adjusting for the SEM of plus or minus five points, Mr. Dotson's projected level of intellectual functioning is 69.9 to 79.9. This meets the diagnostic criteria for intellectual disability.

Consistent with this IQ score, Mr. Dotson was diagnosed with a learning disability at age 7, and he qualified for Special Education services in the Memphis City School system. He was retained once in first grade and twice in fourth grade. He failed all his classes in the seventh grade and dropped out of school after completing eighth grade at age 16. At age 14, testing conducted the same day as the WISC-R with the Woodcock-Johnson Psychoeducational Battery placed him well below his current fifth-grade level with regard to his reading skills (2.8 grade level), written language (3.2 grade level), and mathematics (3.9 grade level). He was diagnosed with a mathematical academic skills disorder. The Memphis City Schools Mental Health Center recognized these intellectual disabilities in the treatment plan that it created on January 31, 1989, which indicated that he fell within the "mildly retarded" range and had significantly impaired intellectual functioning.

Additional testing during the developmental period, two years later, also shows that Mr. Dotson satisfies prong 1. On October 8, 1991, Dr. Robert M. Parr conducted

a psychological evaluation of Mr. Dotson, who was then 16 years old. Dr. Parr found that the evaluation "largely reflect[ed] limited intellectual functioning," and that psychological testing revealed "moderate mental retardation in range of functioning." Mr. Dotson's thought processes were "simplistic and concrete," he had great difficulty with abstract reasoning, and he was "very naïve and immature." On the Peabody Picture Vocabulary Test-Revised Mr. Dotson obtained an age equivalence score of seven years, seven months, a standard score of 50, and an overall score well below the first percentile.

Mr. Dotson also has significant deficits in adaptive behavior. The medical community focuses the adaptive-functioning inquiry on adaptive deficits instead of adaptive strengths. *Moore v. Texas*, 581 U.S. 1, 15 (2017) ("[S]ignificant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills."). "Deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits." *Id.* The three domains are: 1) the conceptual domain (i.e., language, reading, writing, money, time, and number concepts); 2) the social domain (i.e., interpersonal skills, self-esteem, gullibility, and social problem-solving); and 3) the practical domain (i.e., activities of daily living, use of community resources, money management, work skills, health, and safety awareness). ROBERT L. SHALOCK ET AL., INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 30 (AAIDD, 12th ed. 2021).

185

Mr. Dotson has significant deficits in each adaptive-skills domain. The January 1989 testing by the Memphis Public School Mental Health Center establishes significant impairments in the conceptual domain, including significant impairments in language, reading, writing, and math. He also has significant impairments in the social domain as Dr. Parr's conclusion when Mr. Dotson was 16 years old that he was "very naïve and immature" and had an age-equivalence score of less than an 8-year-old. He was also held back three times in school. Witnesses who knew him during the developmental period report that he was a poor communicator who would use incomplete sentences. He struggled with relationships and would try to gain friends by spending money on them. People took advantage of him. He was unable to assess risk and protect his safety. He was a follower in social settings. In the practical domain, witnesses report he wore tattered clothes and shoes. He could not manage money well and would also get cheated out of money.

In addition, as the dates of the testing referenced above demonstrate, Mr. Dotson can show the onset of his intellectual disability prior to the age of 18.

Mr. Dotson is intellectually disabled and meets both the *Atkins* and Tennessee statutory definitions. He is categorically exempt from execution pursuant to the Eighth and Fourteenth Amendments as well as Tennessee Code § 39-13-203(a)(1–3).

As discussed above in Claim 20.15, trial counsel rendered ineffective assistance of counsel related to the investigation, preparation, and presentation of Mr. Dotson's intellectual disability claim.

### 23. The Shelby County Jail gave Mr. Dotson psychotropic medication at the time of his trial in violation of his constitutional rights.

The improper administration of psychotropic medications while Mr. Dotson was in custody impinged his right to a fair trial by adversely affecting his outward appearance, ability to follow the proceedings, ability to meaningfully communicate with counsel, and ability to testify, violating his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) ("The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense.") (Kennedy, J., concurring). Trial counsel rendered ineffective assistance by failing to object or to consult a psychiatrist or other expert to assess the impact of these medications on Mr. Dotson.

### 24. Mr. Dotson suffers from co-morbid neurocognitive disorders, brain damage, and psychiatric illness, which make him ineligible for the death penalty.

In addition to intellectual disability as described above, and incorporated herein by reference, Mr. Dotson also suffers from comorbid medical and psychiatric conditions—neurocognitive disorders, brain damage, and psychiatric illness—the combination of which make him constitutionally ineligible for the death penalty and make his capital sentence otherwise unconstitutional under the Eighth and Fourteenth Amendments. Reliability is the bedrock of any claim that the death penalty is constitutional. The Supreme Court has repeatedly recognized that any capital prosecution offends the Eighth Amendment if the judicial system cannot sufficiently insure reliability in the determination of the sentence. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (citing *Woodson v. North Carolina*, 428 U.S.

187

280, 305 (1976); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Gardner v. Florida*, 430 U.S. 349 (1977)). For this reason, in *Atkins v. Virginia*, 536 U.S. 304 (2002), *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court identified two categories of defendants who it held could not reliably be sentenced to death: the intellectually disabled and juveniles. Because the Court's rationale resulting in those categorical exclusions applies with at least equal force to those who have neurocognitive disorders, brain damage, or psychiatric illness, executing individuals with these conditions is likewise unconstitutional.

Individualized sentencing is the predicate for any constitutional imposition of the death penalty. In 1976, the Supreme Court held "the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304–05. In *Woodson*, the Court specified that the Eighth Amendment requires consideration of "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Id.* at 304; *accord Roberts v. Louisiana*, 428 U.S. 325, 329 (1976). Subsequently, the Court explicitly linked the consideration of mitigating evidence with the heightened need for reliability in capital cases in *Lockett v. Ohio*. *Lockett* held that a "risk" that mitigation may not be fully considered offends the constitution:

> [P]revent[ing] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and

> to circumstances of the offense proffered in mitigation creates the risk
> that the death penalty will be imposed in spite of factors which may call
> for a less severe penalty . . . that risk is unacceptable and incompatible
> with the commands of the Eighth and Fourteenth Amendments.

438 U.S. at 605.

While insisting that individualized sentencing is the lynchpin of reliability in capital cases, the Supreme Court has recognized that some qualities are inherently difficult for jurors to appropriately weigh and consider. These facts are, by their very nature, "double edged." They should mitigate a defendant's moral culpability, but societal misconceptions about those factors create too significant a risk that they will be misused for a defendant with those qualities to be reliably sentenced to death. The *Atkins* Court determined that where a reliable assessment of constitutionally protected mitigation lies beyond the jury's ability, jurors cannot be asked to consider a death sentence. Mental illness, brain damage, and neurocognitive impairments of the type suffered by Mr. Dotson are just such mitigation.

The combination of these serious co-morbid conditions renders Mr. Dotson ineligible for the death penalty because his execution would be cruel and unusual under the Eighth and Fourteenth Amendments. Mr. Dotson is entitled to habeas relief and to be freed from his unconstitutional capital sentence.

### 25. In violation of his procedural and substantive due process rights, Mr. Dotson was not competent to stand trial or to testify.

Mr. Dotson incorporates by reference all relevant factual averments in the petition, including but not limited to Claims 20.15, 20.17, 22, 23, 24. Because of Mr. Dotson's neurocognitive disorders, brain damage, psychiatric illness, intellectual

189

disability, the effects of the psychotropic medication he received from jail staff, and prison conditions, including being kept in isolation, Mr. Dotson did not understand the proceedings against him and was unable to assist counsel, thereby rendering him incompetent to stand trial. As a result, his conviction and sentence violate the Sixth, Eighth and Fourteenth Amendments. He is entitled to habeas relief and his unconstitutional conviction and sentence must be set aside.

A defendant has a substantive due process right not to be tried unless competent. It is well established that the criminal trial of an incompetent defendant violates due process. *Medina v. California*, 505 U.S. 437, 453 (1992). A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel in conducting the defense. *Duskey v. United States*, 362 U.S. 402, 402 (1960); *see also Drope v. Missouri*, 420 U.S. 162, 171–72 (1975) (recognizing the prohibition on trying incompetent defendants as "fundamental" to our adversarial system of justice). The interaction of these co-occurring conditions rendered Mr. Dotson incompetent to stand trial or to testify.

### 26. Mr. Dotson's capital sentence is unconstitutional because of racial disparity in the imposition of the death penalty.

In violation of the Eighth and Fourteenth Amendments, Mr. Dotson's capital sentence is unconstitutional because of racial disparity in the imposition of the death penalty in Tennessee.

Tennessee's death row is rife with evidence of racial disparity—most acutely regarding the imposition of capital punishment in Shelby County. There are currently

190

45 people on death row in the state—24 are people of color and 21 are White. TENN. DEP'T OF CORR, DEATH ROW OFFENDERS, https://www.tn.gov/content/tn/correction/ statistics-and-information/death-row-facts/death-row-offenders.html (last visited Jan. 25, 2024).[49] Black people constitute 49% of Tennessee's death row despite being only 17% of Tennessee's population. *Id.* Against this backdrop, Shelby County accounts for 51% of the total inmates on death row in the state. *Id.* Moreover, 64% of death sentences for Black defendants, from 2003 to 2020, in Tennessee originated in Shelby County. DEATH PENALTY INFO. CTR., DEATH PENALTY CENSUS DATABASE (2023), https://deathpenaltyinfo.org/database/sentences (last visited Jan. 25, 2024).

There are 23 people on death row from Shelby County; 19 of those are people of color and four are White. TENN. DEP'T OF CORR, DEATH ROW OFFENDERS, https://www.tn.gov/content/tn/correction/statistics-and-information/death-rowfacts/ death-row-offenders.html (last visited Jan. 25, 2024). Black people constitute 69% of Shelby County inmates on death row and therefore are overrepresented on death row by 132%, even taking into account that Shelby County is a majority-minority county. The four White men on death row from Shelby County were convicted of offenses in 1990, 1991, 1992, 1998. *Id.* No White person has been sent to death row from Shelby County for a crime in the 21st Century. *Id.*

---

[49] TDOC information incorrectly lists Mr. Gerald Lee Powers as being White. He, and Mr. Heck Van Tran are both Asian. *See* LEGAL DEF. FUND, DEATH ROW U.S.A., WINTER 2023, LEGAL DEFENSE FUND 56, https://www.naacpldf.org/wp-content/uploads/ DRUSAWinter2023.pdf (last visited Jan. 25, 2024) (reflecting these men as Asian).

Of the 14 people sentenced to death since 2000 in Tennessee, ten are Black men and four are White. *Id.* Thus, Black men account for 71% of those placed on death row since 2000. *Id.* Of those sentenced prior to 2000, 42% are Black people. *Id.* This indicates that racial disparity in death sentencing has become increasingly stark in recent years.

Though the overwhelming number of homicides in this country are committed by White people, statistics show that a Black defendant is nearly four times more likely to receive the death penalty than a White man. DEATH PENALTY CENSUS DATABASE; DEATH PENALTY INFO. CTR., THE DEATH PENALTY IN BLACK & WHITE: WHO LIVES, WHO DIES, WHO DECIDES (1998), https://deathpenaltyinfo.org/facts-and-research/dpic-reports/in-depth/the-death-penalty-in-black-and-white-who-lives-who-dies-who-decides (last visited Jan. 25, 2024). While the racist application of the death penalty is obviously reflective of slavery's lasting legacy and the racist hierarchies that slavery was founded on, its race-based application is also perpetuated—at least in part—because prosecutors and decision makers are overwhelmingly White. *Id.*; REFLECTIVE DEMOCRACY CAMPAIGN, TIPPING THE SCALES: CHALLENGERS TAKE ON THE OLD BOY'S CLUB OF ELECTED PROSECUTORS 1 (2019), https://wholeads.us/research/tipping-the-scales-elected-prosecutors/; *see also* Katherine Burgess, '*This is unacceptable': In District Attorney General's Office, 10% of attorneys, supervisors are Black*, MEMPHIS COM. APPEAL (Apr. 5, 2022), https://www.commercialappeal.com/story/news/2022/04/06/steve-mulroy-releases-data-lack-diversity-district-attorneys-office/9476016002/; Jackson Baker, *Mulroy*

*Alleges Blacks Under-Represented in Shelby D.A.'s Office*, MEMPHIS FLYER (Apr. 5, 2022), https://www.memphisflyer.com/mulroy-alleges-blacks-under-represented-in-shelby-d-a-s-office; Brandon Richard, *Shelby County district attorney's race heats up over diversity*, ACTION NEWS 5 (Apr. 6, 2022), https://www.actionnews5.com/2022/04/06/shelby-county-district-attorneys-race-heats-up-over-diversity/.

A study of first-degree murder convictions in Tennessee from 1977 to 2016 found that of those convictions where prosecutors sought the death penalty, 73% involved White victims; and of cases where a jury handed down a death sentence, 75% involved White victims. John M. Scheb & Hemant K. Sharma, *Race and the Death Penalty in Tennessee, 1977–2016*, *in* OPEN JUD. POL. (2d ed. 2021), https://open.oregonstate.education/open-judicial-politics/chapter/race-and-death-penalty-tennessee/. The study determined that prosecutors were 1.5 times more likely to seek the death penalty when the victim was White. *Id*. This is highlighted by the fact that of the death sentences imposed in Tennessee since 1972, 74% have involved White victims, while White victims constituted only 39% of Tennessee homicide victims from 2010–2021. DEATH PENALTY INFO. CTR., DOOMED TO REPEAT: THE LEGACY OF RACE IN TENNESSEE'S CONTEMPORARY DEATH PENALTY 57 (2023). Moreover, many Black defendants in capital cases have been tried by all or nearly all-White juries, even in majority-minority counties like Shelby. *Id*.

Racial bias, even if it is unconscious, should play no role in the imposition of the death penalty. Mr. Dotson's death sentence is constitutionally disproportionate and arbitrary and capricious. Further, it violates equal protection, evolving standards

193

of decency, and the principles underlying the Fifth, Sixth, Eighth, and Fourteenth Amendments. Mr. Dotson is entitled to habeas relief on this claim.

> **27. The jury that presided over Mr. Dotson's trial engaged in misconduct that violated his right to trial by an impartial and unbiased jury, his right to due process and his right to individualized sentencing.**

Juror misconduct infected Mr. Dotson's trial in violation of his Sixth and Fourteenth Amendment rights to trial by an impartial and unbiased jury and due process and his Eighth Amendment right to individualized sentencing.

First, racial animus infected the deliberations. In 2017, the Supreme Court considered a case in which there was evidence that a juror expressed racist biases toward the defendant. *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017). The Court held:

> [W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

*Id.* at 225.

Second, the sole Black male juror, Mr. Gerald Copeland, was unduly pressured to quickly return a verdict. As a result of this coercion, the death verdicts were a product of an unfair process, in violation of the right to a fair jury trial under the Sixth and Fourteenth Amendments.

Third, the jury deliberated prematurely during the guilt-innocence phase, before the submission of all of Mr. Dotson's evidence. Jurors expressed opinions about the case to other jurors, and alternate jurors were included in these deliberations.

These premature deliberations violated Mr. Dotson's Sixth Amendment right to a fair trial and his Fourteenth Amendment right to due process. There are many reasons for the court to prohibit jurors from such premature deliberations. First, because the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his evidence, and it is likely that any initial opinions formed by jurors will be unfavorable to the defendant. *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993). Second, once a juror expresses his or her views in the presence of other jurors, he is likely to continue to adhere to that opinion and pay greater attention to evidence presented that comports with that opinion. *Id.* Third, the jury system is meant to involve decision-making as a collective, deliberative process and premature discussions among individual jurors may thwart that goal, while also lacking the context of the court's legal instructions. *Id.*

The fact that jurors engaged in premature deliberations is further aggravated by the fact that alternative jurors were present and participated in these discussions. *See generally Manning v. Huffman*, 269 F.3d 720, 726 (6th Cir. 2001) (holding that involvement of alternate jurors in deliberations constitutions prejudice per se to defendant). In criminal trials, an improper outside influence is any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Remmer v. United States*, 347 U.S. 227, 229 (1954)). The jury's discussion of Mr. Dotson's guilt with the alternate jurors prior to submission constituted a direct, unauthorized, "private

communication . . . during a trial about the matter pending before the jury" in violation of *Remmer*. *Id.* Such a communication is presumptively prejudicial. *Id.*

The jury that convicted and sentenced Mr. Dotson to death violated his constitutional rights in fundamental ways. Due to individual instances of juror misconduct, as well as cumulative juror misconduct that occurred in Mr. Dotson's case, the verdict here was the result of an unfair process in violation of the Sixth, Eighth, and Fourteenth Amendments.

### 28. Mr. Dotson's constitutional rights were violated by the trial court's failure to sua sponte excuse automatic death penalty juror Stephen Ray.

Juror Stephen Ray, who ultimately served as the foreperson of Mr. Dotson's jury, indicated he would not consider a sentence less than death for the killing of a child. Trial counsel were ineffective for not challenging him for cause or using a peremptory challenge to strike him. *See* Claims 20.9–20.10. But the trial court's failure to excuse him sue sponte constituted structural error, as it violated his Sixth, Eighth, and Fourteenth Amendment rights to a fair and impartial jury, a fair trial, and to be free from cruel and unusual punishment. The resulting jury was one that was conviction prone and unwilling or unable to consider life imprisonment as proper punishment for first degree murder in violation of *Morgan v. Illinois*, 504 U.S. 719 (1992).

There is a reasonable probability that had a proper voir dire examination been conducted, Mr. Dotson would not have been convicted and/or sentenced to death.

29. **The trial court violated Mr. Dotson's due process rights by ordering him to be placed in stun cuffs during trial without conducting a hearing or making findings that they were necessary.**

Mr. Dotson incorporates the averments in Claim 20.8 in this petition as if set forth fully herein.

On September 17, 2010, the Friday before voir dire was to begin, the trial court entered a written order "that the Shelby County Sheriff's Department shall place 'Stun Cuffs' on the defendant at any time he is attending Court proceedings." Trial Tech. R. vol. 4, 557. The state filed no motion requesting such measures, nor did the trial court conduct a hearing to determine the necessity of stun cuffs. The court's order made no factual findings supporting its decision authorizing the use of stun cuffs.

The Supreme Court has held that the Fourteenth Amendment's Due Process Clause generally forbids shackling a criminal defendant at trial absent a special need. *See Deck v. Missouri*, 544 U.S. 622, 626 (2005). In *Deck*, the Court considered whether shackling a convicted offender during the penalty phase of a capital case violated the federal constitution. *Id.* at 624. In answering this question, the Court held the Constitution forbids the use of visible shackles during a capital trial's penalty phase, as it does during the guilt-innocence phase, absent a trial court determination that restraints are justified by a state interest specific to the particular defendant on trial. *Id.* (citing *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)).

197

The right of a criminal defendant to remain unshackled throughout trial is an important one. First, the criminal process presumes that a defendant is innocent until proven guilty. *Coffin v. United States*, 156 U.S. 432, 453 (1895) (presumption of innocence "lies at the foundation of the administration of our criminal law"). The use of visible restraints during the guilt-innocence phase of a criminal trial undermines the presumption of innocence and the related fairness of the factfinding process, by suggesting to the jury "that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Deck*, 544 U.S. at 630 (quoting *Holbrook*, 475 U.S. at 569). Second, the use of shackles interferes with the defendant's ability to communicate with counsel and participate in his own defense. *Id*. Third, the use of shackles in the presence of the jury undermines the dignity of the courtroom. *Id*. Lastly, as the Supreme Court has acknowledged, the use of visible restraints, particularly in the penalty phase, is inherently prejudicial to the defendant because it implies that the defendant is dangerous. *Id*. at 632–33.  An integral part of the jury's determination of whether a defendant should be sentenced to death is the threat of danger he poses to his community. *See, e.g., Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (recognizing that a "defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system"). The perception shackling creates has the power to tip the scales in favor of the death penalty.

Importantly, the Sixth Circuit has held that the imposition of stun belts on defendants at trial more severely impact these fundamental rights than shackles, particularly the right to participate in one's own defense. *United States v. Waagner*, 104 F. App'x 521, 526 (6th Cir. 2004); *see also Gonzalez v. Pliler*, 341 F.3d 897–901 (9th Cir. 2003); *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002).

The Constitution requires a court to make an individualized determination prior to imposing restraints: "[G]iven their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Deck*, 544 U.S. at 632; *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) (holding the Constitution requires an individualized assessment prior to a court imposing visible restraints upon a defendant).

The use of stun cuffs on Mr. Dotson violated his due process right to a fair and impartial trial. The trial court made no individualized determination that they were needed for security as the Constitution requires, and there is no factual basis in the record to suggest Mr. Dotson posed any security risk that would have warranted such a finding had the trial court inquired. There is no indication in the record that he acted out in any way, attempted to escape, or otherwise posed any security risk to support the need for stun cuffs. The stun cuffs impaired his ability to participate in the trial as it had a psychological impact on him during the proceedings, interfered with his ability to communicate with counsel and participate in his own defense, and undermined the dignity of the courtroom and the trial.

30. **The trial court's denigration of defense counsel in the presence of the jury violated Mr. Dotson's right to a fair trial.**

The presence of the cameraman from *The First 48* permeated the investigation of this case. He was permitted to enter and film the crime scene. Officers reenacted events for the benefit of the program. *See, e.g.*, Trial Tr. vol. 21, 660.

When trial counsel attempted to impeach the credibility of the authorities' investigation of Mr. Dotson's case by pointing out that law enforcement permitted *The First 48* to destroy footage of Mr. Dotson's interrogation, the trial judge lost his temper [50] and lit into trial counsel in the presence of the jury. The trial judge stated:

> Mr. Skahan, for the record the Supreme Court of the State of Tennessee has authorized cameras in the courtroom. This Court allows one camera in the courtroom and all media outlets feed off of the one camera. That camera and the TV station associated with that is the lead camera that's in the courtroom. Every media outlet and every channel is peeling off of one camera. That is one that has been authorised [*sic*] by the Supreme Court to be here. . . . This Court is not authorizing a television show or to be part of a television show. They are following the rules that the Supreme Court says. So let's make sure the record is clear that this is not a TV show and this is not being produced as a TV show and it's not being edited as a TV show. This is a trial.

Trial Tr. vol. 21, 661.

Trial counsel again attempted to question Sgt. Mullins regarding the filming of Mr. Dotson's interrogation and the trial judge again erupted, saying:

> [H]e was not present when that interview was conducted so let's move into areas that he's aware of, okay. I've allowed this to go for a long way, and I know where you're going and I understand why you're going there. He's already testified he wasn't present when that interview was conducted. He doesn't know who was in there.

---

[50] In his explanation to the jury, the trial judge stated, "Let me apologize to you for losing my temper." Trial Tr. vol. 22, 730.

Trial Tr. vol. 21, 662–63.

In noting that a trial judge "is more than a neutral arbiter," the Sixth Circuit stated that any "interference [by the trial judge] with the presentations of counsel has the potential of making a mockery of a defendant's right to a fair trial, even in the absence of open hostility." *United States v. Hickman*, 592 F.2d 931, 934 (6th Cir. 1979). More recently, the Sixth Circuit noted the importance of the trial court acting "with a neutral, unbiased demeanor when addressing counsel and witnesses." *United States v. Powers*, 500 F.3d 500, 512 (6th Cir. 2007). A trial judge risks the appearance of partiality if he or she "intervenes continually on the side of one of the parties." *Hickman*, 592 F.2d at 934. To constitute an infringement on the defendant's right to a fair trial, a petitioner need only show "the conduct of the trial judge must have left the jury with a strong impression of the judge's belief of the defendant's probable guilt such that it was unable to freely perform its function of independent fact finder." *Id.* at 936.

Mr. Dotson's trial judge did just that—his repeated outbursts left the jury with the impression that the defense was asserting a ludicrous position. As such, Mr. Dotson's jury was "unable to freely perform its function of independent fact finder." *Id.* Mr. Dotson is entitled to habeas relief on this claim.

### 31. Mr. Dotson's Sixth Amendment right to confront witnesses against him was violated when the state offered testimony of a pathologist who did not perform the autopsies.

At Mr. Dotson's trial, the trial court admitted autopsy reports for each of the six homicide victims. Dr. Miguel Laboy performed autopsies on Cecil Dotson, Sr.,

Hollis Seals, and Cemario Dotson. *See* Tr. Ex. 298, 384, 460. Dr. Lisa Funte performed autopsies on Marissa Williams, Shindri Roberson, and Cecil Dotson II. *See* Tr. Ex. 327, 358, 439. Dr. Laboy did not testify at trial. Instead, Dr. Funte was permitted to testify regarding the findings of the autopsies she conducted, as well as those conducted by Dr. Laboy.

The Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004). The Sixth Amendment right to confront witnesses applies to a "core class of 'testimonial' statements" such as "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pre-trial statements that declarants would reasonably expect to be used prosecutorially" *Id.* at 51. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Supreme Court held that laboratory drug analysis "certificates" were "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 310 (quoting *Crawford*, 541 U.S. at 51). As such, the "certificates" were "testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." *Id.* at 311.

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the state introduced a forensic laboratory report certifying that the defendant had a blood alcohol level greater than the legal limit. At trial, the prosecution did not call the analyst that

conducted and certified the laboratory test but rather another analyst who was familiar with the procedure and operation of the lab. *Id.* at 651. The Supreme Court held that such "surrogate testimony" violated the defendant's Sixth Amendment right to confront witnesses against him. *Id.* at 652.

These doctrines were refined slightly in *Williams v. Illinois*, 567 U.S. 50 (2012). There, a state forensic scientist relied on a DNA report created by a private laboratory. *Id.* at 57–58. Such "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Id.* a 58. Concurring with the four-justice plurality, however, Justice Thomas wrote that he sided with the plurality "solely because [the private lab's] statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause. *Id.* at 103–04 (Thomas, J., concurring).[51]

With these principles in mind, it is clear that Mr. Dotson's right to confront witnesses against him was violated. Unlike in *Williams*, the autopsies were offered for the truth of the matter assert—i.e., that the victims were killed, and the manner of death was homicide. Furthermore, Dr. Laboy did not complete the autopsy reports until June 24, 2008, more than three months after Mr. Dotson had been charged with the crimes. As such, the reports "were made under circumstances which would lead

---

[51] Because Justice Thomas's plurality opinion offers the narrowest grounds for the holding, it is controlling. *Vieth v. Jubelirer*, 541 U.S. 267, 281 (2004).

an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52 (cleaned up). Finally, each autopsy is accompanied by a signed attestation, providing these documents with "formality and solemnity" to be considered testimonial. *Williams*, 567 U.S. at 104. Under these circumstances, the autopsy reports were undoubtedly testimonial in nature and their admission violated Mr. Dotson's Sixth Amendment right to confront the witnesses against him.

32. **The trial court violated Mr. Dotson's due process rights in denying his motion to prohibit the display of photographs of the victims after their death.**

Prior to his trial, Mr. Dotson moved the court to prohibit display of numerous photographs of the victims. These photographs—which showed, *inter alia*, the victims' facial injuries and photographs of the deceased children—had little to no probative value but were highly prejudicial. The trial court denied his motion as to all but one photograph, for which it reserved ruling, and display of all the questionable photos was permitted during the trial. *State v. Dotson*, 450 S.W.3d 1, 92 (Tenn. 2014).

On direct appeal, Mr. Dotson argued that the trial court's denial of his motion to prohibit display of these images violated his due process rights, as well as Tennessee state law. The CCA, reviewing for plain error based upon defense counsel's failure to renew the objection during the trial, concluded that the trial court committed no error under state evidentiary law but did not address Mr. Dotson's due process argument.

The admission of certain evidence may rise to the level of a constitutional violation if the evidence "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994); *accord Spears v. Mullin*, 343 F.3d 1215, 1225–30 (2003) (finding that introduction of gruesome crime scene photographs was highly inflammatory and "fatally infected the trial," depriving defendants of their constitutional rights to a fundamentally fair sentencing proceeding).

The fact that the photographs were justified as "supplement" or "support" of the prosecution's evidence proves that their probative value was very low. The photographs were not necessary for the state to prove any element of conviction or any aggravating circumstance; rather, they were duplicative and cumulative of the other evidence and testimony. These images served no purpose other than to inflame the passions of the jury, and fatally infected the jury's sentencing determination. Mr. Dotson is entitled to habeas relief as to his due process claim.

### 33. The trial court's denial of Mr. Dotson's motion to provide DNA analysis for all person who made contact with the crime scene compromised his efforts to present a defense.

Prior to trial, Mr. Dotson twice requested that the trial court order DNA testing of any and all individuals who had contact with the crime scene to eliminate medical or investigatory personnel as possible contributors of forensic evidence that did not match the victims or Mr. Dotson. Specifically, several hairs were found on or near one of the victims which did not match the ethnicity of Mr. Dotson or the victims, causing him to seek a DNA profile via mouth swab of five individuals who had contact with

the crime scene. The trial court denied the requests, and no such DNA testing was ever performed.

The trial court's denial of his motion for DNA testing of all individuals who had contact with the crime scene violated his due process rights and hindered his ability to present an adequate third-party defense. *Chambers v. Mississippi*, 410 U.S. 284 (1973). Capital cases carry heightened due process interests for the defendant, given the severity of the consequences and punishment at stake. The trial court failed to take Mr. Dotson's heightened due process interests into account in analyzing his requests for third-party DNA testing. The minimal intrusion of a mouth swab of five individuals present on the crime scene must give way to Mr. Dotson's due process right to develop and present an adequate defense in his capital case. Such information was crucial to Mr. Dotson's defense, as elimination of those individuals as contributors of the hairs in question would have materially supported his theory of the case—namely, that another individual was the true perpetrator. Mr. Dotson is entitled to habeas relief as to this claim.

### 34. The trial court erred in denying Mr. Dotson's motion for the production of statements of individuals not called as witnesses for the state.

Prior to trial, Mr. Dotson moved the Court to require the prosecution to produce statements from individuals not expected to testify at trial, essentially asking the court to enforce the state's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court denied the motion after the prosecution agreed at a pre-trial hearing that it had a duty to produce *Brady* material. But both the trial court and the prosecution misunderstood the contours of *Brady*, unfairly conflating "favorable"

206

material with "exculpatory" material. Trial Tr. vol. 10, 13–15. This resulted in Mr. Dotson being deprived of the opportunity to obtain favorable defense testimony that would have supported his theory that the homicides and attempted homicides were gang-related retaliation.

The relevant question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Further, "favorable evidence is material, and constitutional error results" from it being kept from a defendant if there is even a reasonable probability that the result of the proceeding could have been different with disclosure. *Id*. at 433–34 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" *Id*. at 434.

Mr. Dotson's theory of defense was that the homicides and attempted homicides were gang-related retaliation. The state pursued gang-related leads but did not disclose to Mr. Dotson any interviews or tips relating to this line of investigation. Mr. Dotson's Fourteenth Amendment right to due process was violated by the trial court's refusal to require the prosecution to produce this evidence, which he could have used to undermine the state's theory of the case. While such evidence may not have been clearly exculpatory, it was nonetheless favorable, and the trial court erred in accepting the state's position that it was only required to hand over exculpatory evidence. The trial court's denial of Mr. Dotson's motion for production

of statements of witnesses not called by the state also denied him the right to present an adequate defense by denying him access to exculpatory evidence, in violation of *Chambers v. Mississippi*, 410 U.S. 284 (1973). Mr. Dotson is thus entitled to relief on this claim.

### 35. The evidence was insufficient for each count of the indictment.

The state's evidence was constitutionally insufficient as to each crime of conviction. Specifically, the prosecution failed to present evidence of premeditation, which was an essential element of the six convictions of premeditated first-degree murder and three convictions of attempted first-degree murder. The state also failed to meet its burden of proving guilt beyond a reasonable doubt.

Tennessee law has identified several ways in which circumstantial evidence may imply premeditation, none of which were proven by the prosecution's trial evidence. *See State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (noting the following circumstances as relevant to premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of a killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after a killing). Instead, the testimony of the state's witnesses established only "excitement and passion," which is the inverse of premeditation. Indeed, the trial court described Mr. Dotson's actions as occurring "in a heat of passion and in a just rage." Trial Tr. vol. 32, 35. Further, the convictions could not

stand without the testimony of C.J. Dotson, which is contradicted by the physical evidence. Lastly, Mr. Dotson's identity as the perpetrator is insufficiently established. His own statements to the police also contradicted the physical evidence at the Lester Street scene, no forensic evidence implicated Mr. Dotson, and witnesses who saw him after the incident did not mention seeing any blood on his clothing.

The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On habeas review, a federal court's "review of a state-court conviction for sufficiency of the evidence is very limited." *Tackett v. Trierweiler*, 956 F.3d 358, 367 (6th Cir. 2020). In light of evidence of his innocence and the Court's ability to consider new and old evidence under *House v. Bell*, 547 U.S. 518 (2006), there is insufficient evidence to support Mr. Dotson's convictions.

> **36.  The jury instructions improperly defined reasonable doubt, reducing the burden of proof on the state in violation of the due process clause guaranteed by the Fourteenth Amendment.**

The jury instruction in Mr. Dotson's case impermissibly reduced the burden of proof and violated due process. The court instructed the jury that they "should render their verdict with absolute fairness and impartiality as they think truth and justice dictate." Trial Tr. vol. 12, 2236. The jury instructions defined reasonable doubt as follows:

> A reasonable doubt is that doubt created by an investigation of all the proof in the case and an inability after such an investigation to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not

mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every element of proof requisite to constitute the offense.

Trial Tr. vol. 12, 2238.

"The beyond a reasonable doubt standard is a requirement of due process." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). The Constitution does not require any particular form of words be used in advising the jury of the prosecution's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Id.* (cleaned up, alterations in original). Nonetheless, the court must make it "clear to the jury that the burden of proof is high." *United States v. Ashrafkhan*, 964 F.3d 574, 578 (6th Cir. 2020). "To warrant habeas relief, jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair." *Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

Here, a reasonable, textual reading of this instruction commands a juror that she must convict if the defense's theory points to a plausible and realistic possibility that the defendant did not commit the crime. This is because the instruction categorically states that reasonable doubt cannot be based upon a possibility. Thus, a defendant could demonstrate a possibility, even a strong possibility, that the defendant did not commit the offense, but a juror would be compelled to convict because the defense had only demonstrated a possibility of innocence, rather than demonstrated unassailable proof that the defendant did not commit the offense. This

is the antithesis of constitutional reasonable doubt instructions because it impermissibly shifts the burden to the defendant. Under this instruction, a defendant owes an affirmative duty to demonstrate his innocence, a burden wholly foreign to our law.

This problem is particularly acute in this case. Trial counsel's theory of the case was that a perpetrator other than Mr. Dotson committed the crime. To prove this, counsel relied on the absence of physical evidence connecting Mr. Dotson to the crime and Cecil Dotson, Sr.'s gang affiliation as serving as motive for another perpetrator. This strategy could not be proved definitively; the theory required the jury to believe the *possibility* that another perpetrator committed the offense. This theory was not conjecture. It was undisputed that Cecil Dotson and the other adults murdered were gang members. Indeed, law enforcement's initial investigation focused on Cecil Dotson's gang affiliation. Numerous tips were submitted to law enforcement that suggested Cecil Dotson owed drug debts that motivated fellow gang members to kill him. These tips were clearly credible enough to merit law enforcement attention and for several days served as the police's operative theory of the crime. The reasonable doubt instruction forbade the consideration of this evidence because the defense's theory relied on a supported *possibility* that the victims were killed as a result of gang affiliations and involvement in drug trafficking. Under the circumstances, these instructions violated Mr. Dotson's due process rights.

The guilt determination thus violated the Constitution, because the "moral certainty" language, combined with the "satisfactory conclusion" language, combined

with the "as you think truth and justice dictate" language suggested to the jury a standard of proof less than proof beyond a reasonable doubt. Indeed, "moral certainty" by itself is an unconstitutional definition of "reasonable doubt," and the rest of the instruction did not in any way properly state the burden of proof. Permitting the jury to convict based upon a mere "satisfactory conclusion" of guilt allowed conviction despite reasonable doubts. Similarly, jurors were still allowed to convict if they felt that "truth and justice dictate[d]" a conviction, notwithstanding the existence of reasonable doubts. Accordingly, the convictions were obtained in violation of the Sixth, Eighth, and Fourteenth Amendments. *See Cage v. Louisiana*, 498 U.S. 39 (1991); *Victor v. Nebraska*, 511 U.S. 1 (1994); *In Re Winship*, 397 U.S. 358 (1970).

### 37. The anti-sympathy jury instruction violated Mr. Dotson's Eighth and Fourteenth Amendment rights.

The jury in this case upon first deliberation was instructed as follows:

> The jury in no case should have any sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict. They should render their verdict with absolute fairness and impartiality as they think truth and justice dictate. Every fact and circumstance in the case you may consider in arriving at your verdict.

Trial Tech. R. vol. 6, 18; *see also* Trial Tr. vol. 29, 2235 ("The jury in no case should have any sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict.").

The jury was further instructed at the close of the sentencing phase they could specifically consider victim impact evidence in their sentencing decision. Trial Tech. R. vol. 6, 45–46; Trial Tr. vol. 31, 2550–51. Without objection from Mr. Dotson's trial counsel, the trial court instructed the jury based on the pattern instruction:

212

> Victim impact evidence is not the same as an aggravating circumstance.
> Proof of an adverse impact on the victim's family is not proof of an
> aggravating circumstance. Introduction of this victim's impact evidence
> in no way relieves the state of its burden to prove beyond a reasonable
> doubt at least one aggravating circumstance which has been alleged.
>
> You may consider this victim impact evidence in determining the
> appropriateness of the death penalty only if you first find that the
> existence of one or more aggravating circumstances have been proven
> beyond a reasonable doubt by evidence independent from the victim
> impact evidence and finding the aggravating circumstances found
> outweigh the finding of one or more mitigating circumstances beyond a
> reasonable doubt.

Trial Tr. vol. 14, 2551. These instructions, given together, prohibited the jury from

considering mitigation and violated the governing law by placing a finger on the scale

of death.

Anti-sympathy instructions generally "cause too many problems as some

mitigating factors and some aggravating factors are designed to invoke sympathy for

the victim or the defendant." PRESIDING OVER A CAPITAL CASE: A BENCHBOOK FOR

JUDGES 245 (The Nat'l Jud. Coll. Ed., 2009). This confusing instruction effectively

functioned to preclude the consideration of mitigation, particularly when combined

with the victim impact testimony in this case. As for the victim impact instruction,

while the court stated that victim impact evidence is "not the same as an aggravating

circumstance" and attempted to limit the use of victim impact evidence until after

the jury has already found that aggravating circumstances outweigh the mitigating

circumstances, capital jury studies suggest that juries often misunderstand and fail

to comprehend such instructions. *See* Luginbuhl & Howe, *Discretion in Capital

Sentencing Instructions: Guided or MisGuided?*, 70 IND. L.J. 1161 (1995); Eisenberg

& Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1 (1993). This creates a constitutionally unacceptable risk that the jury may insert an invalid aggravating circumstance into the sentencing decision impose the death penalty in an arbitrary and capricious manner. *Espinosa v. Florida*, 504 U.S. 854, 858 (1992) (holding that "in a state where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment").

Prior to *Payne v. Tennessee*, the Supreme Court recognized that the introduction of victim impact evidence in the penalty phase of a capital case is irrelevant to a proper sentencing determination and creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. *See, e.g.*, *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), *partially overruled by Payne v. Tennessee*, 501 U.S. 808 (1991). *Payne*, however, established an equality principle in Eighth Amendment jurisprudence. In overruling, in part, *Booth v. Maryland*, 482 U.S. 496 (1987), the majority of the court held that the exclusion of victim impact evidence "unfairly weighted the scales in a capital trial." *Payne*, 501 U.S. at 809. Just as no capital sentencing can be without the consideration of the defendant as a "uniquely individual human bein[g]," *id.* at 818, the jury "should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.* at 825.

In this instance, the jury was told that victim impact evidence was "introduced to show the financial, emotional, psychological or physical effects of the victim's death

on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment." Trial Tr. vol. 31, 2550. But the jury was also told it could not "have any sympathy" in making its decision. Trial Tech. R. vol. 6, 18. These confusing instructions would lead a reasonable juror to believe that mitigation proof that induces sympathy could not be considered.

The Supreme Court has repeatedly recognized that the Eighth and Fourteenth Amendments require that the jury "in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Mitigation is "the empathy-evoking evidence that attempts to humanize the accused killer in death penalty cases." Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make A Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J.L. & SOC. CHANGE 237, 237 (2008); *see also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (affording significance to the "compassionate or mitigating factors stemming from the diverse frailties of humankind").

The message sent by the court's instructions was that the jury could not consider sympathy in mitigation, but it could consider the devastating impacts of the crimes on the victims.

This failed attempt to compartmentalize the decision-making process allows a death penalty fueled by emotion rather than reason while disturbing the careful balance mandated by *Payne*. Mr. Dotson's rights to due process and to be free from

215

cruel and unusual punishment were violated in this case given that the anti-sympathy instruction misled jurors into believing they could not extend mercy to Mr. Dotson while simultaneously instructing the jury to consider victim impact evidence.

**38.  The state utilized duplicative aggravating circumstances that failed to narrow the class of defendants eligible for the death penalty in violation of Mr. Dotson's due process and Eighth Amendment rights.**

The state alleged two aggravating circumstances at issue in this case. First, the state alleged that Mr. Dotson "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." Tenn. Code Ann. § 39-13-204(i)(3). Second, the state alleged that Mr. Dotson "committed 'mass murder,' which is defined as the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12). These aggravating circumstances impermissibly failed to narrow the class of defendants eligible for the death penalty in violation of the Eighth and Fourteenth Amendments.

"[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). As such, "aggravating circumstance[s] must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

Necessarily, any individual who qualifies for the "mass murder" aggravator also qualifies for the (i)(3) aggravator. Any individual that is convicted of killing three or more individuals ipso facto has "knowingly created a risk of death to two (2) or more persons." The application of these two circumstances to this case permitted a single factual circumstance to create two aggravating circumstances. Regardless of the label of the circumstances, killing more than three individuals is what aggravated the crime. While either circumstance standing alone could likely withstand constitutional scrutiny, the application of the two circumstances together cannot. The act of killing multiple individuals may only rationally aggravate a crime but once. What aggravates a murder is the conduct, not the statutory labels provided by the legislature. As such, the aggravating circumstances did not "circumscribe the class of persons eligible for the death penalty." *Stephens*, 462 U.S. at 878.

In a weighing state like Tennessee, "there is Eighth Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence." *Sochor v. Florida*, 504 U.S. 527, 532 (1992). "Employing an invalid aggravating factor in the weighing process creates the possibility of randomness by placing a thumb [on] death's side of the scale, creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death penalty." *Id.* (cleaned up). As such, Mr. Dotson's death sentences are constitutionally infirm and must be vacated.

217

39. **The trial court violated Mr. Dotson's constitutional rights by denying his motion for disclosure of information regarding the proportionality review of the imposition of the death penalty.**

The trial court's denial of Mr. Dotson's pre-trial motion for data regarding all homicide prosecutions by the State of Tennessee denied him access to the information needed to develop and present proof of the arbitrary nature of the death penalty. Because only the prosecuting attorneys have the information necessary to prove the arbitrary and capricious application of Tennessee's death penalty scheme, Mr. Dotson's due process rights were violated by the trial court's denial of his pre-trial motion. This left Mr. Dotson the options of requesting reports from the administrative office of the courts, which would not include all relevant cases, and/or personally searching court records from each of the 95 county clerk's offices in the state.

As Tennessee Supreme Court Justice Birch expressed in a dissenting opinion, Tennessee's method of proportionality review is unconstitutional:

> In order to meet constitutional requirements, a protocol of capital punishment must provide a meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not. Although comparative proportionality review itself is not constitutionally required, the Tennessee legislature has chosen comparative proportionality review as a means of providing the "meaningful basis" required by the constitution. Unfortunately, the manner in which we conduct our comparative proportionality review fails to accomplish this objective. The review procedures are ineffective for three reasons: the "test" we employ is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the "pool" of cases which are reviewed for proportionality is too small.

*State v. Chalmers*, 28 S.W.3d 913, 923 (Tenn. 2000) (Birch, J., dissenting) (footnote and citations omitted).

218

Excluded from "pool" of proportionality review are cases in which the state, for whatever reason, elected not to seek the death penalty or a jury voted against death: In *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997), the Tennessee Supreme Court recited a non-exhaustive list of factors for appellate courts to consider in conducting a proportionality review of a death sentence. *Id.* at 667. It limited the universe of cases to be compared, holding that "[f]or purposes of comparative proportionality review, we eliminate from the 'universe' and include in the more narrow 'pool' for comparison only those cases in which a capital sentencing hearing was actually conducted[.]" *Id.* at 666.

The constitutional propriety of the rule in *Bland* remained an open question at the time of Mr. Dotson's trial, as demonstrated by the fact that two Tennessee Supreme Court judges concurred in Mr. Dotson's direct appeal to continue to express constitutional concerns regarding this limitation. Without the information that was solely within the possession of the state's prosecuting attorneys, Mr. Dotson was unable to mount a meaningful challenge to Tennessee's proportionality system. The trial court's refusal to compel discovery of such information violated Mr. Dotson's Fourteenth Amendment right to due process of law.

> ### 40. Mr. Dotson's rights to due process and to be free from cruel and unusual punishment were violated by the introduction of victim impact evidence at sentencing.

At the penalty phase of Mr. Dotson's trial, the prosecution presented victim impact evidence from two family members of victims. On direct appeal, he argued that the introduction of any victim impact evidence was improper, as was the jury instruction directing the jury to consider such evidence. The CCA rejected the claim,

noting that Tennessee state law had found no constitutional barriers to the introduction of victim evidence during capital sentencing proceedings. *Dotson*, 2013 WL 4728679, at *75 (citing *State v. Nesbitt*, 978 S.W.2d 872, 899–90 (Tenn. 1998).

The Supreme Court has repeatedly held that "in a state where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment." *Espinosa v. Florida*, 504 U.S. 854, 858 (1992); *see e.g.*, *Sochor v. Florida*, 504 U.S. 326, 337 (1992). Prior to *Payne v. Tennessee*, the Supreme Court recognized that the introduction of victim impact evidence in the penalty phase of a capital case is irrelevant to a proper sentencing determination and creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. *See, e.g.*, *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), *partially overruled by Payne v. Tennessee*, 501 U.S. 808 (1991).

The presentation of victim impact evidence and the instruction for how to consider it created a constitutionally unacceptable risk that the jury would consider an invalid aggravating circumstances and impose the death penalty in an arbitrary and capricious manner. *See* Claim 37, 40. Based on the reasons expressed by the dissenters in *Payne* and more than three decades of experience with the pernicious problems created by "victim impact" evidence, Mr. Dotson urges the courts to revisit and overrule *Payne*.

### 41. Mr. Dotson's three, forty-year consecutive sentences for the three counts of attempted first degree murder are unreasonable and violate due process of law.

The trial court improperly imposed consecutive forty-year sentences, the top of the range, for each of the three attempted first-degree murder convictions. Mr. Dotson's 120-year sentence is to be served consecutive to his six death penalties. Tennessee law requires that "the sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4). At sentencing, Mr. Dotson faced six sentences of death to be served consecutive to each other. These are to be carried out before he could begin serving his 120-year sentence. The trial court's finding that the sentence is necessary to protect the public from further criminal conduct in this instance is without logic. Consecutive sentencing in this case serves no practical purpose.

Moreover, the sentencing hearing was procedurally unreasonable. The trial court permitted the state to present argument but ruled without affording defense counsel an opportunity to respond. Additionally, the trial court failed to consider the proof of non-statutory mitigating circumstances presented during the sentencing hearing as required by Tennessee law. The sentencing hearing and imposition of three consecutive 40-year sentences violates Mr. Dotson's due process rights.

### 42. Mr. Dotson's death sentence is unconstitutional because he is innocent.

The execution of the innocent—such as Mr. Dotson—violates the constitution. *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the

221

execution of a defendant unconstitutional"). Mr. Dotson is actually innocent, and his conviction and death sentence thus violate the Eighth and Fourteenth Amendments. Mr. Dotson was erroneously convicted based on the withholding of evidence, ineffectiveness of trial counsel, prosecutorial misconduct, and other errors and failures that occurred at the trial leading to an erroneous conviction.[52] Even apart from any violation of rights which occurred at trial, the evidence would establish that, as a matter of fact, Jessie Dotson did not commit the offense for which he has been convicted, and that someone else killed the victims. As a result, his conviction and death sentence are unconstitutional, and he is entitled to habeas corpus relief. *Id.* at 417.

### 43. The Tennessee death penalty statutory scheme is unconstitutional.

The Tennessee capital sentencing scheme violates the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because, *inter alia*, (1)

---

[52] All errors set forth in this petition are incorporated herein by reference. Included within this claim of actual innocence is Mr. Dotson's claim of innocence due to incompetence to be put to trial because of mental retardation and organic brain damage. Also included within this claim of actual innocence is Mr. Dotson's claim of innocence of the death penalty. Because Mr. Dotson suffers from cognitive impairments which render him mentally retarded under the Tennessee statute on mental retardation, under the standards for clinical practice set by the American Association on Intellectual and Developmental Disabilities, the American Psychological Association, and the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders, as well as the standards promulgated by the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), Mr. Dotson is actually innocent of the death penalty.

prosecutors have unlimited discretion to decide whether to seek the death penalty, and the standards prosecutors use to determine whether to seek the death penalty vary amongst the judicial circuits resulting in the arbitrary and capricious imposition of the death penalty; (2) the death penalty in Tennessee is imposed disproportionately on poor people; (3) the death qualification process lacks uniform standards for qualifying jurors and results in an unfairly prejudicial conviction-prone jury; (4) the jury is instructed that it must agree unanimously in order to impose a life sentence in violation of *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990); (5) the jury's discretion to consider all possible mitigation, including to exercise mercy, is limited by requiring the jury to impose a sentence of death if it finds the aggravating circumstances outweigh the mitigating circumstances; (6) the statute fails to genuinely narrow those individuals who should be eligible for the death penalty individuals who should be eligible for the death penalty—including, but not limited to, the fact that that (7) the "heinous, atrocious, or cruel" aggravating circumstance is impermissibly vague and overbroad; (8) the language of the "mass murder" aggravating circumstance unnecessarily and prejudicially conjures images of attacks on the scale of terrorism, whereas "multiple murders" captures the same substance and is not unfairly prejudicial; (9) the statute concerning evidence of prior convictions permits the admission of the conviction and, unfairly prejudicially, permits the admission of the facts and circumstances underlying prior murder convictions; (10) the defense is not permitted to offer a rebuttal argument; (11) Tennessee's thirteenth juror rule violates the Sixth

Amendment under *Hurst v. Florida*, 577 U.S. 92, 99 (2016); and (12) the appellate review process in death penalty cases is constitutionally flawed in that proportionality review looks only at cases where death sentenced were upheld and, those courts conducting proportionality review, are unable to meaningfully do so due to the absence of written findings concerning mitigating circumstances.

### 44. Mr. Dotson's capital sentence is disproportionate in violation of the Eighth Amendment guarantee of freedom from cruel and unusual punishment.

A bedrock principle of capital jurisprudence in the United States is the need for procedural protections against "random or arbitrary imposition of the death penalty." *Gregg v. Georgia*, 428 U.S. 153, 206 (1976). Executing an individual is "unlike any other decision citizens and public officials are called upon to make." *Mills v. Maryland*, 486 U.S. 367, 383 (1988). As such, "[e]volving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case." *Id.* at 383–84. Random or arbitrary death sentences may result from different sources, including unfettered prosecutorial discretion in seeking the death penalty, deficient legal presentation, and juror confusion in the sentencing process. In Tennessee, there is troubling evidence of a breakdown in systemic fairness: significant sentencing disparities based on the county in which a capital case is brought, and disparities depending on the defendant's race.

Supreme Court case law recognizes that proportionality review may serve as a constitutionally required check on capital sentencing. Specifically, in upholding Georgia's modified death penalty statute—after previously striking down the death

penalty on a nationwide basis as unconstitutionally arbitrary and capricious—the Court found that Georgia's new "sentencing procedures . . . focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant . . . . In this way the jury's discretion is channeled." *Gregg*, 428 U.S. at 206. In a decision issued the same day, the Court found that a mandatory death penalty statute did not appropriately cabin the unlimited discretion found unconstitutional years earlier, nor did it "allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina¸* 428 U.S. 280, 303 (1976). More recently, the Supreme Court has reaffirmed that "capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (internal quotation marks and citations omitted).

Mr. Dotson does not fit within the narrow category of unredeemable murderers for whom the death penalty is reserved. As described in detail throughout this petition, Mr. Dotson had a traumatic and impoverished upbringing and suffers from neurocognitive disorders, organic brain damage, and severe mental illness, which mitigate the aggravating evidence. *See, e.g.*, Claims 20.13–20.15, 20.17, 22–25. On this basis, his sentence should be set aside.

### 45. Tennessee's methods of execution are unconstitutional.

Tennessee's lethal injection protocol and electric chair protocols violate the Eighth and Fourteenth Amendments and are illegal under state and federal law,

including laws regarding the handling of controlled substances. As a result, Tennessee's execution methods are facially unconstitutional and unconstitutional as applied to Mr. Dotson. This claim is not yet ripe for adjudication because Tennessee does not currently have an execution protocol and there is no imminent execution date. But Mr. Dotson raises the claim to preserve it for future review. *Cf. Stewart v. Martinez-Villareal*, 523 U.S. 637, 645 (1998) (finding competency to be executed claims are not a second or successive application under AEDPA).

### 46.   Mr. Dotson's death sentence violates international law.

Article VI of the United States Constitution provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land," and the United States Supreme Court has recognized as much. *See, e.g., Beard v. Greene*, 523 U.S. 371, 376 (1998) (noting "treaties are recognized by our constitution as the supreme law of the land").

Sentences of death violate the following treaties: the International Covenant of Civil and Political Rights (ICCPR); the International Convention on the Elimination of All Forms of Racial Discrimination; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT); the American Convention on Human Rights; the Convention on the Elimination of All Forms of Discrimination Against Women; and the International Covenant on Economic, Social and Cultural Rights.

Article 1 of the CAT defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him for an act he or a third person has committed or is

suspected of having committed . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." While the same Article excludes "pain or suffering arising only from, inherent in or incidental to lawful sanctions," the lawfulness of sanctions must be determined by reference to international standards. Sentences of death inherently involve the intentional infliction of severe pain or suffering—all the more so when the means of execution carries with it gratuitous pain and suffering, as is the case with lethal injection and firing squads. Further, the time death-sentenced inmates spend on death row—punishment not inherent to the death penalty—constitutes torture, as inmates are subjected to years of uncertainty under dismal physical conditions.

Sentences of death also violate the American Declaration of the Rights and Duties of Man, the Universal Declaration of Human Rights, and customary international law—including but not limited to the right to life; the right to a fair and impartial trial; the right to be presumed innocent until proven guilty according to law; the right to adequate time and resources in which to prepare his defense the right to be free from racial discrimination; the right to be free from gender discrimination; the right to be free from discrimination on the basis of economic status; the right not to be sentenced to death for this crime because it was not sufficiently serious to warrant a sentence of death; and the right to not be executed by lethal injection, because death by lethal injection constitutes cruel, inhumane, and degrading punishment.

The conditions of Mr. Dotson's confinement on death row, including the length of his confinement on death row, constitute torture, or cruel, inhumane or degrading treatment or punishment in violation of his rights under treaties or international compacts or agreements entered into by the United States; under customary international law; under general principles common to the major legal systems of the world, including peremptory norms of *jus cogens*; under the ICCPR; and/or under the CAT.

**47. Mr. Dotson's death sentence violates his fundamental right to life.**

Life without parole was an available sentence for first-degree murder in Tennessee at the time of Mr. Dotson's trial. *Stephenson v. Carlton*, 28 S.W.3d 910, 912 (Tenn. 2000) (noting that Tennessee legislature created the life without parole punishment and that the sentencing option applies to offenses committed after July 1, 1993). Thus, (1) there is no compelling state interest in executing Mr. Dotson; (2) taking his life is not necessary to promote any state interest; and (3) there is a less restrictive means of achieving the state's interests by sentencing him to life without parole instead of killing him. Thus, Mr. Dotson's death sentence violates his Eighth and Fourteenth Amendment Rights.

**48. Mr. Dotson's death sentence is unconstitutional under *Hurst v. Florida*.**

Mr. Dotson's trial judge independently found facts necessary for the imposition of the death sentence via the thirteenth juror rule, violating his Sixth, Eighth, and Fourteenth Amendment rights. *Hurst v. Florida*, 577 U.S. 92 (2016). Following the jury's return of death sentences for Mr. Dotson, the trial court fulfilled his role under

228

Tennessee law as the thirteenth juror. Trial Tr. vol. 31, 2573. Before the final verdict was rendered, the trial judge necessarily found that: (1) the aggravating circumstances had been proven beyond a reasonable doubt, as required by Tenn. Code Ann. § 39-13-204(g)(1)(A); (2) the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, as required by Tenn. Code Ann. § 39-13-204(g)(1)(B); and (3) the jury's verdict was legally sound.

The mandatory duty imposed on Tennessee sentencing judges under the thirteenth juror rule is similar to the Florida law found unconstitutional in *Hurst*. Under Tennessee law, the thirteenth juror rule unconstitutionally requires a sentencing judge to independently make "the critical findings necessary to impose the death penalty." *Id.* at 98. According to state law, a Tennessee trial judge has a "mandatory duty to serve as the thirteenth juror," making certain evidentiary findings before imposing the final judgment. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). In so doing, the judge does not merely consider whether the evidence is constitutionally sufficient, but instead must "weigh the evidence himself as if he were a juror and determine the credibility of the witnesses and the preponderance of the evidence." *State v. Ellis*, 453 S.W.3d 889, 899 (Tenn. 2015) (citation omitted). Such findings are a "necessary prerequisite to the imposition of a valid judgment. *Id.* at 900 (citation omitted).

In death penalty cases, the judge's thirteenth juror findings are necessarily required to impose the death penalty; a defendant is not eligible for death until the trial judge makes such a finding. *Smith v. State*, 357 S.W.3d 322, 339 (Tenn. 2011).

Without such a finding, any judgment imposing the death penalty would be invalid, despite the jury's verdict. *Ellis*, 453 S.W.3d at 900 (explaining that "when a trial court in a criminal case fails to discharge its mandatory duty to act as the thirteenth juror, the sole remedy on appeal is reversal of the defendant's conviction(s) and a new trial").

"Although Tennessee trial judges have a 'mandatory duty to serve as the thirteenth juror in every criminal case,' a judge is not required to provide a specific statement on the record to indicate his or her approval of the jury's verdict." *State v. Hall*, 461 S.W.3d 469, 490 (Tenn. 2015) (quoting *Carter*, 896 SW.2d at 122). In Mr. Dotson's case, the court did not make a specific statement on the record.

Mr. Dotson's death sentences are unconstitutional under *Hurst*.

### 49. The cumulative effect of the errors recited herein render Mr. Dotson's conviction and death sentence unconstitutional.

Mr. Dotson incorporates the averments in all claims in this petition as if set forth fully herein. The cumulative effect of the errors at Mr. Dotson's trial, sentencing hearing, direct appeal, and post-conviction proceedings renders his conviction and death sentence unconstitutional in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) (holding all instances of constitutional error must be viewed "in conjunction" with each other).

50. **AEDPA unconstitutionally suspends the writ of habeas corpus and abridges Mr. Dotson's Fourteenth Amendment rights under the Privileges and Immunities Clause of the Fourteenth Amendment.**

Shortly after the passage of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) passed, the Supreme Court held that the Act was constitutional and that the Act did not violate the habeas corpus clause of the constitution. *Felker v. Turpin*, 518 U.S. 651, 654 (1996). Since then, federal courts' interpretation of the Act has employed a one-way ratchet making relief under the AEDPA illusory. Simply, AEDPA has made the Great Writ a shadow of itself, and federal courts have so constrained the writ to make the constitutional right to habeas corpus nothing more than a hollow promise. *Taylor v. Jordan*, 10 F.4th 625, 645 (6th Cir. 2021*), cert. denied*, 142 S. Ct. 1678 (2022) (en banc) (Moore, J., dissenting) (AEDPA jurisprudence "confirms a largely unspoken truth: the once-great writ of habeas corpus now means nothing."); *Doody v. Ryan*, 649 F.3d 986, 1003 (9th Cir. 2011) (Too many judges prefer to "simply parrot the findings made during the state court proceedings and call it a day. However, if we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ good-bye.").

a. **Judicially created restrictions on the availability of the writ have created a de facto suspension of the writ.**

When the Supreme Court decided *Felker v. Turpin*, AEDPA law was in its infancy. We did not yet understand that § 2254(d)'s reasonableness inquiry was nearly boundless. In the years since then, the reasonableness inquiry has acquired outsized

and atextual requirements. At the time of *Felker*, the court characterized § 2254(d) as merely "a modified res judicata rule" reimposing the doctrine of "abuse of the writ." *Felker*, 518 U.S. at 664. Since then, § 2254(d) has grown to require a petitioner to demonstrate that *no fairminded jurist* could disagree with the state court's resolution of a claim. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Even when a state court does not deign to explain its reasons for denying a claim, a habeas petitioner must do the work of the state courts and show there was no reasonable basis for denying the claim. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). And in 1996, we had no conception that AEDPA would all together prohibit the consideration of new evidence in determining the reasonableness of state court decisions. *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). To the extent relief was even conceivable under these constraints, the court has gone farther, eliminating remaining avenues for relief and superadding atextual requirements. *See, e.g.*, *Shinn v. Ramirez*, 596 U.S. 366, 404 (2022) (rendering relief under *Martinez/Trevino* "dead letters"); *Brown v. Davenport*, 596 U.S. 118, 122 (2022) (holding that in addition to meeting § 2254(d)'s requirements a habeas petitioner must show "'law and justice' require relief"); *Shoop v. Twyford*, 596 U.S. 811, 822 (2022) (requiring a mini-merits determination before conducting basic mitigation investigation). Taken cumulatively, the inescapable conclusion is that the contours of the writ look extremely different than when the Supreme Court first passed judgment on the constitutionality of AEDPA.

A central part of *Felker*'s reasoning, of course, was the existence of the Supreme Court's authority to grant an original writ of habeas corpus. *Felker*, 518 U.S. at 661. But the last time the Supreme Court granted habeas relief to an original habeas petitioner was 1925. Lee Kovarsky, Original Habeas Redux, 97 Va. L. Rev. 61, 62 (2011). The court had gone more than 50 years without even entertaining an original habeas petition. *In re Davis*, 557 U.S. 952, 952 (2009); *Chaapel v. Cochran*, 369 U.S. 869 (1962); *see also* Kovarsky, *Original Habeas Redux*, *supra*, at 62. Respectfully, the theoretical, remote possibility of relief for all intents and purposes suspends the writ.

These doctrines denigrate the writ. If there was ever a "second-class right" it now appears to be the Great Writ. *See McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 780 (2010). AEDPA's treatment of the right to habeas corpus can only endure if we subject that right to an "entirely different body of rules" than other constitutional protections. *Id.* Once, "there [was] no higher duty than to maintain [the writ] unimpaired." *Fay v. Noia*, 372 U.S. 391, 400 (1963). Today, we cast aside what Blackstone referred "as the most celebrated writ in the English law" for the thin gruel of AEDPA jurisprudence. William Blackstone, 3 Commentaries on the Law of England 129 (1769).

The habeas corpus clause unambiguously states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." [53] U.S. Const., art. I, sec. 9, cl. 2. The notion

---

[53] The clause itself presupposes that a writ of habeas corpus exists and should operate unencumbered absent rebellion or invasion. Necessarily, this means there is judicial power to grant the writ.

that these protections are not abridged merely because of a tenuous, theoretical possibility that the stars may align, and relief will be granted is a constitutional anathema. Surely, some judges will respond that all that has happened here is that Congress has created a difficult standard that is hard to meet because "it was meant to be."[54] *Richter*, 562 U.S. at 102. But we can point to no other constitutional

---

[54] Furthermore, the newest afront to the Great Writ is the notion that habeas relief has traditionally been limited to "jurisdictional" errors in criminal judgements. *See, e.g.*, *Edwards v. Vannoy*, 141 S. Ct. 1547, 1567 (2021) (Gorsuch, J., concurring). But "[t]he notion that, at English common law, there was some jurisdictional barrier to using habeas for post-conviction review is one of the most pervasive falsehoods in the habeas literature." Lee Kovarsky, *A Constitutional Theory of Habeas Power*, 99 Va. L. Rev. 753, 768–69 (2013). Indeed, a cursory examination of common law cases demonstrates that courts routinely looked beyond the return of the writ and considered evidence outside the return of the writ. *See, e.g.*, KB 21/4/72 *Queen v. Stainforth*, 11 Q.R. 75, 76 (Q.B. 1611) 116 Eng. Rep. 404 ("In respect of such an instrument the ordinary maxim for construing in favour of validity may well be applied; the ordinary power of *proving by extrinsic evidence essential to facts not expressed in writing may be exercised*.") (emphasis added). *See also*, *Ex Parte Beeching*, 107 Eng. Rep. 1010, 1010 (K.B. 1825); *Case of the Hottentot Venus*, 104 Eng. Rep. 344, 345 (K.B. 1810); *R. v. Winton*, 101 Eng. Rep 51, 51–52 (K.B. 1792); *Goldswain's Case*, 96 Eng. Rep. 711, 712 (K.B. 1778); *R. v. Delaval*, 97 Eng. Rep. 913, 913–14 (K.B. 1763); *Good's Case*, 96 Eng. Rep. 137, 137 (K.B. 1760); *R. v. Schiever*, 97 Eng. Rep. 551, 551–52 (K.B 1759); *R. v. Turlington*, 97 Eng. Rep. 741, 741 (K.B. 1758); *Crisp's Case*, 94 Eng. Rep. 495, 495 (K.B. 1744). Early American cases continued this practice. *See, e.g., Ex parte Bollman*, 8 U.S. 75, 78–79 (1807) (requiring the court to make an inquiry "*regarding the nature and circumstances of the offence and of the evidence*." *United States v. Hamilton*, 3 U.S. 17, 17–18 (1795) ("examin[ing] the affidavits produced against the prisoner, to show, that although he attended at several meetings of the insurgents, his deportment, upon those occasions, was calculated to restore order and submission to the laws: and he added the affidavits of several of the most respectable inhabitants of the western counties, in testimony of the propriety of the prisoner's conduct throughout the insurrection."); *Ex parte Randolph*, 20 F. Cas. 242, 242 (C.C.D. Va. 1833) (Marshall, C.J. on circuit) (taking evidence to refute accuracy of the writ). The Supreme Court's own jurisprudence rejects the notion that habeas relief was limited to jurisdictional defects. *Fay v. Noia*, 372 U.S. 391, 404 (1963) (overruled on other grounds) ("Nor is it true that at common law habeas corpus was available only to inquire into the jurisdiction, in a narrow sense, of the committing court.").

protection that tolerates repeated infringement by whittling basic rights to a shell of themselves. *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) ("We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need."); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 225 (1963) ("[I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment.").

One need not look far to see the ways that AEDPA is palpably unjust and permits the continued detention of prisoners in violation of their constitution rights. *See, e.g., Taylor v. Jordan*, 10 F.4th 625, 661 (6th Cir. 2021) (en banc) (Griffin, J., dissenting), *cert. denied*, 142 S. Ct. 1678 (2022) (denying habeas relief in a case that was "*Batson v. Kentucky* revisited" and involved the *same prosecutors* and behavior found unconstitutional in *Batson*); *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1273 (11th Cir. 2012) (denying habeas relief to a petitioner whose trial counsel admitted to drinking a quart[55] of vodka each night during his representation of the petitioner including during trial); *see also*. Marc Bookman, *This Man's Alcoholic Lawyer Botched His Case. Georgia Executed Him Anyway* Mother Jones, https://www.motherjones.com/politics/2014/04/alcoholic-lawyer-botched-robert-

---

[55] Many of us are unaccustomed to quantifying alcohol by the quart. A quart of vodka is approximately 21 shots of alcohol. *See Frequently Asked Questions*, Centers for Disease Control and Prevention, https://www.cdc.gov/alcohol/faqs.htm#:~:text=1 .5%20ounces%20or%20a%20%E2%80%9Cshot,rum%2C%20vodka%2C%20whiskey). (last visited Jan. 25, 2024).

wayne-holsey-death-penalty-trial; *Freeney v. Stephens*, No. 4:14-CV-373, 2016 WL 320768, at \*10 (S.D. Tex. Jan. 27, 2016) (applying AEDPA deference to adjudications that were verbatim adoptions of the prosecution's brief, including typos); *see also* Jordan M. Steiker et. al., *The Problem of "Rubber-Stamping" in State Capital Habeas Proceedings: A Harris County Case Study*, 55 Hous. L. Rev. 889, 908 (2018); *Frye v. Lee*, 235 F.3d 897, 907 (4th Cir. 2000) (denying habeas relief to a petitioner whose trial counsel had a "decades-long" drinking problem). AEDPA purports to be reserved to "guard against extreme malfunctions in the state criminal justice systems," *Richter*, 562 U.S. at 102, but somehow AEDPA steadfastly denies relief even when these egregious practices are exposed.

As a product of the judiciary's one-way ratchet, AEDPA is now "an aimless and chaotic exercise in futility." *Jones v. Hendrix*, 599 U.S. 465, 530 (2023) (Jackson, J., dissenting). Instead of the Great Writ being "inextricably intertwined with the growth of fundamental rights of personal liberty," *Noia*, 372 U.S. at 401, it now stands as an impenetrable fortress "replete with imagined artificial barriers, arbitrary dead ends, and traps for the unwary." *Jones*, 599 U.S. at 530. As such, AEDPA effectively suspends the writ of habeas corpus and cannot stand.

> **b.    AEDPA violates the Fourteenth Amendment's Privileges and Immunities Clause.**

For more than 150 years, the Supreme Court has interpreted the privileges and immunities clause of the Fourteenth Amendment "to include only those rights 'which owe their existence to the Federal government, its National character, its Constitution, or its laws.'" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 808 (2010)

(Thomas, J., concurring) (quoting *Slaughter-House Cases*, 83 U.S. 36, 79 (1872)). Among the rights "guaranteed by the Federal Constitution" is "the privilege of the writ of habeas corpus." *Slaughter-House Cases*, 83 U.S. at 79. Although widely derided as too "narrowly" defining the scope of rights, the *Slaughter-House Cases* make clear that a limited set of rights—expressly including the writ of habeas corpus—were incorporated by the Privileges and Immunities clause. *McDonald*, 561 U.S. at 808, 813 ("At the time of Reconstruction, the terms 'privileges' and 'immunities' had an established meaning as synonyms for 'rights.'"). Prior to the enactment of the Fourteenth Amendment, the writ of habeas corpus was a right of national citizenship. *Ex parte Dorr*, 44 U.S. 103, 105 (1845). The Privileges and Immunities clause—even under the strained logic of the *Slaughter-House Cases*—incorporated and extended the federal privilege (right) of habeas corpus to individuals held in state custody.[56] Lee Kovarsky, *Prisoners and Habeas Privileges Under the Fourteenth Amendment*, 67 Vand. L. Rev. 609, 622–25 (2014).

Significantly, the framers of the Fourteenth Amendment viewed the writ of habeas corpus as playing a crucial role in Reconstruction and the Reconstruction

---

[56] Subsequent caselaw further narrowed the rights available under the penumbra of the Privileges and Immunities clause. In *United States v. Cruikshank*, 92 U.S. 542, (1875) (involving formerly enslaved individuals), for example, the court held that "the right to peaceably assemble codified in the First Amendment was not a privilege of United States citizenship because '[t]he right . . . existed long *before* the adoption of the Constitution." *McDonald*, 561 U.S. at 809 (quoting *Cruikshank*, 92 U.S. at 551). But *Cruikshank* does not mention habeas corpus and its ruling is therefore cabined to the question of whether the Privileges and Immunities clause incorporated the right to peaceably assemble and seek redress of grievance.

Congress used its new authority under the Fourteenth Amendment to expand the habeas corpus jurisdiction of the federal courts. The Habeas Corpus Act of 1867 transformed and significantly expanded the scope of habeas corpus relief. Habeas Corpus Act, sess. ii, ch. 28, 14 Stat. 385 (1867). This Act vastly grew the federal courts' authority and expressly permitted federal courts to issue a writ of habeas corpus to a prisoner held in state custody. Considering the United States Supreme Court had previously interpreted the constitutional habeas corpus protection to apply only to prisoners in federal custody, the passage of the Act necessarily relied on previously unavailable constitutional authority in order to reach prisoners in state custody.

This reality has consequences for AEDPA. Because the right for state prisoners to seek habeas relief is constitutionally protected, restrictions on the writ must pass constitutional muster. Heretofore, AEDPA's constitutionality has only been challenged through the lens of the suspension clause. But given the reality that the right to habeas relief is protected by the Fourteenth Amendment, AEDPA's restrictions burden the exercise of a constitutional right. The Great Writ "cuts through all forms and goes to the very tissue of the structure." *Frank v. Mangum*, 237 U.S. 309, 346 (1915). This can hardly be said of AEDPA, which is perhaps more aptly described as a "Byzantine morass of arbitrary, unnecessary, and unjustifiable impediments." *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting).

We allow no other constitutional right to be degraded to the extent that AEDPA insults the Great Writ. As such, Mr. Dotson's Fourteenth Amendment right to habeas

corpus is violated by AEDPA and his petition should be considered free from the unconstitutional impediments of AEDPA.

## IX.   Conclusion

All claims in this petition are rooted in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, unless specified otherwise.

Mr. Dotson did not commit the crimes for which he is on death row. For all of the foregoing reason we pray the Court will grant the following relief:

1.    Order Respondent to file the record of state court proceedings with this Court.

2.    Enter a Scheduling Order for the filing of Discovery Motions followed by a time for filing an amended petition.

3.    Order an evidentiary hearing for Mr. Dotson's procedural defenses (i.e., fundamental miscarriage of justice, cause and prejudice, actual innocence), as well as an evidentiary hearing on the merits of his claims.

4.    Issue a writ of habeas corpus setting aside Mr. Dotson's unconstitutional convictions and sentences.

5.    Any other relief as law and justice require.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER FOR
THE MIDDLE DISTRICT OF TENNESSEE
CAPITAL HABEAS UNIT

KELLEY J. HENRY
Supervisory Asst. Federal Public Defender

Katherine M. Dix
Marshall A. Jensen
Asst. Federal Public Defenders
810 Broadway, Suite 200
Nashville, TN 37203
Phone:  (615) 736-5047
Fax:      (615) 736-5265
Email:   kelley_henry@fd.org

*/s/Kelley J. Henry*
Counsel for Petitioner

## VERIFICATION

I declare under penalty of perjury that the forgoing is true and correct.

*/s/Kelley J. Henry*
Counsel for Petitioner[57]

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served on counsel for Respondent, Deputy Attorney General Courtney Orr, at the Office of the Tennessee Attorney General, P.O. Box 20207, Nashville, Tennessee 37202 by United States Mail, postage pre-paid, on this the 26th day of January, 2024.

*/s/ Kelley J. Henry*
Date of Service: January 26, 2024

---

[57] The facts alleged in this petition are based on investigation, record review, and counsel's experience. Mr. Dotson is not in a position to verify the facts or law in the Petition because he is incarcerated, untrained in the law, and suffers from neurocognitive deficits. This petition was prepared by counsel pursuant to counsel's obligations under *Martel v. Clair*, 565 U.S. 648 (2012), *McFarland v. Scott*, 512 U.S. 849 (1994), 28 U.S.C. § 3599, this Court's Order of Appointment of Counsel, and the ABA Guidelines. As investigation and discovery continues, counsel will seek to amend the petition as appropriate.